**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**FREDERICK A. MUNDT,**

        **Petitioner,**          **Case No.  2:17-cv-773**
                                  **JUDGE MICHAEL R. BARRETT**
**v.**                           **Magistrate Judge Stephanie K. Bowman**

**CHARLOTTE JENKINS, Warden,**

        **Respondent.**

<u>**REPORT AND RECOMMENDATIONS**</u>

Petitioner, Frederick A. Mundt, a prisoner sentenced to death by the State of Ohio, has before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254.  This matter is before the Court upon Mundt's Petition for Writ of Habeas Corpus (ECF No. 63), the Respondent Warden's Return of Writ (ECF No. 21), the Appendix to the Return of Writ (ECF Nos. 7, 8, 10, 15, 16, 17, and 20), Mundt's Traverse (ECF No. 27), and Response to Show Cause Order and Submission of Additional Authority (ECF No. 61).

**I.  Overview**

These proceedings began on September 1, 2017, when Petitioner Mundt filed a Motion for Leave to Proceed In Forma Pauperis, a Notice of Intention to File a Habeas Corpus Petition, and a Motion for Appointment of Counsel.  (ECF Nos. 1 and 2.)  He filed his Petition on June 21, 2018.  (ECF No. 18.)  Pursuant to the Undersigned's April 12, 2023, Order (ECF No. 62), Mundt refiled his Petition on April 13, 2023 (ECF No. 63), which is now the operative petition. Mundt's motions for discovery and to expand the record were denied (ECF No. 44), and following Mundt's voluntary dismissal of his motion for relief from judgment under Ohio's new

standards for determining whether a capital defendant is exempt from the death penalty due to intellectual disability (ECF Nos. 46 and 53), this case is now decisional.

## II. Factual and Procedural History

### A. Facts

The details of this capital murder are set forth in numerous state court opinions, including the Ohio Supreme Court's published opinion in *State v. Mundt*, 115 Ohio St. 3d 22 (2007); (ECF No. 7-5, PageID 2372.)

{¶ 1} On March 9, 2004, seven-year-old Brittany Hendrickson disappeared from her home in Noble County. The next day, searchers found Brittany's raped, battered body hidden in a nearby abandoned well. Appellant, Frederick A. Mundt, was convicted of the aggravated murder of Brittany and sentenced to death.

{¶ 2} The evidence at Mundt's trial revealed that Brittany's mother, Misty Hendrickson, became acquainted with Mundt in 1999. She and her daughters, Brittany and L----, soon moved into Mundt's house in Lower Salem, Noble County. In 2004, Mundt and Hendrickson lived there with Brittany and L---- and their infant son, S--- M----. Mundt's mother, Sarah Mundt, lived nearby with her boyfriend Tim Bowman and their adult daughters, Mundt's half-sisters, Timica, Teresa, and Mary Anne Bowman.

{¶ 3} During the late morning or early afternoon of March 9, 2004, Mundt visited the Biolife Plasma Services Plasma Center in Parkersburg, West Virginia to sell his blood plasma.

{¶ 4} March 9, 2004, was a school day for Brittany Hendrickson. The school bus brought her home that day around 4:10 p.m., and her bus driver saw her go inside the house.

{¶ 5} Five or ten minutes later, Mundt's stepfather, Tim Bowman, arrived. Bowman and Sarah, along with their daughter Mary Anne and her date, had plans to play bingo that night in Woodsfield, Ohio. Bowman came to invite Hendrickson to join them. After checking with Mundt, Hendrickson accepted. Bowman was at Mundt's house for five to ten minutes; during that time, he saw Brittany and L---- at play.

{¶ 6} Hendrickson fed her daughters about 4:45 p.m. Half an hour later,

2

Bowman arrived at Mundt's house to pick Hendrickson up.

{¶ 7} Hendrickson said goodbye and "told the kids to go upstairs with their dad [Mundt] when they [were] done eating." Although Bowman did not enter the house, he recalled hearing Hendrickson telling the girls to eat dinner and go upstairs.

{¶ 8} Around 8:00 p.m., Mundt arrived at the Bowman residence with L--- and S---. Timica and Teresa Bowman were present. Mundt asked Timica if Brittany was there and said, "[S]he ain't up home, and I have to find her." Leaving the children with Teresa, Mundt and Timica drove to Woodsfield.

{¶ 9} They arrived at the bingo hall around 8:30 p.m. Mundt approached Hendrickson and asked if Brittany was with her. Hendrickson replied, "No, I left her there with you." She got up, grabbed her coat, and left with Mundt and Timica. The three then drove back to Mundt's house. At 9:18 p.m., Hendrickson called the Monroe County Sheriff's Office to report Brittany missing. Officers immediately began to search for Brittany, a search that lasted into the next day.

{¶ 10} On March 10, a civilian volunteer taking part in the search noticed a sheet of tin covering the opening of an old well on property near Mundt's house. Moving the tin revealed a chunk of concrete wedged into the opening of the well. The surface of the well water was visible around the sides of the concrete chunk. The volunteer looked into the well and saw a pair of green shoes floating amid some debris. The volunteer reported his find and led sheriff's deputies to the well.

{¶ 11} The deputies recovered one of the shoes and brought it to Hendrickson, who identified it as Brittany's. Other officers removed the chunk of concrete and recovered Brittany's body from the well.

{¶ 12} Shortly after the officers recovered her body, Agents Gary Wilgus and William Hatfield of the Bureau of Criminal Identification and Investigation ("BCI") arrived at the crime scene. Wilgus noted numerous abrasions and contusions on Brittany's head. Her jeans were undone, and the leg bottoms partly covered her feet.

{¶ 13} Hatfield found bloodstains and hairs on the chunk of concrete from the well. Hatfield later weighed and measured the chunk; it was 36 inches long and 14 inches wide at its widest point and weighed 254 pounds.

{¶ 14} According to Hendrickson, Mundt stated on the morning of March 10 that "they will probably pin this on him * * * because he was supposed to be the last one to see her."

3

{¶ 15} Detective Sergeant Mark Warden and Lieutenant Seevers of the Washington County Sheriff's Office interviewed Mundt after Brittany's body was found. Mundt asked whether a condemned prisoner could "choose between lethal injection and the gas chamber." Warden then informed Mundt that Brittany's body had been found and that Warden "felt he was responsible for [her] death." Mundt denied it.

{¶ 16} Warden noted that Mundt's forearms were scratched. Mundt claimed that the family dog had knocked him down some steps while he was looking for Brittany. When Warden expressed disbelief, Mundt merely hung his head. Biolife Plasma Services personnel later testified that Mundt did not have those scratches on his arm when he sold plasma on the morning of March 9.

{¶ 17} Seevers asked Mundt whether Brittany could have been sexually assaulted. Mundt first said no, then asked, "Well, how would I know?" The officers then took a DNA swab and collected other trace evidence from Mundt's person. As Warden was cataloguing these items, Mundt asked: "Do you think I should die?" Warden replied, "Well, do you think you should be put to death?" Mundt said, "Yes."

{¶ 18} Dr. P.S.S. Sreenivasa Murthy, a pathologist and deputy coroner for Stark and Wayne Counties, conducted an autopsy on Brittany, assisted by Dr. Anthony Bertin, a urologist, who examined Brittany's genitalia.

{¶ 19} Dr. Murthy found that Brittany had extensive blunt-force head injuries. These included multiple lacerations and bruises, a skull fracture, and hemorrhaging and contusions of the brain. She also had blunt-force injuries to her trunk and extremities.

{¶ 20} Brittany's lungs were hyperinflated and contained excess fluid, leading Dr. Murthy to conclude that she had drowned in the well. But because Brittany was 47 inches tall while the water in the well was only 30 to 36 inches deep, Murthy concluded that Brittany's injuries had left her unable to stand up. Murthy also concluded that given the severity of her injuries, Brittany would have died within 10 to 15 minutes. Thus, Murthy concluded that she died both of drowning and of her multiple blunt-force injuries.

{¶ 21} Dr. Bertin, the urologist, observed that Brittany's panties were soaked with blood. Her vaginal opening was "imploded," as if a large object had been forced into it. Her vaginal walls had been "ripped apart," with deep, full-length lacerations on both sides. In Dr. Bertin's opinion, a rigid object, approximately two and one-half inches in diameter, had been forced up Brittany's vaginal canal with "considerable force."

4

{¶ 22} Diane Larson, a BCI forensic scientist, examined numerous evidentiary items. Those yielding significant DNA evidence included vaginal swabs taken during Brittany's autopsy, fabric cut from the crotch of Brittany's panties, a bloodstained bedsheet found on the bed in Mundt's master bedroom, and a bloodstained shirt found in Mundt's bathroom and identified as his.

{¶ 23} Larson found sperm cells on the vaginal swabs and on Brittany's panties. She identified a mixture of two DNA profiles on the sperm fraction of the vaginal swabs. One of the mixed profiles was consistent with Mundt; the other was consistent with Brittany. The proportion of the population that could not be excluded as a possible contributor to that mixture was one in 203,800.

{¶ 24} On the panties, Larson identified "two clean separate DNA profiles." The major profile, or largest amount, came from sperm and was consistent with Mundt's DNA. The expected frequency of the major profile was one in approximately 39 quadrillion, 350 trillion persons. The minor profile was consistent with Brittany's DNA.

{¶ 25} On the bedsheet, DNA testing showed a mixture of two DNA profiles. The major profile was consistent with Mundt's DNA; the minor profile was consistent with Brittany's. The expected frequency of the minor profile was one in 146 million persons.

{¶ 26} Mark Losko, another forensic scientist at BCI, testified that testing on Mundt's shirt revealed a mixture of two DNA profiles. The major profile was consistent with Brittany's DNA. The expected frequency of that profile was one in 4.7 quadrillion persons. The minor profile was consistent with Mundt's DNA.

{¶ 27} After Mundt's arrest, his half-brother, Johnny Mundt, visited him in jail. Johnny testified that he asked Mundt "if he done it." Mundt admitted that he had raped Brittany. Then he asked Johnny "if I can get the stuff out of the house." Mundt told Johnny that "the stuff" was behind the stereo. Johnny agreed to remove it.

{¶ 28} On April 24 and 25, 2004, while Mundt was incarcerated in the county jail, he had several telephone conversations with Johnny. In these conversations, Mundt repeatedly urged Johnny to remove and destroy certain "stuff" or "trash" located in the wall behind the stereo in Mundt's house. The sheriff's office recorded these conversations, and the state introduced them at trial.

{¶ 29} These recordings convey Mundt's sense of urgency and concern for secrecy because he continually expressed his anxiety about when Johnny was

going to burn the "trash" and whether he had burned "all of it." He warned Johnny that their conversation was being taped and reminded him several times not to let their mother see him burning the "trash."

{¶ 30} On April 24, Mundt asked Johnny: "Hey, did you get all that stuff out of there where the radio is? * * * Would you be able to get that out?"

{¶ 31} Mundt continued:

{¶ 32} "You going to burn that stuff? * * * Well, make sure Mom ain't down there when you get burning that. * * * I really – really hope you can do that for me."

{¶ 33} "You, uh, sure you can get that stuff out of there? * * * I'm really a-hoping. * * * 'Cause I'm really wanting that stuff out of there. You hear? * * * Make sure you get it all."

{¶ 34} "Yeah, I hope you do that, take – take that trash out. Out – out back of the stereo. I really need to get that out of the house. You hear? * * * Back behind the stereo, yeah. Where the wall's at? * * * Down in there * * * You going to burn all that? * * * That would do me a lot of good."

{¶ 35} On the following day, Mundt talked to Johnny three more times. In the first of these conversations, Mundt asked: "Did you get all that trash burnt?" Mundt explained that the "trash" was hidden in the wall to the left of the stereo "where the insulation [was] moved," approximately two feet away from the drywall. He instructed Johnny to "find all that trash" and "get rid of that for me and burn it. * * * Don't have Ma and them up there." He also warned Johnny that "[t]his telephone's taped."

{¶ 36} In their second conversation on April 25, Mundt pressed Johnny: "Did you get it? * * * Did you get all of it? * * * Make sure you burn all that trash. * * * Mom and them can't see that."

{¶ 37} In his third April 25 conversation with Johnny, Mundt again asked: "Did you make sure that other trash is burnt?" He told Johnny to "make sure that burns up nice and good. * * * Make sure there ain't nothing left of it. * * * 'Cause they be up there looking through that next." Johnny said, "They're done up there, they ain't gonna go back up there." Mundt replied, "Don't bet on it."

{¶ 38} According to Johnny, he eventually found "a little hole" in the corner of a room in Mundt's house. In that hole, Johnny found a pair of boxer shorts, a T-shirt, a pair of girl's socks, and a pillowcase, each spattered with blood. Johnny put these items into a box and hid the box in another part of the

6

house.  The next day, he took the box home and burned it with the bloodstained items inside.

{¶ 39} On April 26, Mundt talked to Sarah Mundt from jail.  The sheriff's office recorded this conversation.  Sarah mentioned that Johnny had been burning things the night before, including a box.  Mundt had his mother describe the box, then asked:  "He burn it?"  Mundt pressed Sarah for details:  "Did you go up with him last night? * * * Did he pour gas on all that trash? * * * Did it burn?"

{¶ 40} On May 3, 2004, police searched Mundt's house again.  In a second-floor room, between a floor joist and the exterior wall, they found the space where Mundt had hidden the bloodstained items.

{¶ 41} Police cut out a section of the floor joist from the hiding place. The joist tested positive for blood.  Mark Losko, the BCI forensic scientist, found a mixture of two DNA profiles on the joist.  The major contributor's DNA profile was consistent with Brittany's and would be found in one of 4.7 quadrillion persons.  The minor contributor's DNA profile was consistent with Mundt's and would be found in one of 139 persons.

{¶ 42} On June 19, Mundt had yet another phone conversation with his mother from jail, and this too was recorded by the sheriff's office.  Mundt urged his mother to remove his weights from his house.  "You need to get those weights out of there * * * They'll use that against me. * * * They'll try to say that I lifted those things down there.[] * * * Well, at least take some of the weights off the weight bench. * * * Did you take any weights off it?"

Verdict and Sentence

{¶ 43} At trial, the jury found Mundt guilty of four counts of aggravated murder, each with four death specifications; two counts of rape, R.C. 2907.02(A)(1)(b) and (A)(2); and one count of kidnapping.

{¶ 44} Before the penalty phase, the trial court merged the four aggravated-murder counts into a single count of aggravated murder under R.C. 2903.01(C) (murder of a child under 13) and merged the four specifications into two:  murder to escape detection, apprehension, trial, or punishment for another offense, R.C. 2929.04(A)(3), and murder committed during a kidnapping, R.C. 2929.04(A)(7).

{¶ 45} The jury recommended that Mundt be sentenced to death for his aggravated-murder conviction.  The trial judge sentenced Mundt to death.  Mundt appeals his convictions and death sentence to this court as of right.

7

*State v. Mundt*, 115 Ohio St. 3d 22; (ECF No. 7-5, PageID 2372–79.)

### B.     Trial Proceedings

Mundt was indicted in Noble County, Ohio on March 22, 2004.  (ECF No. 7-1, PageID 68.)  Mundt was charged with four counts of aggravated murder, each of which contained five death penalty specifications; two counts of rape; and one count of kidnapping.  (*Id*. at PageID 68–85.)  Mundt was represented by lead counsel Jack A. Blakeslee and co-counsel Andrew J. Warhola, Jr.  (*Id*. at PageID 126, 155.)

Following a period of pretrial motions that included motions to suppress, to remove the death penalty as a sentencing option due to alleged intellectual disability, and for a change of venue, Mundt's jury trial commenced on November 8, 2004.  (ECF No. 8-3, PageID 6887.)  Mundt was convicted on December 3, 2004.  (ECF No. 7-4, PageID 1623.)  The penalty phase began on December 7, 2004.  (ECF No. 8-15, PageID 12264.)  On December 10, 2004, the jury recommended that Mundt be sentenced to death.  (ECF No. 7-4, PageID 1741.)  And on December 16, 2004, the trial court accepted the jury's recommendation and sentenced Mundt to death.  (*Id*. at PageID 1748.)  The trial court issued a written Sentencing Opinion, as required by Ohio Rev. Code § 2929.03(F).  (*Id*. at PageID 1753.)

### C.     Direct Appeal

Represented by new counsel, Assistant State Public Defenders Richard J. Vickers and Linda E. Prucha, Mundt pursued a direct appeal of right to the Supreme Court of Ohio.  (ECF No. 7-5, PageID 1829.)  In a Merit Brief filed on December 30, 2005, Mundt raised the following propositions of law:

<u>Proposition of Law No. I</u>:  The accused's right to effective assistance of counsel is violated when counsel's performance is deficient and the accused is thereby prejudiced.  U.S. Const. Amends. VI, XIV; Ohio Const. Art I, § 10.

Ineffective Assistance of Counsel During Voir Dire

> The juror questionnaire responses of Juror Julie Watson indicated her bias against Appellant.  Counsel unreasonably failed to challenge her for cause based on those responses.  During voir dire, counsel failed to ask any questions of this facially biased juror regarding her questionnaire responses.

> Appellant Mundt's trial counsel sounded like a prosecutor during voir dire.

> Defense counsel failed to challenge Juror Gaydosik for cause.

Ineffective Assistance During the Trial Phase

> Counsel failed to move in limine or to timely object to prejudicial victim impact testimony.

>> Dr. P.S.S. Murthy.
>> Dr. Anthony Bertin.

> Counsel unreasonably failed to obtain necessary expert assistance at the trial phase.

> Counsel failed to object to the prosecutor's misconduct during closing argument.

The Errors and Omissions of Defense Counsel at the Penalty Phase of Appellant Mundt's Capital Trial Prejudiced Appellant.

> The trial phase theory—guilty of rape but not murder.

> In a total reversal of theories the penalty phase defense presented the jury with appellant's horrific admissions at to Brittany Hendrickson's murder.

>> Defense witness Marsha Heiden—the mitigation specialist.
>> Daniel J. Selmon (pharmacist).
>> Dr. Ali Melhem (community mental health psychiatrist).
>> Timothy Bowman (community health outpatient therapist).
>> Dr. Sandra McPherson (psychologist).

9

The prosecution fully capitalized on the damaging testimony of defense witnesses Heiden and McPherson in closing argument.

Defense counsel's closing argument did more harm than good.

Defense counsel failed to present available mitigating evidence that was worthy of weight and effect.

>Robert Willis (special education supervisor).
>Dr. Connie Brady (school psychologist).
>Jeffrey Stevens (former special education teacher).

Defense counsel's unreasonable failure to present the available, compelling[] testimony of Robert Willis, Dr. Connie Brady and Jeffrey Stevens deprived Mundt's sentencing jury of mitigating evidence worthy of weight and effect.

Proposition of Law No. II: The service of a juror at the penalty phase who is biased in favor of the death penalty violates a capital defendant's right to due process. U.S. Const. Amend. XIV; Ohio Const. Art. I, § 16. (Julie Watson)

Proposition of Law No. III: A capital defendant is denied his substantive and procedural due process rights to a fair trial when a prosecutor commits acts of misconduct during the trial and the sentencing phases of his capital trial. He is also denied his right to reliable sentencing. U.S. Const. Amends. VIII, XIV; Ohio Const. Art. I, §§ 9, 16.

A.    Introduction.

B.    Trial Phase.

B.1.    Victim impact.

The prosecution introduced various types of prejudicial victim impact evidence through witnesses.

The prosecution utilized victim impact evidence to strengthen its case that appellant murdered Brittany Hendrickson.

Prosecutorial misconduct during closing trial phase argument.

10

<u>Proposition of Law No. IV</u>: The admission of victim impact evidence at appellant Mundt's trial deprived him of a fair trial and due process. U.S. Const. Amend. XIV; Ohio Const. Art. I, § 16.

The character of the victim and the impact of her death on the family.

Inflammatory testimony.

The autopsy.

<u>Proposition of Law No. V</u>: A defendant's right to a reliable capital sentencing hearing is violated when the trial court fails to properly instruct the jury at the penalty phase. U.S. Const. Amends. VI, VIII, XIV; Ohio Const. Art. I, §§ 9, 16.

<u>Proposition of Law No. VI</u>: Where inflammatory, repetitive evidence is admitted into evidence, a capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence. U.S. Const. Amends. VIII, XIV; Ohio Const. Art. I, §§ 10, 16.

William Hatfield (BCI special agent).
Gary Wilgus (BCI agent).
Dr. P.S.S. Murthy (chief deputy coroner).
Dr. Anthony Bertin (urologist).
Stephen Hannum (detective).

<u>Proposition of Law No. VII</u>: Instructing a jury on O.R.C. § 2905.01(C) mitigating factor when a defendant does not raise this affirmative defense violates a capital defendant's right to a fair trial and a[n] impartial jury. U.S. Const. Amends. VI, XIV; Ohio Const. Art. I, §§ 5, 10, 16.

<u>Proposition of Law No. VIII</u>: A jury instruction that shifts the burden of proof on the *mens rea* element of any offense to the accused, or reduces the state's burden of proof violates the due process clause of the Fourteenth Amendment to the United States Constitution. (causation and foreseeability)

<u>Proposition of Law No. IX</u>: The sentence of death imposed on the appellant was unreliable and inappropriate. The death sentence in his case violates U.S. Const. Amends. VIII and XIV; Ohio Const. Art. I, §§ 9 and 16; and Ohio Rev. Code § 2929.05.

1.      Mitigation evidence.

2.      History, character and background.

11

> A childhood of chaos, abuse, and neglect.
> Developmentally handicapped in school.
> Physical and mental disorders.

3.      Lack of criminal history.

4.      Other evidence relevant to sentencing.

<u>Proposition of Law No. X</u>:   The capital defendant's right against cruel and unusual punishment and his right to due process are violated when[] the legal issue of relevance is left to the jury regarding sentencing considerations, and, the sentencing proceeding creates an unacceptable risk of arbitrary, nonstatutory aggravators in the weighing process.  U.S. Const. Amends. VIII, XIV.  (vague instruction on what trial phase evidence was relevant at the sentencing phase)

<u>Proposition of Law No. XI</u>:  Ohio's death penalty law is unconstitutional.  Ohio Rev. Code Ann. §§ 2903.01, O.R.C. § 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Frederick Mundt.  U.S. Const. Amends. V, VI, VIII, and XIV; Ohio Const. Art. I, §§ 2, 9, 10, and 16.  Further, Ohio's death penalty statute violates the United States' obligations under international law.

1.      Arbitrary and unequal punishment.

2.      Unreliable sentencing procedures.

3.      Defendant's right to a jury is burdened.

4.      Mandatory submission of reports and evaluations.

5.      O.R.C. § 2929.04(A)(7) is constitutionally invalid when used to aggravate O.R.C. § 2903.01(B) aggravated murder.

6.      O.R.C. §§ 2929.03(D)(1) and 2929.04 are unconstitutionally vague.

7.      Proportionality and appropriateness review.

8.      Lethal injection is cruel and unusual punishment.

9.      Ohio's statutory death penalty scheme violates international law.

9.1     International law binds the State of Ohio.

9.2     Ohio's obligations under international charters, treaties, and conventions.

9.2.1   Ohio's statutory scheme violates the ICCPR's and ICERD's guarantees of equal protection and due process.

9.2.2   Ohio's statutory scheme violates the ICCPR's protection against arbitrary execution.

9.2.3   Ohio's statutory scheme violates the ICERD's protections against race discrimination.

9.2.4   Ohio's statutory scheme violates the ICCPR's and the CAT's prohibitions against cruel, inhuman or degrading punishment.

9.2.5   Ohio's obligations under the ICCPR, the ICERD, and the CAT are not limited by the reservations and conditions placed on these conventions by the Senate.

9.2.6   Ohio's obligations under the ICCPR are not limited by the Senate's declaration that it is not self-executing.

9.3     Ohio's obligations under customary international law.

(ECF No. 7-5, PageID 1909–2149.)

The state filed its merit brief on May 22, 2006 (*Id*. at PageID 2237), to which Mundt filed a reply brief (*Id*. at PageID 2341).  On October 3, 2007, the Supreme Court of Ohio rejected Mundt's propositions of law, independently found that his death sentence was appropriate and proportionate, and affirmed the judgment.  *Mundt*, 115 Ohio St.3d 22; (ECF No. 7-5, PageID 2372.)  The record does not indicate whether Mundt sought *certiorari* from the Supreme Court of the United States.

13

### D.  Postconviction

Represented by one of the state public defenders who represented him on direct appeal

and by the state public defender who filed his motion to reopen his direct appeal,[1] Mundt on May

2, 2006, filed a postconviction action in the state trial court.  (ECF No. 7-6, PageID 2498.)

Mundt raised the following grounds for relief:

> First Ground for Relief:  Coterminous with the duty to make [mitigation]
> investigations [into all reasonably available mitigating evidence] is counsel's duty
> to make reasonable decisions as to what information—and witnesses—should be
> presented to the sentencing jury at the penalty phase in order to rebut the
> aggravating circumstances.  Equally so, defense counsel must coordinate and
> integrate the presentation during the guilt phase of the trial with the projected
> strategy for seeking a non-death sentence at the penalty phase.  If counsel takes
> contradictory positions at guilt/innocence and sentencing, credibility with the
> sentencer is lost and the defendant's chances for a life verdict reduced.  ABA
> Guidelines for the Appointment and Performance of Counsel in Death Cases
> Guideline 10.10.1 Trial Preparation Overall.  Ex. A.  The indiscriminate
> presentation of information and witnesses at the penalty phase can have disastrous
> results for the capital client.  That result occurred in Petitioner Mundt's case.
> (ECF No. 7-6, PageID 2515–17)

> Second Ground for Relief:  Petitioner Mundt's convictions and sentences are
> voidable because he was denied effective assistance of counsel during his capital
> trial as guaranteed by the Sixth and Fourteenth Amendments to the United States
> Constitution and § 10, Article I of the Ohio Constitution, C.P. Sup. R. 20 (IV)(D),
> Strickland v. Washington, 466 U.S. 668 (1984).  It is a bedrock principle of
> capital jurisprudence that the accused in a capital case is entitled to the assistance
> of experts.  Ake v. Oklahoma, 470 U.S. 68 (1985); State v. Mason, 82 Ohio St. 3d
> 144 (1998), syllabus; State v. Jenkins, 15 Ohio St. 3d 164 (1984), syl. para. 4;
> Ohio Rev. Code § 2929.024; C. P. Sup. R. 20 § IV(D).  However, Petitioner's
> counsel unreasonably and prejudicially failed to obtain expert assistance to assess
> and rebut the prosecution's DNA evidence.  (ECF No. 7-6, PageID 2518–20)

> Third Ground for Relief:  Petitioner's counsel failed to obtain the funds for, and
> secure the administration of, a quantitative magnetic resonance imaging (MRI)
> and a positron emission tomography (PET) scan of Petitioner's brain to

---

[1]  At the postconviction evidentiary hearing conducted on January 22 and January 23,
2013, Mundt was represented by state public defenders Jennifer A. Prillo, Tyson Fleming, and
Gregory Hoover.  (ECF No. 7-13, PageID 4055.)

adequately prepare the defense case at Petitioner's trial. As a result, counsel's performance "fell below an objective standard of reasonableness." [] And Petitioner was prejudiced. (ECF No. 7-6, PageID 2521–22 (internal citations omitted))

Fourth Ground for Relief: [C]ounsel in a capital case have a duty to make reasonable decisions as to what mental health evidence—and mental health experts—should be presented to the sentencing jury at the penalty phase in order to rebut, not to enhance, the aggravating circumstances. The indiscriminate presentation of negative information through psychologists can result in disastrous consequences for the capital defendant. That result occurred in Petitioner Mundt's case. (Dr. Sandra McPherson) (ECF No. 7-6, PageID 2523–25)

Fifth Ground for Relief: The convictions and sentence imposed against Petitioner are voidable because trial counsel rendered ineffective assistance of counsel at Petitioner's trial. Counsel moved for a change of venue but failed to pursue an effective voir dire to cause the trial court to grant the venue change. Defense counsel's failures deprived Petitioner of his rights to a fair trial and due process of law and he was prejudiced. U.S. Const. Amend. VI, XIV. Counsel did not provide objectively reasonable assistance and Petitioner was prejudiced as a result of this failure. Strickland v. Washington, 466 U.S. 668 (1984). Petitioner's rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated and he was prejudiced. Due to his counsel's unreasonable and prejudicial failures, Petitioner was also deprived of his constitutional right to a fair and impartial jury as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Sixth Amendment to the United States Constitution. (ECF No. 7-6, PageID 2526–28)

Sixth Ground for Relief: Defense counsel failed to reasonably and competently investigate, prepare and present available mitigating evidence at the penalty phase of Petitioner's capital trial (former teacher Jeffrey Stevens). Counsel's deficient performance precluded the sentencing jury from considering and giving weight and effect to available mitigating evidence in the determination of Petitioner's sentence pursuant to O.R.C. § 2929.04 (B) (7). Counsel's failure to reasonably investigate, prepare and present this mitigating evidence cannot be viewed as a reasonable strategic decision, but rather must be viewed as a dereliction of duty that prejudiced Petitioner. (ECF No. 7-6, PageID 2529–31)

Seventh Ground for Relief: Petitioner Mundt's convictions and sentences are voidable because Petitioner was denied the effective assistance of counsel during voir dire at the trial stage of his capital case. The acts and omissions of trial counsel deprived him of the Sixth Amendment right to effective assistance of

15

counsel. U.S. Const. amends. V, VI, VIII, IX, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). (ECF No. 7-6, PageID 2532–34)

<u>Eighth Ground for Relief</u>: Defense counsel failed to reasonably and competently investigate, prepare and present available mitigating evidence at the penalty phase of Petitioner's capital trial (special education supervisor Robert Willis). Counsel's deficient performance precluded the sentencing jury from considering and giving weight and effect to available mitigating evidence in the determination of Petitioner's sentence pursuant to O.R.C. § 2929.04 (B) (7). Counsel's failure to reasonably investigate, prepare and present this mitigating evidence cannot be viewed as a reasonable strategic decision, but rather must be viewed as a dereliction of duty that prejudiced Petitioner. (ECF No. 7-6, PageID 2535–37)

<u>Ninth Ground for Relief</u>: Defense counsel failed to reasonably and competently investigate, prepare and present available mitigating evidence at the penalty phase of Petitioner's capital trial (Petitioner's mother Sara Mundt). Counsel's deficient performance precluded the sentencing jury from considering and giving weight and effect to available mitigating evidence in the determination of Petitioner's sentence pursuant to O.R.C. § 2929.04 (B) (7). Counsel's failure to reasonably investigate, prepare and present this mitigating evidence cannot be viewed as a reasonable strategic decision, but rather must be viewed as a dereliction of duty that prejudiced Petitioner. (ECF No. 7-6, PageID 2538–40)

<u>Tenth Ground for Relief</u>: Defense counsel failed to reasonably and competently investigate, prepare and present available mitigating evidence at the penalty phase of Petitioner's capital trial (Petitioner's half-sister Mary Ann Patterson). Counsel's deficient performance precluded the sentencing jury from considering and giving weight and effect to available mitigating evidence in the determination of Petitioner's sentence pursuant to O.R.C. § 2929.04 (B) (7). Counsel's failure to reasonably investigate, prepare and present this mitigating evidence cannot be viewed as a reasonable strategic decision, but rather must be viewed as a dereliction of duty that prejudiced Petitioner. (ECF No. 7-6, PageID 2541–42)

<u>Eleventh Ground for Relief</u>: Petitioner Mundt's judgment and sentence are void or voidable because, assuming *arguendo*, that none of the Grounds for Relief in his Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in grounds for relief one through fourteen [sic] have been prejudicial to the Petitioner and have denied the Petitioner his rights as secured by the United States and Ohio Constitutions. (ECF No. 7-6, PageID 2543)

16

After conducting a two-day evidentiary hearing that began on January 22, 2013, and receiving post-hearing briefs (ECF No. 7-13, PageID 4070, 4104, 4151, 4172), the trial court denied the action on August 23, 2013. (*Id.* at PageID 4176.)

Represented by the same state public defenders, Mundt took a timely appeal to the court of appeals for the seventh appellate district. In a merit brief filed on December 3, 2013, Mundt raised the following assignments of error:

> First Assignment of Error: The trial court erred by applying the doctrine of res judicata to bar Mundt's grounds for relief.

> Second Assignment of Error: The trial court erred in dismissing Mundt's post conviction when he presented sufficient operative facts to merit relief.

(ECF No. 7-14, PageID 4248–49.) The court of appeals affirmed the trial court's denial on June 30, 2016, (*id.* at PageID 4357), and the Ohio Supreme Court, on June 21, 2017, declined to accept jurisdiction over Mundt's appeal from the appellate court's decision (ECF No. 7-15, PageID 4475).

### E. Motion to Reopen

Represented by a different assistant state public defender, on December 31, 2007, Mundt filed a motion to reopen his direct appeal pursuant to S.Ct.Prac.R. XI, Section 6—the procedure in Ohio for raising claims of ineffective assistance of appellate counsel. (ECF No. 7-5, PageID 2429.) Mundt argued that his appellate attorneys were ineffective for failing to raise the following propositions of law:

> Proposition of Law No. 1: The introduction of graphic photographs with no probative value but which are highly prejudicial violates a capital defendant's right to a fair trial, due process, and a reliable determination of guilt as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10, and 16 of the Ohio Constitution.

17

<u>Proposition of Law No. 2</u>: The failure to grant a mistrial after the testimony of a witness that an alternate suspect took a polygraph violates a capital defendant's right to a fair trial, due process, right to present a defense, and a reliable determination of guilt as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10, and 16 of the Ohio Constitution.

<u>Proposition of Law No. 3</u>: A defendant's right to due process is violated when the cumulative effect of prosecutorial misconduct renders the defendant's trial unfair. U.S. Const. amend. XIV; Ohio Const. art. I, § 16.

<u>Proposition of Law No. 4</u>: A Defendant's due process rights are violated when the State is permitted to argue facts not in evidence in its closing argument. U.S. Const. amend. XIV; Ohio Const. art. I, § 16.

<u>Proposition of Law No. 5</u>: A defendant's right to effective assistance of counsel is violated when counsel's performance is deficient and the defendant is thereby prejudiced. U.S. Const. amends. VI, XIV; Ohio Const. Art. I, § 10.

1.   Failing to challenge Juror Archer who said in voir dire that he would not consider 25 years or 30 years to life as real punishments;

2.   Failing to object to the unduly prejudicial crime scene and autopsy photos;

3.   Failing to object to the inflammatory, repetitive testimony of William Hatfield, Gary Wilgus, and Stephen Hannum;

4.   Failing to object to a flawed instruction on the kidnapping count;

5.   Failing to object to a flawed mens rea instruction;

6.   Failing to object to prosecutorial misconduct during the State's trial phase closing argument;

7.   Failing to object to a flawed penalty phase instruction; and

8.   Failing to object to prosecutorial misconduct in the State's penalty phase closing argument.

<u>Proposition of Law No. 6</u>: Considered together, the cumulative errors set forth in Appellant's brief merit reversal.

(ECF No. 7-5, PageID 2429–39.)  The Ohio Supreme Court denied Mundt's application on July 9, 2008.  (*Id.* at PageID 2465.)[2]

### F.      Motion for New Mitigation Trial

Represented by state public defenders Kimberly S. Rigby and Melissa Jackson, on January 13, 2017, Mundt also filed in the trial court, a motion for leave to file a motion for a new mitigation trial.  (ECF No. 7-13, PageID 4194.)  The trial court denied that motion on February 24, 2017.  (*Id*. at PageID 4227.)  Mundt appealed, but the court of appeals affirmed the trial court's denial on September 21, 2017.  (ECF No. 7-16, PageID 4527.)  Though not clear from the record, the Ohio Supreme Court declined to accept jurisdiction on February 28, 2018.  *State v. Mundt*, 92 N.E.3d 881 (Ohio 2018) (docket available at https://www.supremecourt.ohio.gov/Clerk/ecms/#/caseinfo/2017/1544).

### III.  Standards for Habeas Corpus Review

This case is ripe for review of the merits on the grounds properly before the Court. Provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective prior to the filing of the instant petition, apply to this case.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  Section 2254(d)(1)

---

[2] The Court notes that the cited entry is unsigned, undated, and without any timestamp.

circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places

restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent

"when the state court confronts facts that are materially indistinguishable from a decision of the

Supreme Court and nevertheless arrives at a result different from its precedent" or "when the

state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases."

*Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362,

406–07 (2000)). A state court decision involves an unreasonable application of Supreme Court

precedent if the state court identifies the correct legal principle from the decisions of the

Supreme Court but unreasonably applies that principle to the facts of the petitioner's case.

*Williams v. Coyle*, 260 F.3d at 699. A federal habeas court may not find a state adjudication to

be "unreasonable" simply because the court concludes in its independent judgment that the

relevant state court decision applied clearly established federal law erroneously or incorrectly.

*England v. Hart*, 970 F.3d 698, 710 (6th Cir. 2020) (citation omitted). Rather, to be deemed

unreasonable, "'the state court's ruling … [must be] so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas

relief on a claim that the state courts adjudicated on the merits unless the state court adjudication

of the claim "resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this

regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct

and that a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

Finally, as noted earlier, the Supreme Court has clarified that in making the § 2254(d) determination, a federal court in habeas corpus must confine its review to the record that was before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

### IV.  Petitioner's Claims

This matter is now before the Court for consideration of whether any of Mundt's claims entitle him to habeas corpus relief.

> **First Ground for Relief**:  **Trial counsel were ineffective for failing to discover that Mr. Mundt suffers from organic brain damage.**  (Petition, ECF No. 63, PageID 15386–94, ¶¶ 25–51.)

Mundt first asserts that the numerous and concerning findings that defense counsel's mitigation-phase psychologist discovered about Mundt's mental disabilities "should have led trial counsel to investigate whether Mr. Mundt suffered from organic brain damage."  (Petition, ECF No. 63, PageID 15387, ¶ 30.)  Mundt contends that testimony during his post-conviction hearing reveals that trial counsel's failure to procure a neuropsychologist and pursue neurological testing was based not on an informed strategic decision, but on an "unreasonable and illogical" misunderstanding that the mitigation psychologist had *ruled out* the need for such testing and determined that there was no organic brain damage, when what her notation actually meant was that organic brain damage *needed* to be ruled out.  (*Id*. at PageID 15389, ¶ 33.)  As a result of trial counsel's deficient performance, according to Mundt, his "jury did not hear that his decision making process and planning capacity were compromised due to damage to areas of his

21

brain and these deficits affected his actions." (*Id*. at PageID 15393, ¶ 47.)  Mundt maintains that

the prejudice from this omission was especially exasperating in view of the damaging (and

incomplete/inaccurate) expert testimony that trial counsel *did* present to Mundt's jury.  (*Id.*

¶¶ 47–49.)

        In response, the Warden contends that relief for this claim is barred by *res judicata*

because the issue of whether "trial counsel knew or should have known that he 'suffers from

organic brain damage' was first raised in post-conviction," despite the information being part of

the trial record in Dr. McPherson's report.  (Return, ECF No. 21, PageID 14410.)  Even looking

beyond the procedural default, the Warden asserts that Dr. McPherson's references about

potential brain damage are "far too ambiguous and tentative" to put trial counsel on notice.  (*Id.*

at PageID 14411.)  Further, the Warden suggests that Mundt "undoubtedly will continue to

contend" that Dr. McPherson's report says that "Mundt has organic brain damage," putting trial

counsel on notice of the issue.[3]  (*Id.* at PageID 14413.)  The Warden maintains that this position

"impliedly conced[es]" the procedural default because if Dr. McPherson's report was the

"flashing red beacon for brain damage," then the claim should have been raised on direct appeal.

(*Id.*)

_____

        [3] To note, Mundt does not contend Dr. McPherson's report says he has brain damage,
rather he asserts the following:

        36).  Dr. McPherson's notations about the signs of Mr. Mundt's organic brain
        damage were termed as "possible."  Her notations were that "Mundt had
        significant issues when it comes to **possible** underlying neurological
        components."  (ECF 7-21, PAGEID 5199, McPherson Report).  She stated
        "Mundt had been in accidents with **possible** head injuries."  *Id.*  She testified that
        Mr. Mundt showed "signs of **possible** organicity."  (ECF 8-16, PAGEID 12789).
        These notations should have clarified to trial counsel that Dr. McPherson had not
        yet determined whether Mr. Mundt had organic brain damage.

(Petition, ECF No. 63, PageID 15389–90, ¶ 36 (emphasis in original).)

Alternatively, the Warden suggests that if evidence *de hors* the trial record was necessary to "properly present this 'brain damage' claim," then Mundt "impliedly admit[s]" that his contentions about Dr. McPherson's report putting trial counsel on notice is "false," and her notes were "tentative and ambiguous." (*Id.*) As another alternative, the Warden asserts that if Mundt's contention that Dr. McPherson's report was "merely suggestive of brain damage as a 'maybe/maybe not possibility'" and the claim could only be raised in post-conviction proceedings, then Mundt needs to "retract his over-the-top characterization" of the report. (*Id.*)

In reply, Mundt addresses the alleged procedural default, contending that the issue could not have been raised on direct appeal. (Traverse, ECF No. 27, PageID 14507.) He posits that the prejudice prong of the ineffective assistance of counsel claim could not have been demonstrated "without evidence that he suffers from organic brain damage." (*Id.*) If he had raised this claim on direct appeal, Mundt maintains that the court would have dismissed the claim as meritless, since he could not prove prejudice.[4] (*Id.*) Subsequently, Mundt asserts that prejudice could not be established without first "prov[ing] through neuroimaging and psychological testing" that Mundt *did* suffer from organic brain damage, which was not within the trial record. (*Id.*) Further, Mundt argues that the state appellate court wrongly determined that he failed to prove the deficiency prong and points out that the prejudice prong was dismissed as "moot." (*Id.* at PageID 14512–13.) Mundt contends that the state rulings were contrary to the rules established in *Strickland*, *Wiggins*, and their progeny. (*Id.* at PageID 14521 (citing

---

[4] Mundt addresses the "Catch-22" created by the Warden's arguments and the state court decisions. Specifically, he argues that this claim is "doomed" no matter when it was raised—meritless on direct appeal due to the absence of any evidence of prejudice or barred by *res judicata* in post-conviction because it was not raised on direct appeal based on the evidence that existed in the trial record. (Traverse, ECF No. 27, PageID 14507–08.)

*Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003)).) Mundt concludes by asserting that his "now-established organic brain damage significantly undermines any confidence" in the penalty phase outcome, warranting "*de novo* review of the prejudice prong." (*Id.* at PageID 14521–22.)

As noted, this claim was not raised on direct appeal, but was raised in Mundt's state post-conviction action and subsequent appeal as his third claim for relief. (ECF No. 7-13, PageID 4178; ECF No. 7-14, PageID 4371.) In denying this claim in Mundt's post-conviction action, the state trial court first enforced a procedural default:

> Claim for relief # 3, ineffective counsel for failing to obtain funds for the administration of an MRI and PET scan of Defendant's brain. This claim was not raised on direct appeal.
>
> Since there was a direct appeal, and since appellate counsel was different from trial counsel, there is little fertile ground to be plowed on the issue of ineffective trial counsel. The alleged short comings on the part of trial counsel would necessarily be so evident such that trial counsel was deficient, yet not so evident such that necessarily appellate counsel needed to raise the deficiency on direct appeal. Else, Res Judicata would be applicable, because an appellate issue that could have been raised was not raised.
>
> So what did trial counsel know that appellate counsel could not have known from the record? Apparently, nothing, as trial counsel's alleged short comings are continually referred back to items in the record. This issues [sic] could have been raised on appeal, was not, and is now barred by the doctrine of res judicata.
>
> Were this Court to address the merits of this claim # 3, the outcome would be the same.

(ECF No. 7-13, PageID 4178–79.) The state trial court, in the alternative, applied the *Strickland* standard to find that Mundt could not show prejudice through a "reasonable probability" the outcome would have been different. (*Id.* at PageID 4179–81.) Notably, the state trial court, denying this claim in an alternative merits ruling, provided the following:

24

In order to succeed, Mundt must also demonstrate that his attorney's alleged deficiencies caused him prejudice. It is not enough for Mundt to merely allege that the errors had "some conceivable effect on the outcome of the proceeding." *Strickland*, *supra*, at 694. Instead, Mundt must demonstrate a "reasonable probability" that, but for his counsel's deficient errors, the resulting sentence would have been different." *Wiggins*, 539 U.S. at 534, *quoting*, *Strickland*, 466 U.S. at 694. (emphasis added). In a death penalty case, the issue of "prejudice" turns on whether there is a reasonable probability that the sentencer would have concluded, after the weighing process, that the scales no longer weigh in favor of death. *Slaughter v. Parker*, 450 F.3d 220, 234 (6th Cir. 2006).

This case was tried in 2004. Had this Court ordered an MRI if requested, that test would not have been probative. (This Court was asked in this Post Conviction proceedings to order a PET scan, after an MRI had been done, because the MRI was not sophisticated enough to produce data sufficient for Dr. Gur.) The use of PET scans in 2004 to correlate brain structure and activity with criminal behavior was in its infancy so to speak. As late as 2011, the methodology used by Dr. Gur was called into serious question. *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011).

As of January 2013, the date of the evidentiary hearing, with his data from the PET scan, and the "cartoon" pictures of Defendant's brain generated by applying that data to his complex algorithm, Dr. Gur offered no diagnosis and was unable or unwilling to ascribe any connection between his findings and the criminal activity of Defendant in 2002 [sic].

Even if Dr. Gur's testimony would have been offered, and even if admissible, to assume a different outcome in this case would amount to pure speculation. That is not sufficient. *Baze*, *supra*.

Claim # 3 is denied.

(ECF No. 7-13, PageID 4180–81.)

In Mundt's post-conviction appeal, the state appellate court denied this claim based on

*res judicata*, or in the alternative, based on Mundt's failure to prove deficient performance,

noting the following:

{¶ 21} Regarding claim three, that counsel was ineffective for failing to obtain the funds and order MRI and PET scans to use during mitigation, the trial judge found it to be barred by res judicata, but also denied it on the merits.

25

{¶ 22} To prevail on a claim of ineffective assistance of counsel, the defendant must show not only that counsel's performance was deficient, but also that he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 23} The trial court is correct that this claim is res judicata and also fails on the merits. Mundt concedes that PET scan procedures had long been accepted at the time of his capital trial. More importantly, where a defendant, represented by different counsel on direct appeal, "fails to raise [in the direct appeal] the issue of competent trial counsel and said issue could fairly have been determined without resort to evidence dehors the record, res judicata is a proper basis for dismissing defendant's petition for postconviction relief." *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), syllabus. Mundt had different counsel for his direct appeal and the McPherson report was long in existence. As such this argument was capable of being made on direct appeal and is res judicata.

{¶ 24} We turn next to the trial court's denial of this claim on the merits. The basic premise of Mundt's claim is that his trial expert, Dr. McPherson had indicated in her report that organic brain damage *needed* to be ruled out, but trial counsel interpreted that to mean that Dr. McPherson *had* ruled out organic brain damage. As such he believes his trial counsel was ineffective for not following up on the McPherson recommendation.

{¶ 25} Dr. Richard Jackson was retained by Mundt's trial counsel for the mental retardation hearing, Marsha Heiden was hired as a mitigation specialist, and Dr. Sandra McPherson was retained as a clinical psychologist. These professionals gathered records from numerous sources and interviewed Mundt. McPherson administered several psychological tests on Mundt, and in her report the axis three diagnosis states "rule out organic damage impacting brain function."

{¶ 26} McPherson was not called to testify at the post-conviction petition hearing. As such, it is speculation to conclude exactly what she meant by the statement "rule out organic damage impacting brain function". In fact, trial counsel testified at the hearing that Mundt's post-conviction counsel would need to ask McPherson what "rule out means" as he believed it meant something different to each of them.

{¶ 27} Mundt attached to his post-conviction petition a letter from Dr. Ruben Gur, an independent psychologist, stating that a "quantitative MRI and FDG PET could be helpful in documenting likely developmental abnormalities in brain structure and function" as well as a 2001 article regarding quantitative PET findings. During his testimony at the evidentiary hearing Dr. Gur conceded that he did not personally examine Mundt, and admitted he did not base his conclusions on the findings of Jackson, Heiden, or McPherson, all of which had

interaction with Mundt. Dr. Gur offered no diagnosis and was unable to ascribe any connection between his findings and Mundt's criminal activity in 2002 [sic], and further acknowledged that he is not a medical doctor and psychologists do not receive formal training on MRI or PET scan results.

{¶ 28} Instead, Dr. Gur reached his conclusions by applying an algorithm patented in 1989 and created by him, his doctor-wife, and another individual. However, after 1990 there were no articles published that addressed the validity of the algorithm. When questioned further, Dr. Gur could only name one medical professional who used the algorithm in a clinical setting for diagnosis and treatment since 1989.

{¶ 29} Mundt argues that Dr. Gur's testimony demonstrates what could have been presented to the jury in mitigation, and because this information was not presented, the prejudice prong of *Strickland* has been established. However, the *Strickland* test mandates that both prongs must be proven; deficient performance by counsel and prejudice. Mundt has failed to make a showing of deficient performance.

{¶ 30} The trial record demonstrates defense counsel retained three professionals to investigate Mundt's mental status and psychological state to present evidence for mitigation. It is entirely possible that these experts evaluated Mundt and decided that a neurological evaluation was unnecessary. "The defense decision to call or not call a mitigation witness is a matter of trial strategy." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116. Moreover, as none of the trial experts were called to testify at the post-conviction hearing, any conclusions regarding what was or was not done, are speculative at best. It is improper to infer a defense failure to investigate from a silent record as the burden of demonstrating ineffective assistance is on Mundt. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 221. Thus, Mundt has failed to demonstrate that counsel were deficient by failing to have a neuropsychologist evaluate him. This renders his prejudice argument moot.

(ECF No. 7-14, PageID 4371–73 (emphasis added).)

The Undersigned recently discussed the standard for procedural default, and for cause-and-prejudice to excuse procedural default, in *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582 (S.D. Ohio June 5, 2023):

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal

27

constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Leroy v. Marshall*, 757 F.2d 94, 97, 99-100 (6th Cir. 1985). If the petitioner fails to fairly present his constitutional claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default that prevents a merit-based review of the federal claims by the state's highest court, he may have waived the claims for purposes of federal habeas review. *See O'Sullivan*, 526 U.S. at 847-48; *Harris v. Reed*, 489 U.S. 255, 260-62, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989); *McBee v. Grant*, 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz*, 888 F.2d 1097, 1099 (6th Cir. 1989).

In order to satisfy the "fair presentation" requirement, a habeas corpus petitioner must present both the factual and legal underpinnings of his claims to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987). "While a petitioner need not cite chapter and verse of constitutional law, general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated." *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017).

A set of four guidelines has been developed for determining whether a claim was presented in such a way as to alert the state courts of the claim's federal nature. *McMeans*, 228 F.3d at 681. Under those guidelines, the fair presentation requirement is satisfied if the petitioner raised the federal issue in the state courts by (1) relying on federal cases employing constitutional analysis; (2) relying on state cases employing constitutional analysis in similar factual contexts; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Id.* (citing *Franklin*, 811 F.2d at 326).

It is well-settled under the procedural default doctrine that the default of a federal claim in the state court may preclude federal habeas review if the state court judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision. *See Harris*, 489 U.S. at 260-62. The Supreme Court has stated:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default, and actual prejudice as a result of the alleged violation of federal law,

28

or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

The Sixth Circuit applies a four-part test to determine if a claim is procedurally defaulted:

> (1) the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

In the usual case, the adequate and independent state ground doctrine will not apply to bar consideration of a federal claim on habeas corpus review unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on a state procedural bar. *Harris*, 489 U.S. at 263. In cases where the last state court to render a reasoned opinion explicitly relies on a procedural bar, the court will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).

In addition, the rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the state rule relied on by the courts is deemed "adequate" or, in other words, involves a "firmly established and regularly followed state practice" at the time that it was applied. *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991). To be considered regularly followed, a procedural rule need not be applied in every relevant case, but rather "[i]n the vast majority of cases." *Dugger v. Adams*, 489 U.S. 401, 410 n.6, 109 S. Ct. 1211, 103 L. Ed. 2d 435 (1989).

29

> Finally, the state court's adequate and independent finding of procedural default will preclude habeas corpus review of the petitioner's federal claims unless the petitioner can show "cause" for the default and "actual prejudice" as a result of the alleged violations of federal law, or that failure to consider the federal claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Harris*, 489 U.S. at 262; *see also Murray v. Carrier*, 477 U.S. 478, 485, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986).

*Berry*, 2023 WL 3818582, at *6–7.

As noted above, a petitioner "fairly presents" the substance of his federal habeas corpus claim when the state courts are afforded sufficient notice and a "'fair opportunity' to apply controlling legal principles to the facts" underlying the constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). Thus, a petitioner must present to the state courts both the legal theory and factual basis of any claim that he or she seeks to present in habeas corpus. *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 496–97 (6th Cir. 1987)) ("[T]he exhaustion doctrine requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."). "It is not sufficient that all the facts necessary to support the federal claim were before the court or that the petitioner made a 'somewhat similar' state-law claim." *Gross v. Warden, Lebanon Corr. Inst.*, 426 F. App'x 349, 355 (6th Cir. 2011) (citations omitted). If he fails to fairly present his claim, but still has an avenue open to him by which he may do so, then his petition is subject to dismissal, or stay and abeyance, for failure to exhaust state remedies. 28 U.S.C. § 2254(b), (c); *Rhines v. Weber*, 544 U.S. 269, 275–76 (2005); *Harless*, 459 U.S. at 6; *Picard*, 404 U.S. at 275–76. But if, because of a procedural default, the petitioner can no longer present his claims to the state courts, then he has also waived those claims for purposes of federal

habeas corpus review unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)); *Kelly v. Lazaroff*, 856 F.3d 819, 827–28 (6th Cir. 2017) (citing *Engle v. Isaac*, 456 U.S. 107, 129 (1982)).

The Warden's primary contention is that this claim is barred by *res judicata*. (Return, ECF No. 21, PageID 14410.) The Warden asserts, as both the state trial court and state appellate court found in Mundt's post-conviction proceedings, that the claim should have been raised on direct appeal but was not. The Undersigned disagrees. To support applying *res judicata* for this claim, the state courts noted Mundt had different counsel on direct appeal than during trial and that evidence was available in the trial record to support this claim. (ECF No. 7-13, PageID 4178; ECF No. 7-14, PageID 4371.) Even if the trial record arguably may have contained sufficient evidence to assess the deficient-performance prong of the test set forth in *Strickland*, Mundt could prove prejudice only with evidence developed in post-conviction proceedings.

As the Undersigned found in the June 18, 2020, Decision and Order denying Mundt's motion for discovery, the state court misplaced its application of *res judicata* in this instance because "the claim ineluctably relies upon evidence outside the trial court record, that being the scans and testimonial analysis of their results." (ECF No. 44, PageID 14889–90.) The state courts erred in applying *res judicata* to this claim because evidence outside the record was needed to prove the prejudice prong through neuroimaging results that showed Mundt actually suffered from organic brain damage. Accordingly, this claim is not barred by procedural default and is entitled to review on the merits. *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005) (quoting *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001)) (citing *Hill v. Mitchell*, 400 F.3d

308, 314 (6th Cir. 2005)) (finding that federal habeas review is not precluded when a state court misplaces reliance on its own procedural rule).

The *Strickland* two-prong test applies in reviewing this claim on the merits. "In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a petitioner claiming the ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). A petitioner proves deficient performance by demonstrating that his "counsel's representation fell below an objective standard of reasonableness." *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688)). To make such a showing, a petitioner must overcome the "strong[] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689). To prove the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) (citation and internal quotation marks omitted).

Further, "[s]urmounting *Strickland's* high bar is never an easy task." *Harrington*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so []. . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (internal citations omitted). A counsel's failure to make a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the jury at sentencing, can constitute ineffective assistance. *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003). In assessing whether defense counsel was ineffective for failing to introduce certain evidence at the mitigation hearing, the focus must be on whether the investigation supporting counsel's decision *not* to introduce mitigating evidence of the defendant's background was itself reasonable. *Id.* at 523. "In assessing the reasonableness of an attorney's investigation," the "quantum of evidence already known to counsel" must be considered, as well as whether that evidence should have led "a reasonable attorney to investigate further." *Id*. at 527.

As noted above, federal habeas relief is not warranted on a claim that the state courts adjudicated on the merits unless the state court decision was contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1); *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001). In reviewing this claim on the merits, the Undersigned must afford deference to the state courts' decisions and limit review to the record before the state courts. 28 U.S.C. § 2254(d); *Cullen v.*

*Pinholster*, 563 U.S. 170, 181 (2011).  Mundt contends that the prejudice prong of this claim should be reviewed *de novo* because the state appellate court did not adjudicate that component of *Strickland* on the merits.  (Traverse, ECF No. 27, PageID 14518.)

Mundt submits *Odraye Jones, n/k/a Malik Allah-U-Akbar v. Bradshaw*, 46 F.4th 459, 485 (6th Cir. 2022), as support for why this claim should be reviewed *de novo*.  (ECF No. 61.)  *Jones* focused on whether extra-record evidence allows *de novo* review when *res judicata* was incorrectly applied by the state courts.  *Jones*, 46 F.4th at 484–85.  The newly presented, extra-record evidence "must demonstrate that the petitioner could not have appealed the constitutional claim based upon information in the original record."  *Id.* at 485 (citing *State v. Lawson*, 659 N.E.2d 362, 367 (Ohio Ct. App. 1995)).  The Sixth Circuit agreed with Jones that when a state court errs in applying procedural default, such as *res judicata*, a petitioner "benefits from de novo review" when the "claim has never been considered on its merits."  *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

While in Mundt's case the state courts misplaced reliance on applying *res judicata* to this claim, both the state trial court and state appellate court provided alternative merits rulings in Mundt's post-conviction action.  The state trial court denied this claim through analysis of the prejudice prong (ECF No. 7-13, PageID 4179–81), and the state appellate court denied this claim through analysis of the deficiency prong.  (ECF No. 7-14, PageID 4371–73.)  Mundt asserts that "this Court must consider the prejudice prong *de novo* and find that counsel's failure to introduce this imperative testimony during the penalty phase was prejudicial to its outcome."  (Traverse, ECF No. 27, PageID 14518 (citation omitted).)

Under federal habeas review, however, a district court owes deference to the state courts even if the merits adjudication was an alternative ruling. *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) (citing *Brooks v. Bagley*, 513 F.3d 618, 625 (6th Cir. 2008)) ("[W]e give AEDPA deference to a ruling on the merits despite the fact that the reasoning was given as an alternative to a primary ground for decision . . . ."). Moreover, many circuit courts have held that deference is due even when the state courts separately adjudicate a *Strickland* claim on different prongs. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008) (deferring to the state highest court for the *Strickland* deficiency prong and to the state appellate court for the *Strickland* prejudice prong, in accord with "seven of our sister circuit courts that consider the 'last reasoned decision' of the state courts in the AEDPA context." (citations omitted)); *Hammond v. Hall*, 586 F.3d 1289, 1332 (11th Cir. 2009) ("[W]here a state trial court rejects a claim on one prong of the ineffective assistance of counsel test and the state supreme court, without disapproving that holding, affirms on the other prong, both of those state court decisions are due AEDPA deference."); *Atkins v. Zenk*, 667 F.3d 939, 944 (7th Cir. 2012) ("Because both prongs have been addressed by Indiana state courts, in one form or another, the deferential standard of review set out in § 2254(d) applies to both."); *Loden v. McCarty*, 778 F.3d 484, 494–95 (5th Cir. 2015) ("Where a lower state court ruled on an element that a higher state court did not, the lower state court's decision is entitled to AEDPA deference." (citations omitted)). The state courts collectively found that Mundt's trial counsel did not perform deficiently and that even if deficient, Mundt was not prejudiced. This ineffective assistance of trial counsel claim, therefore, is reviewed with deference to the state courts' adjudications.

35

As noted above, under AEDPA deference, federal habeas relief is warranted only if the reviewing court determines that the state court's adjudication of the claim was unreasonable.  28 U.S.C. § 2254(d)(1).  Federal habeas relief is precluded if a reviewing court merely disagrees with a state court finding.  *England v. Hart*, 970 F.3d 698, 710 (6th Cir. 2020).  A state court's ruling is "unreasonable" only if the decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* (quoting *Harrington*, 562 U.S. at 103.  In *England*, the Sixth Circuit described a federal court's role in analyzing "fairminded disagreement" as follows:

> Our role is therefore to "determine what arguments or theories supported or . . . could have supported, the state court's decision." . . . We then turn to the question of whether "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."

*England*, 970 F.3d at 710 (quoting *Harrington*, 562 U.S. at 102).  Federal habeas relief is not warranted "so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Cassano v. Shoop*, 1 F.4th 458, 473 (6th Cir. 2021) (quoting *Harrington*, 562 U.S. at 101) (cleaned up).

The state appellate court decision denying this claim on the deficiency prong was not an unreasonable application of clearly established federal law as it comports with *Strickland* and *Wiggins* and their progeny.  In Mundt's post-conviction action, as an alternative ruling to applying *res judicata*, discussed above, the state appellate court denied this claim under *Strickland*. (ECF No. 7-14, PageID 4371–73.)  The state appellate court only analyzed this claim under the deficiency prong, noting that the prejudice prong was "moot."  (*Id.* at PageID 4373.)  Specifically, the state appellate court noted that it would be "speculation to conclude exactly

what [Dr. McPherson] meant by the statement 'rule out organic damage impacting brain function.'" (*Id.* at PageID 4372.) The state appellate court highlighted that trial counsel Warhola had a different take on what "rule out" means, pointing out that Warhola suggested asking Dr. McPherson about the phrase's meaning. (*Id.*) The state appellate court also noted that it was "entirely possible" that the three experts trial counsel retained, Dr. McPherson, Marsha Heiden, and Dr. Jackson, "evaluated Mundt and decided that a neurological evaluation was unnecessary." (*Id.* at PageID 4373.) The Undersigned finds, based on the record before the state court, that state appellate court was not necessarily unreasonable in finding no deficient performance.

As noted above, to prove that trial counsel performed deficiently, Mundt must show that his "counsel's representation fell below an objective standard of reasonableness." *Davis*, 658 F.3d at 536 (quoting *Strickland*, 466 U.S. at 688). The Warden maintains that any references to organic brain damage in the trial record were too tenuous to prompt a reasonable attorney to investigate further. (Return, ECF No. 21, PageID 14411–12.) The state appellate court in post-conviction instead focused on the fact that trial counsel had retained three experts to evaluate Mundt, pointing out that it was "entirely possible that these experts evaluated Mundt and decided that a neurological evaluation was unnecessary." (ECF No. 7-14, PageID 4373.) The state appellate court chalked this up to sound trial strategy, noting that a "defense decision to call or not call a mitigation witness is a matter of trial strategy." (*Id.* (quoting *State v. Elmore*, 857 N.E.2d 547, 566–67 (Ohio 2006)). The state appellate court concluded that Mundt had failed to prove deficient performance. Specifically, the state appellate court reasoned that, since the trial experts were not called to testify at the evidentiary hearing in Mundt's post-conviction action,

"any conclusions regarding what was or was not done, are speculative at best." (ECF No. 7-14, PageID 4373.) The Undersigned, in assessing the quantum of evidence known to trial counsel, finds that the state appellate court was not unreasonable in denying this claim on the deficiency prong. *Wiggins*, 539 U.S. at 527. The state appellate court appropriately applied the *Strickland* standard in denying this claim on the deficiency prong.

Affording deference to the state courts, the state appellate court was not unreasonable in finding that defense counsel did not perform deficiently when they failed to pursue Mundt's potential organic brain damage. In proving deficient performance, the analysis focuses on whether the information available to trial counsel would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527. The Warden points out, and then Mundt highlights, that Dr. McPherson's report contains four references to brain damage. The Warden's argument that these references are "not definitive and show lack of certainty" (Return, ECF No. 21, PageID 14411), is the exact issue the Court must resolve in assessing the reasonableness of counsel's performance. If Dr. McPherson's references to organic brain damage show a lack of certainty, would a reasonable attorney terminate further investigation into potential brain damage at this point in counsel's mitigation preparation? *Wiggins*, 539 U.S. at 527.

During the post-conviction evidentiary hearing, Dr. Gur testified about Dr. McPherson's report. (ECF No. 8-18, PageID 13471–72.) Specifically, Dr. Gur testified about Dr. McPherson's Axis III diagnosis:

Q  Do you recall what her axis III diagnosis was?

A  Yes. She found evidence in her testing for brain damage and asked for that to be ruled out.

Q  Is that what it means when a psychologist in their diagnosis says rule out, in this case it was organic brain damage?  But whatever it is after rule out, can you explain what that means?

A  Yes.  If a psychologist does testing and finds evidence for brain damage then they'll put that in the rule out which means we need further studies of that because there is a good possibility that this is what we have and we can't rule it out until the appropriate studies are done.

(*Id.*)  As detailed above, the state appellate court pointed out that Dr. McPherson did not testify during the post-conviction evidentiary hearing.  (ECF No. 7-14, PageID 4372.)

To note, Mundt submitted a declaration from Dr. McPherson in the instant action.  (ECF No. 18-1, PageID 14339–40.)  Dr. McPherson explained the following:

4. I recall Mr. Mundt's case.  I prepared a Psychological Report detailing my evaluation and diagnoses of Mr. Mundt.  In the diagnosis section, I noted Axis III as "History of a variety of complaints, some of which may be indicative of stress or exacerbated by same including fibromyalgia and low back pain; seizure disorder, R/O other organic damage impacting brain function."

5. The last phrase "R/O other organic damage impacting brain function" literally means rule out whether there are any organic brain impairment issues with Mr. Mundt.  This is a term of art in the psychology and medical fields.  My intention with this phrase was to signal to anyone who would review the report that I suspected Mr. Mundt may have organic brain impairment.  I am not a neuropsychologist, but my testing and other data revealed significant concerns about Mr. Mundt's brain functioning that needed to be further explored by other professionals.

6. My usual and customary practice would be to have discussed with trial counsel the psychological issues that I found to be of mitigating significance.  I know from doing this type of work for decades that organic brain impairment is a major and significant mitigating circumstance in capital case.  I recognized that further testing, including neurological evaluation such as neuroimaging and neuropsychological testing, would have been the appropriate means to clarify diagnostic status.  I am confident that I would have discussed that issue with the trial attorneys.

(*Id.*)  Dr. McPherson also noted that she was not contacted for Mundt's direct appeal or post-conviction proceedings.  (*Id.*)  Dr. McPherson's declaration clearly identifies what "R/O" means

in her report *and* shows that she was confident that she discussed this issue with trial counsel. Nevertheless, this evidence was not presented to the state courts, which bars consideration of Dr. McPherson's declaration in the present federal habeas action.  (ECF No. 44, PageID 14895–98 (citing *Pinholster*, 563 U.S. at 181–82) (denying Mundt's motion to expand the record to include Dr. McPherson's declaration).)  Based on the record before it, the state appellate court determined that it was "speculation to conclude exactly what [Dr. McPherson] meant by the statement 'rule out organic damage impacting brain function.'"  (ECF No. 7-14, PageID 4372.)[5]

On one hand, a lack of certainty about *possible* organic brain damage—mentioned multiple times in Dr. McPherson's report and throughout her testimony—could lead a reasonable attorney to investigate the matter further in an effort to clarify any uncertainty.   The record indicates that Mundt had suffered head injuries and a possible seizure disorder, would bang his head on the floor as a young child, and had learning deficits throughout his primary and secondary education, which could all impact Mundt's brain function or indicate brain damage. (ECF No. 8-16, PageID 12779–89, 12823–24.)  Given the accounts of Mundt's head injuries, drug and alcohol abuse, and Dr. McPherson's note to "R/O" potential organic brain damage, an argument could be made that trial counsel had sufficient red flags to warrant further investigation.

---

[5] In a December 21, 2018, Decision and Order denying Mundt's motion for a stay and abeyance to exhaust his second and fourth grounds for relief, the Undersigned noted that "Dr. McPherson's comment can be read as meaning that she had ruled out organic brain damage, or as a directive to counsel that it should be ruled out, presumably by someone other than herself." (ECF No. 28, PageID 14611 n.2 (pointing out that Dr. McPherson's "R/O" notation was ambiguous).)  The Undersigned determined that Mundt's trial counsel did not have an "unreasonable interpretation of such an ambiguous notation" (*id.* at PageID 14611), but that decision was a limited review for the motion to stay.  Here, the Undersigned now engages in a full merits review of this claim.

Importantly, there is cause to question whether trial counsel Warhola's interpretation of the notation "R/O" was objectively reasonable.  Warhola testified at the post-conviction evidentiary hearing that Dr. McPherson had noted possible brain damage under the Axis III diagnosis, and Warhola thought this notation meant she had "ruled out" organic brain damage. (ECF No. 8-17, PageID 13261.)  If Warhola's interpretation of the "R/O" notation was reasonable, it seems apparent that Dr. McPherson would have also noted to rule out bipolar disorder and schizophrenia in the Axis diagnoses.  (ECF No. 8-16, PageID 12758 ("[T]here is not, in my opinion, a basis for arriving at a diagnosis of a major mental illness, schizophrenia."); *id.* at PageID 12859–60 (noting that while there is "significant overlap," her "diagnosis remains personality disorder borderline type without a Bipolar addition to Axis 1").  Bipolar disorder and schizophrenia are two diagnoses Dr. McPherson specifically *had* ruled out, but she did not list to "R/O" those disorders in her Axis diagnoses.  (ECF No. 7-21, PageID 5199 ("However, what the record does not support is a diagnosis of schizophrenia. . . . There is no evidence for a Bipolar Affective Disorder[.]"); *id.* at PageID 5203–04 (listing Dr. McPherson's Axis diagnoses for Mundt, including "R/O other organic damage impacting brain function").)  Moreover, if McPherson had ruled out organic brain damage, it does not seem that she would continue to testify about "possible organicity."  (ECF No. 8-16, PageID 12789.)  Based on the record as a whole, Warhola does not seem to have a reasonable interpretation of "rule out" in the context of an Axis diagnosis.  *Davis*, 658 F.3d at 536 (quoting *Strickland*, 466 U.S. at 688) (noting that to prove deficient performance, trial counsel's "representation fell below an objective standard of reasonableness").

41

When Warhola's misplaced understanding of the "R/O" notation is coupled with the information that trial counsel *did* know—from the red flags in Dr. McPherson's report and Mundt's medical and educational history—trial counsel appears to have performed deficiently for failing to investigate the possibility that Mundt had organic brain damage. *Wiggins*, 539 U.S. at 527. During the post-conviction evidentiary hearing, Warhola testified that Dr. McPherson's report "possibly could point" to Mundt having neurological problems. (ECF No. 8-17, PageID 13260.) The record contains sufficient indicia of possible organic brain damage to prompt a reasonable defense attorney to investigate further. Investigating this aspect of Mundt's background was important, given the previously undisclosed confessions trial counsel did present and the issue of malingering discussed during mitigation. Terminating further investigation into potential brain damage under these circumstances seems to be a decision no reasonable defense attorney would make.

On the other hand, the Undersigned notes that this Court is not a court of first review and deference is owed to the state appellate court decision. While the Undersigned may have reason to question whether trial counsel performed deficiently in failing to pursue testing Mundt for organic brain damage, the state appellate court did not find the deficiency prong to be met. (ECF No. 7-14, PageID 4373.) In denying this claim on the deficiency prong, the state appellate court found a reasonable argument that defense counsel were not deficient. *Harrington*, 562 U.S. at 105. The state appellate court noted that the three experts defense counsel retained could have "evaluated Mundt and decided that a neurological evaluation was unnecessary." (ECF No. 7-14, PageID 4373.)

Warhola testified that Dr. McPherson "never recommended to me that we follow up with any kind of neuro psych exam," nor did Dr. Jackson or Marsha Heiden (ECF No. 8-17, PageID 13260), but he could not recall if he asked Dr. McPherson whether a "neuro psych counsel" was needed.  (*Id.* at PageID 13284.)  Warhola also noted that had one of these experts recommended follow up testing, he "would've asked the Court for funds to hire such a person."  (*Id.* at PageID 13269–70.)  Failing to investigate potentially weighty mitigating evidence can amount to trial strategy had trial counsel determined that further investigation into potential brain damage was better to avoid.  If defense counsel decided to not explore additional mitigation evidence after a thorough investigation, then that decision would be afforded deference.  *Wiggins*, 539 U.S. at 523.

The Warden points out that Warhola had a differing view of what "rule out" means in Dr. McPherson's report.   (Return, ECF No. 21, PageID 14415; ECF No. 8-17, PageID 13284 ("You would have to ask her what rule out means.  I think you and I differ on that.").)  To note, trial counsel had some awareness of the significance of "rule out" in psychological reports, evidenced by Warhola's direct examination of Dr. Ali Melhem during mitigation.  (ECF No. 8-15, PageID 12490–12516.)  Mundt's therapist, R. Tim Bowman, referred Mundt to Dr. Melhem, a licensed psychiatrist from Community Mental Health Services who evaluated Mundt and prescribed him medication.  (*Id.* at PageID 12491–92, 12495, 12501–02.)  In discussing Dr. Melhem's diagnosis of Mundt, the following exchange occurred between Dr. Melhem and trial counsel Warhola:

> Q. So, with that initial -- at the initial assessment you had where you say you were going -- the differential diagnosis, *rule out* bipolar NOS/intermittent explosive disorder, what does that mean to us?

A. Nothing. I'm suspecting. There's a certain *amount of certainty that this patient might be suffering from this*.  However, further testing, *further evaluation is needed* and -- however, we felt that needed to be treated, so --

(ECF No. 8-15, PageID 12508 (emphasis added).)  Warhola would be on notice that including a "rule out" statement in an Axis diagnosis indicated that "further evaluation is needed."  (*Id.*)  It also follows from this answer that Dr. McPherson's inclusion of "R/O other organic damage impacting brain function" in her Axis III diagnosis (ECF No. 7-21, PageID 5204), meant she had some level of certainty that Mundt suffered from organic brain damage but that further evaluation was needed to confirm that opinion.

Dr. Melhem, however, further explained how a diagnosis can be documented as having been ruled out, noting the following:

Q. Okay. So what you conducted on that day, January 12th, was a psychiatric evaluation and you arrived at a differential diagnosis?

A. No. This is -- this is typically the standard note of a follow-up visit.  You initiate medication, you assess whether the medication helped or not.  And, if it didn't, you assess again, you try to re-establish the symptoms, persistence of these symptoms and the need for further treatment.  And when you do so, you proceed with the treatment.

Q. All right.  Were you able to rule out bipolar, NOS, and the intermittent explosive disorder?

A. I was able to rule it in, in fact.

Q. Rule it in?

A. Yes.  Rule out means --

Q. Eliminate it?

A. Eliminate it.  Rule in is, I was -- I had more certainty that this is what we're dealing with.

(ECF No. 8-15, PageID 12512.) Dr. Melhem explained that "rule out" meant a diagnosis was eliminated. (*Id.*) At Mundt's follow-up appointment, Dr. Melhem was able to "rule in" the diagnoses he had previously listed as "rule out." (*Id.*)

Thus, while there may have been cause to question Warhola's interpretation of the "R/O" notation as definitively ruling out a diagnosis, there was ample countervailing evidence to support that interpretation. Warhola's evidentiary hearing testimony was accurate, in general, that "rule out" means a diagnosis was ruled out or eliminated. Even if this understanding does not apply when listing "rule out" under an Axis on a psychological report (ECF No. 8-15, PageID 12508; ECF No. 8-18, PageID 13471–72), given the various expert testimony about what "rule out" means, the record shows Warhola's interpretation was not unreasonable. Further, Warhola found it significant to question Dr. Melhem about what "rule out" means, which leads to a reasonable argument that Warhola may have also discussed the issue with Dr. McPherson. Warhola testified that he would have requested the funds to pursue Mundt's possible organicity had Dr. McPherson recommended further testing, while also noting that none of the three defense experts made such a recommendation. (ECF No. 8-17, PageID 13260, 13269–70.) The state appellate court was not unreasonable to deny this claim on the deficiency prong because there is a "reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105 (noting that the *Strickland* analysis is doubly deferential under 28 U.S.C. § 2254(d)).

No federal law has clearly established that trial counsel is deficient for failing to further investigate signs of potential organic brain damage on similar facts, leading to a conclusion that the state appellate court's decision comports with *Strickland* and *Wiggins* progeny. The state

45

appellate court noted that trial counsel "retained three professionals to investigate Mundt's mental status and psychological state" for mitigation. (ECF No. 7-14, PageID 4373.) The court opined that it was "entirely possible that these experts evaluated Mundt and decided that a neurological evaluation was unnecessary." (*Id.*) Without the benefit of Dr. McPherson's declaration in the state court record showing otherwise (ECF No. 18-1), it would be also speculative to conclude the opposite. The state appellate court is afforded deference under the AEDPA, and the court found a reasonable argument that defense counsel satisfied *Strickland's* performance prong. 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 105.

Fairminded jurists may disagree with the state appellate court's findings, but it was not unreasonable for the state appellate court to conclude that trial counsel performed effectively in this instance. This case is not one where trial counsel failed to investigate any mitigating evidence at all. Trial counsel retained mental health experts and reviewed Mundt's past records in preparing for the mitigation phase. Because fairminded jurists could disagree, the state appellate court decision is afforded deference. *England v. Hart*, 970 F.3d 698, 710 (6th Cir. 2020); *Harrington*, 562 U.S. at 102. Accordingly, the state appellate court was not unreasonable in denying this claim on the deficiency prong.

Moving to the prejudice prong, Mundt contends that it should be reviewed *de novo* because the state appellate court did not analyze this claim under *Strickland's* second prong. (Traverse, ECF No. 27, PageID 14518–19 (citing *Porter v. McCollum*, 558 U.S. 30, 39 (2009)).) As noted above, to find prejudice, there must be a reasonable probability that the outcome would be different had defense counsel presented evidence of Mundt's organic brain damage. *Strickland*, 466 U.S. at 694; *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) ("A

reasonable probability is a probability sufficient to undermine confidence in the outcome."). Finding *Strickland's* prejudice prong to be met requires that had defense counsel presented evidence of Mundt's organic brain damage, there is a reasonable probability that at least one juror would weigh the factors against returning a death sentence. *Wiggins*, 539 U.S. at 536 (finding a reasonable probability that the jury would have returned a different sentence if confronted with the additional mitigating evidence); *Slaughter v. Parker*, 450 F.3d 224, 234 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 695) (noting that when alleging ineffective assistance of trial counsel during mitigation in a death penalty case, "the question is whether there is a 'reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'").

The state appellate court mentioned the prejudice prong only in passing, accurately noting that both *Strickland* prongs must be met to warrant relief. (ECF No. 7-14, PageID 4373 ("Thus, Mundt has failed to demonstrate that counsel were deficient by failing to have a neuropsychologist evaluate him. This renders his prejudice argument moot.")); *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). Because the state appellate court failed to address the prejudice prong on the merits, Mundt contends this prong should be reviewed *de novo*. (Traverse, ECF No. 27, PageID 14518–19.) This assertion, however, does not account for the fact that the state trial court, as an alternative ruling, did address the prejudice prong on the merits. (ECF No. 7-13, PageID 4180–81.) And, as explained above, that decision is owed

deference. *Bond*, 539 F.3d at 289–90; *Hammond*, 586 F.3d at 1332; *Zenk*, 667 F.3d at 944; *Loden*, 778 F.3d at 494–95.

Mundt supports the prejudice prong with evidence that he actually suffers from organic brain damage. (Petition, ECF No. 63, PageID 15391–93, ¶¶ 41–47; PageID 15394, ¶ 50.) Mundt presented this evidence through Dr. Ruben Gur, a neuropsychologist who testified at the state post-conviction evidentiary hearing. (*Id.* at PageID 15391, ¶¶ 41–42; ECF No. 8-18, PageID 13440–13550.) In analyzing the prejudice prong, the state trial court determined that "to assume a different outcome in this case would amount to pure speculation." (ECF No. 7-13, PageID 4181.) The state trial court noted that "Dr. Gur offered no diagnosis and was unable or unwilling to ascribe any connection between his findings and the criminal activity of [Mundt] in 2002 [sic]." (*Id.*) The Warden asserts that "Dr. Gur's state court post-conviction testimony was far from persuasive, and barely relevant." (Return, ECF No. 21, PageID 14417.)

Dr. Gur analyzed neuropsychological testing and neuroimaging results performed on Mundt. The neuroimaging was conducted through the use of an MRI and PET scan. Dr. Gur testified to the following:

Q  When you're using brain scans, Dr. Gur, the MRI and the PET scan are you looking for damaged areas of the brain?

A  Yes.

Q  And do you believe that Mr. Mundt in fact has damaged areas in his brain?

A  Yes.

Q  And did you reach that conclusion to a reasonable degree of neuropsychological certainty?

A  Yes.

48

Q  Have you testified in other cases, Dr. Gur, in which you relied on PET scan results as you did here today?

A  Yes.

(ECF No. 8-18, PageID 13549.)

After a full review of the record before the state court, as demonstrated below, the Undersigned finds that the state trial court was not unreasonable in denying this claim under the prejudice prong.  The state trial court did rely on factual inaccuracies in its *Strickland* analysis, however, reliance on those inaccuracies was not sufficient to render unreasonable the trial court's conclusion that it would be "pure speculation" to "assume a different outcome in this case." (ECF No. 7-13, PageID 4181 (citing *Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004).) Although the state trial court was not unreasonable in denying this claim, the Undersigned finds it important to first note the factual inaccuracies in the state trial court's decision.

To start, the state trial court determined that the MRI results would not be probative had an MRI been ordered at trial.  (*Id.* at PageID 4180.)  The state trial court further noted that a PET scan was ordered *after* the MRI was completed "because the MRI was not sophisticated enough to produce data sufficient for Dr. Gur." (*Id.*)  Mundt requested the PET scan and MRI *at the same time*. (ECF No. 7-10, PageID 3266.)  The state trial court also authorized funds for the PET scan and MRI *at the same time*, ordering them both to be completed at The Ohio State University Medical Center. (*Id.* at PageID 3496.)  Mundt also requested an extension of time to conduct the PET scan because it was not completed at the same time as the first MRI. (*Id.* at PageID 3498.)  The first MRI was conducted at the Corrections Medical Center, which did not have the "proper medical equipment to perform the appropriate MRI scan," going against the court's order to conduct the MRI at Ohio State. (*Id.* at PageID 3538–39.)  Mundt requested

49

additional funds to complete a second MRI because the first MRI results were "not usable as it was too coarse," but the PET scan was already completed at the time of that motion.  (*Id.* at PageID 3537–38; ECF No. 7-11, PageID 3546.)   Due to the low resolution of the first two MRIs, another MRI was ordered, not a PET scan (ECF No. 18-2, PageID 14342), which reveals a factual inaccuracy that the state trial court seemingly relied on when it denied this claim.

Another issue with the state trial court's decision, reiterated by the Warden here (Return, ECF No. 21, PageID 14419–20), was the court's reliance on an Eighth Circuit case to assess Dr. Gur's credibility: "As late as 2011, the methodology used by Dr. Gur was called into serious question."  (ECF No. 7-13, PageID 4180 (citing *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011)).)  The state trial court mischaracterized the issue in *Montgomery* by conflating two different methodologies.  The *Montgomery* court did not call into question the algorithm used by Dr. Gur during the neuropsychological testing in the instant action.  The issue in *Montgomery*, instead, was related to a pseudocyesis diagnosis based on comparisons to studying the effects of pseudopregnancy in rats.  *United States v. Montgomery*, 635 F.3d 1074, 1088–91 (8th Cir. 2011).

While Dr. Gur's testimony shows he approached the neuropsychological testing and neuroimaging in a similar fashion (ECF No. 8-18, PageID 13539–44), it is clear from *Montgomery* that the methodology called into question in that case was the rat study being used as a comparative tool in diagnosing pseudocyesis.  *Montgomery*, 635 F.3d at 1088–91.  One expert in *Montgomery* noted that the defendant's brain functioning abnormalities had no causal connection to pseudocyesis because the PET scan results were "consistent with many, many, many things."  *Id.* at 1088.

50

The state trial court leaned on *Montgomery* to diminish Dr. Gur's credibility in Mundt's case.  In reviewing Dr. Gur's testimony, however, the Eighth Circuit determined that the "government experts *did not* dispute Dr. Gur's testimony that the limbic system regulates emotion processing and that the midbrain, including the hypothalamus, regulates core functions like sleep and sex drive." *Id.* at 1090 (emphasis added).  The PET scan used in *Montgomery* was used to identify "any brain abnormalities that might underlie [the defendant's] extreme behavior." *Id.* at 1088.  In Mundt's case, a PET scan was ordered to establish whether Mundt suffered from organic brain damage.  (ECF No. 7-10, PageID 3266–69.)  Notably, the Eighth Circuit found Dr. Gur's PET scan testimony "sufficiently reliable."  *Montgomery*, 635 F.3d at 1090.  The Eighth Circuit went on to explain that the pseudocyesis diagnosis was "another matter," because "Montgomery failed to show that Dr. Gur's [pseudocyesis] opinion was based on scientifically valid principles." *Id.* (noting that the issue stems from Dr. Gur's reliance on a "scientific study involving rats as evidence of the correlation between increased activity in the hypothalamus and pseudocyesis").  Though the Eighth Circuit found an issue with Dr. Gur's pseudocyesis diagnosis, the court noted that the PET scan "showed increased activity in the limbic and somatomotor regions of Montgomery's brain and the evidence that those areas are associated with certain functions *was reliable and should have been admitted*." *Id.* at 1091 (emphasis added).

The experts in *Montgomery* testified that if the defendant did have pseudocyesis at the time of testing, they could not confirm she was inflicted at the time of the crime. *Id.* at 1088, 1090–91.  This point further distinguishes *Montgomery* from Mundt's case where evidence in the record supports an inference that he suffered from brain damage from a young age due to

developmental delays, repeated abuse, head-banging, seizure disorders, and drug and alcohol abuse. (*See, e.g.*, ECF No. 7-21, PageID 5195–96, 5198–5201 (detailing Mundt's background in Dr. McPherson's expert report); ECF No. 8-16, PageID 12779–89, 12823–24 (detailing Mundt's background in Dr. McPherson's expert testimony); (ECF No. 8-18, PageID 13470–71 ("And usually in situations like [Mundt's] more often than not we find that there is brain damage.").) Mundt had a background of intellectual and behavioral issues, indicating that he likely suffered from organic brain damage before the committed crimes.

Another factual issue that stood out to this Court was that the state trial court found that Dr. Gur was "unable or unwilling to ascribe any connection between his findings and the criminal activity." (ECF No. 7-13, PageID 4181.) Remarkably, Dr. Gur *did* ascribe a connection between his findings of Mundt's brain damage and other behaviors, such as making "a lot of bad decisions" in an unstructured environment. (ECF No. 8-18, PageID 13515.) It is more than speculation that those behaviors informed the criminal activity at issue in this case. Dr. Gur was retained to conduct neuropsychological testing, and based on that testing, review neuroimaging results from Mundt's MRI and PET scan. Dr. Gur presented testimony that Mundt suffered from organic brain damage. Dr. Gur connected the brain damage to Mundt's behaviors and the criminal activity, creating an inference that there might be a nexus between Mundt's brain damage and commission of the crimes. Specifically, Dr. Gur noted the following in his expert report:

> In Mr. Mundt's case, there is reduced volume in frontal, parietal and some subcortical regions, and some cortical regions are already at a highly hyper-activated state. Thus, when Mr. Mundt's amygdala becomes activated, his frontal lobe would be unable to exercise control as a normal one would, because his "thinking brain" is not only damaged but is already operating at full capacity in its hyper-vigilant state. . . . Furthermore, with unreliable and inefficient integration

> and interpretation of sensory input, even relatively minor threats or aversive stimuli might be misperceived as threatening, triggering Mr. Mundt's amygdala to activate in unpredictable ways.

(ECF No. 18-2, PageID 14345.) Comparing Mundt's brain to a "normal brain," Dr. Gur testified, "Oh, no, this is not normal. This is abnormal, clearly abnormal. I mean I've seen worse but this is pretty bad." (ECF No. 8-18, PageID 13514.)

Further, Dr. Gur was retained to determine whether Mundt suffered from organic brain damage, not to provide a psychological diagnosis. Importantly, Dr. Gur concluded that Mundt *does* suffer from brain abnormalities. (ECF No. 18-2, PageID 14341–45; ECF No. 8-18, PageID 13496–97, 13499, 13510–11, 13514, 13549.) The Warden focuses on *Montgomery* to undermine Dr. Gur's credibility. (Return, ECF No. 21, PageID 14419–20.) As mentioned above, the Eighth Circuit deemed Dr. Gur's PET scan testimony "sufficiently reliable." *Montgomery*, 635 F.3d at 1090. Moreover, Dr. Gur has been qualified and testified as a neuropsychological expert in several cases. (ECF No. 8-18, PageID 13449 (providing Dr. Gur's testimony that he testified in "approximately forty or fifty" cases and was qualified as an expert "[e]very time").) Dr. Gur's conclusions, made to a reasonable degree of neuropsychological certainty, were not questioned or objected to by the State during the state post-conviction evidentiary hearing. While the State questioned Dr. Gur's expertise on neuroimaging (*Id.* at PageID 13441), the State did not object to qualifying Dr. Gur as an expert in neuropsychology (*id.* at PageID 13440), nor to Dr. Gur's neuropsychological findings. (*Id.* at PageID 13506, 13515.) Reliance on *Montgomery* as a reason to question Dr. Gur's credibility was misplaced, especially in consideration of the other factual inaccuracies noted in this analysis.

53

There may be an argument that the state trial court was unreasonable in denying this claim on the prejudice prong given the factual inaccuracies the court relied on to discredit Dr. Gur. *England v. Hart*, 970 F.3d 698, 710 (6th Cir. 2020) (citing *Goodell v. Williams*, 643 F.3d 490, 495 (6th Cir. 2011)) ("The 'unreasonable application' prong of 28 U.S.C. § 2254(d)(1) applies when the state court identified the correct legal principle but applied it to the facts of the petitioner's case in an objectively unreasonable way."). During mitigation, Dr. McPherson noted that Mundt had motivation to malinger or overstate his pathology (ECF No. 8-16, PageID 12754 ("[H]e was clearly overstating pathology."), and she did not make a definitive determination that Mundt actually suffered from organic brain damage. (*Id.* at PageID 12789 (testifying about signs of "possible organicity").) Notably, with the neuroimaging results, Mundt's organic brain damage would not be subjected to the issue of potential malingering. During post-conviction, Mundt presented evidence about the impacts of his organic brain damage, to wit: Dr. Gur's testimony about the nexus between the brain damage and aspects of Mundt's behavior. The jury would have heard *conclusively* that Mundt suffered brain damage, to a reasonable degree of neuropsychological certainty (ECF No. 8-18, PageID 13549), whereas Dr. McPherson's testimony merely described *potential* or *possible* brain damage. (ECF No. 8-16, PageID 12789.)

That being said, the state trial court concluded that it would be "pure speculation" to find a reasonable probability that the outcome would be different had defense counsel presented evidence of Mundt's organic brain damage during mitigation. (ECF No. 7-13, PageID 4181 (citing *Baze*, 371 F.3d at 322).) If Dr. Gur's testimony had been presented during mitigation, the jury would have heard that individuals with frontal lobe damage "make a lot of bad decisions" in unstructured environments but will "respond very well" in structured environments. (ECF No.

54

8-18, PageID 13515.)  Hearing this additional information *might* create a reasonable probability

that at least one juror would have been more amenable to a life sentence, however, similar

evidence was presented through Dr. McPherson during mitigation.  Dr. McPherson testified as to

Mundt's future dangerousness, noting the following:

> He is dangerous if he is in a domestic context because he won't manage the
> territory and he will do something stupid and something terrible at times.

> In a structured prison setting, he will not be the problem.  He will probably be a
> victim, but he will not be the problem.

(ECF No. 8-16, PageID 12795.)  Dr. McPherson also made a link between borderline personality

disorder and the crimes.  (*Id.* at PageID 12791; ECF No. 7-5, PageID 2398 ("To McPherson,

Mundt's thoughts during the crime exemplified 'pure borderline thinking' and thus supported her

diagnosis.")  Any evidence of this type from Dr. Gur would be merely cumulative and not

enough to support finding prejudice.[6]  These facts undermine a finding that the state trial court

was unreasonable in concluding that the prejudice prong was not met.

---

[6] To note, in the instant action, Mundt submitted Dr. Mosnik's expert report (ECF No. 38-1), as support of how organic brain damage would have impacted Mundt prior to and during the crimes.  (ECF No. 38, PageID 14664 ("Dr. Mosnik's thorough and comprehensive neuropsychological evaluation further supports this claim.").)  Dr. Mosnik noted that Mundt's "overall profile was consistent with a true genuine presentation and not one of malingering." (ECF No. 38-1, PageID 14706.)  Further, Dr. Mosnik connected Mundt's brain damage to the convicted crimes, providing the following explanation:

> To Mr. Mundt's brain, various family members engaging in sexual conduct with
> each other and with underage individuals was the norm, it was not viewed as
> inappropriate, but as common.

> Given his organic brain impairment, Mr. Mundt's behavior cannot be compare[d]
> to someone with neurotypical (that is, normal) brain development, because his
> brain development was not normal, nor was his upbringing.

> As a direct result of his brain impairments, as documented in neuropsychological

The Undersigned notes that there is at least *some* probability that the outcome of the mitigation phase would have been different if the jury was presented with conclusive evidence of Mundt's organic brain damage.  Given the mitigation evidence that *was* presented through Dr. McPherson's report and testimony, however, the Undersigned cannot find that a *reasonable* probability exists that the outcome would be different had trial counsel presented evidence of Mundt's organic brain damage.  *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. Moreover, deference is afforded to the state appellate court denying this claim on the deficiency prong.  Because of this deference, federal habeas relief is precluded.

Accordingly, this claim should be **DISMISSED**.

The Undersigned recommends, however, that the denial of this claim warrants further consideration on appeal.  A state prisoner seeking federal habeas corpus relief may not appeal a district court's decision unless the district court issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c).  When a claim is denied on the merits, a COA may be issued only if the petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  A petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that

---

testing of the client, Mr. Mundt is not capable of reasoning and thinking through a situation to generate possible alternative strategies and consider possible consequences of different possible courses of action.

(*Id.* at PageID 14707–08.)  Dr. Mosnik's report details how Mundt's background and brain damage likely impacted his thought process at the time of the crime.  Because Dr. Mosnik's report is not part of the state court record, the Undersigned in precluded from considering the report in analyzing the reasonableness of the state court decision.  *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

The Sixth Circuit previously has vacated a COA when the district court did not apply the stringent standard required for issuance of a COA. *Moody v. United States*, 958 F.3d 485, 487 (6th Cir. 2020) ("Because reasonable jurists could not doubt that the district court properly denied relief, we vacate the [COA] and dismiss the appeal."). In *Moody*, the Sixth Circuit cautioned that "a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect." *Id.* at 488. The Sixth Circuit also noted that "[w]hile this standard is not overly rigid, it still demands 'something more than the absence of frivolity.'" *Id.* (citations omitted). Further, "a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*." *Id.* (emphasis in original). If a claim is "plainly barred by a procedural default," a COA should not be issued. *Id.* To issue a COA for a claim that the state courts rejected on the merits, "there must be a substantial argument that the state court's decision was not just wrong but *objectively unreasonable* under the stringent requirements of § 2254(d) (commonly known as 'AEDPA' deference)." *Id.* (emphasis in original).

A COA should not be issued unless a petitioner has shown that "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim or that the issue could be resolved in a different manner. *Malone v. Warden*, No. 1:16-cv-1160, 2018 WL 722863, at *5 (S.D. Ohio Feb. 6, 2018) (Bowman, J.) (citing *Slack*, 529 U.S. at 484–85); *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582, at *12 (S.D. Ohio June 5, 2023) (Bowman, J.). The Undersigned finds that reasonable jurists could resolve this claim in a

different manner.  *Moody*, 958 F.3d at 488.  Accordingly, the Undersigned **RECOMMENDS**

issuing a COA for this claim.

> **Second Ground for Relief**:  **Trial counsel were ineffective for failing to procure an expert who could testify about the causal connection between Mr. Mundt's organic brain damage and the horrific criminal acts he committed.**
> (Petition, ECF No. 63, PageID 15394–97, ¶¶ 52–62.)

In his Second Ground for Relief, Mundt alleges that trial counsel failed to present expert

testimony to contextualize his "serious impairment issues to the facts of the crime."  (Petition,

ECF No. 63, PageID 15394–95, ¶ 53.)  Mundt contends that this failure prejudiced him during

the mitigation phase.  (*Id.* at PageID 15395, ¶ 53.)  Pivoting away from trial counsel's failure to

make this causal connection during mitigation, Mundt describes how Dr. Lehrer was procured to

help make that connection in his state post-conviction action.  (*Id.* at PageID 15395–96, ¶¶ 54–

59.)  Mundt then asserts that the trial court erred by prohibiting Dr. Lehrer from testifying during

the post-conviction evidentiary hearing about "information [that] was critical to the ineffective

assistance of counsel claim."  (*Id.* at PageID 15397, ¶ 60.)  Alternatively, Mundt contends that

his "post-conviction counsel were ineffective for failing to timely produce Dr. Lehrer's report

and identify him as a testifying witness."  (*Id.* ¶ 61 (citing *Martinez v. Ryan*, 566 U.S. 1 (2012).)

The Warden, in response, asserts that this claim is a "mere rewrite of habeas claim 1,

[and] fails for the same reasons."  (Return, ECF No. 21, PageID 14420.)  The Warden suggests

that if this claim is alleging "ineffective assistance of *state court post-conviction counsel*," then

the claim was not fairly presented to the state courts.  (*Id.* (emphasis in original).)  The Warden

notes that type of claim is also barred because 28 U.S.C. § 2254(i) provides that "the

ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction

proceedings shall not be a ground for relief in a proceeding arising under section 2254." (*Id.* at

58

PageID 14421 (quoting *Post v. Bradshaw*, 422 F.3d 419, 423 (2005).)  In the alternative, the Warden contends that if the claim is construed as an error by the trial court for prohibiting Dr. Lehrer's testimony during the post-conviction evidentiary hearing (*id.* at PageID 14422), then the claim is "outside the parameters of a 2254 action" because it "does not attack the state court judgment of conviction and sentence."  (*Id.* at PageID 14423 (citing *Magwood v. Patterson*, 561 U.S. 320, 332 (2010)).)

In reply, Mundt notes that this claim is "clearly distinct" from his first claim.  (Traverse, ECF No. 27, PageID 14522.)  Mundt asserts that he is not raising an individual claim of ineffective assistance of state post-conviction counsel, but rather "seeks to utilize post conviction counsel's ineffectiveness to excuse his procedurally defaulted ineffective trial counsel claim." (*Id.* at PageID 14523 (citing *Martinez*, 566 U.S. 1; *Trevino v. Thaler*, 569 U.S. 413 (2013)).) Reiterating that the trial court erred by not allowing Dr. Lehrer to testify at the post-conviction evidentiary hearing, Mundt notes this "summary dismissal" was unreasonable, denying his "constitutional right to Due Process and a fair trial."  (*Id.* at PageID 14524 (citing *Taylor v. Illinois*, 484 U.S. 400 (1988)).)  Further, Mundt submits in the alternative that post-conviction counsel was ineffective for the untimely identification of Dr. Lehrer as a witness and the untimely production of Lehrer's expert report.  (*Id.*)

On August 14, 2018, Mundt sought the opportunity to return to state court to exhaust this claim, filing a Motion to Stay Habeas Case and Hold It In Abeyance.  (ECF No. 22.)  The Warden opposed Mundt's Motion (ECF No. 24), and Mundt filed a Reply.  (ECF No. 25.)  In determining whether this claim warranted a stay, the Undersigned construed this ground for relief as an ineffective assistance of post-conviction counsel claim.  (ECF No. 28, PageID

59

14607–09 ("But it seems to the Court that the main complaint Mundt has is that his post-conviction counsel failed to timely disclose Dr. Lehrer as his expert witness and to provide the doctor's report to the State, causing their exclusion from the post-conviction hearing.").) Because such a claim is not cognizable in federal habeas proceedings, the Motion was denied. (*Id.* at PageID 14609.)

Mundt objected to the Undersigned's findings in denying the motion to stay (ECF No. 30), and the Warden opposed the objections. (ECF No. 31.) In overruling Mundt's objections, Judge Barrett agreed with the "conclusion that Petitioner is not entitled to a stay, albeit for different reasons." (ECF No. 32, PageID 14636.) Specifically, Judge Barrett noted:

> As such, it appears that Petitioner is not arguing a claim based on ineffective assistance of post-conviction counsel (which is not cognizable in federal habeas corpus), but is relying on the ineffective assistance of post-conviction counsel as good cause to return to state court to argue his claim for ineffective assistance of trial counsel claim. Therefore, unlike the Magistrate Judge, the Court concludes that Petitioner has stated a cognizable claim in federal habeas: ineffective assistance of trial counsel. However, the question is whether this claim is unexhausted, "not plainly meritless," and whether there was good cause for failing to present the claim to the state court.

> As the Sixth Circuit has recognized, "Ohio law appears to contemplate two kinds of ineffective assistance of counsel claims, those based only on evidence in the trial record and those based in part on evidence outside the record." *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013). "A claim of ineffective assistance of counsel that is dependent on facts that are not part of the trial record cannot be raised on direct appeal. Instead, it must be raised in a post-conviction proceeding pursuant to Ohio Rev.Code § 2953.21." *Gunner v. Welch*, 749 F.3d 511, 514 (6th Cir. 2014). Petitioner raises a claim in the second category: he claims his trial counsel was ineffective for failing to investigate and present evidence during the penalty phase of trial. His claim is dependent on facts which are not a part of the trial record: the testimony of Dr. Douglas S. Lehrer. Petitioner explains that Lehrer would have testified about the causal connection between Petitioner's organic brain damage and the criminal acts he committed. According to Petitioner, Lehrer's testimony would have demonstrated prejudice under the two-part test for establishing ineffective assistance of counsel: "A petitioner must show that counsel's

60

performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The difficulty is that Petitioner has already attempted to present this evidence in a hearing held in the state post-conviction proceedings, but it was rejected because (according to the post-conviction state court) his post-conviction counsel did not provide Dr. Lehrer's report to the State in a timely manner. To be clear, to the extent that Petitioner's claim is that post-conviction counsel was ineffective for failing to provide it in a timely manner, the Magistrate Judge is correct in concluding that such a claim is not cognizable on habeas review. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

To the extent that Petitioner is arguing that his ineffective assistance of trial counsel claim should be stayed because his post-conviction counsel failed to provide Dr. Lehrer's report in a timely manner, the Ninth Circuit has held that a showing of ineffective assistance of post-conviction counsel satisfies the *Rhines* good cause standard. *Blake v. Baker*, 745 F.3d 977, 984 (9th Cir. 2014). However, Petitioner has not explained how his ineffective assistance of trial counsel claim has not already been "fairly presented" to the Ohio courts solely based on the missing testimony. The Sixth Circuit has clearly rejected the premise that "*Rhines* permits stays for a petitioner to 'exhaust evidence'—in other words, to return to state court to submit additional evidence to buttress claims already exhausted." *Carter v. Mitchell*, 829 F.3d 455, 466, 467 (6th Cir. 2011) (concluding that petitioner was not entitled to stay where he "neglected to submit relevant documents to the jury or attach much additional information to his post-conviction petition."). Therefore, Petitioner is not entitled to a stay under *Rhines* to present additional evidence in support of a claim which has already been exhausted in state court.

If Petitioner's actual claim is that the post-conviction court erred in refusing to admit the evidence in support of his ineffective assistance of trial counsel claim, this claim has a number of problems, the least of which is that this is not a claim Petitioner has brought in his federal habeas petition. In addition, the Court notes that on appeal in his post-conviction proceedings, Petitioner argued that what was contained in the record during the post-conviction proceedings was sufficient to prove his ineffective assistance of trial counsel claim; and Petitioner did not argue that the court in the post-conviction proceedings erroneously excluded evidence. Therefore, any claim may be procedurally barred. The Sixth Circuit has held that ineffective assistance of postconviction counsel on appeal from the denial of state postconviction relief in Ohio courts cannot provide cause for procedural default. *Williams v. Mitchell*,

792 F.3d 606, 615–16 (6th Cir. 2015); *Onunwor v. Moore*, 655 F. App'x 369, 375 (6th Cir. 2016).

> While the Magistrate Judge concluded that Petitioner was not entitled to a stay because his claim was not cognizable in habeas corpus; this Court finds no error in the Magistrate Judge's conclusion that Petitioner is not entitled to a stay, albeit for different reasons than cited by the Magistrate Judge.

(ECF No. 32, PageID 14633–36 (footnotes omitted).)

As noted, the Warden alleges that this claim is a "mere rewrite" of the first ground for relief, or alternatively, that it is a claim of ineffective assistance of post-conviction counsel. (Return, ECF No. 21, PageID 14420.)  In view of the reasoning in the above order (ECF No. 32), however, the Undersigned adopts the position detailed by Judge Barrett.  Here, Mundt raises a claim of ineffective assistance of trial counsel for failing to make a causal connection between Mundt's organic brain damage and his crimes.  This claim was not raised in state court.  Mundt's second ground for relief therefore appears to be barred due to procedural default.  28 U.S.C. § 2254(b)(1); *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582 (S.D. Ohio June 5, 2023) (Bowman, J.); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

Mundt seeks to excuse the procedural default through the alleged ineffectiveness of his post-conviction counsel.  (Traverse, ECF No. 27, PageID 14523–24 (citing *Martinez*, 566 U.S. 1; *Trevino*, 569 U.S. 413).)  The *Martinez*/*Trevino* exception was laid out in the Undersigned's June 18, 2020, Decision & Order denying Mundt's motion for discovery (ECF No. 44):

> Although a claim of ineffective assistance of post-conviction counsel is not itself cognizable in habeas corpus, 28 U.S.C. 2254(i), the Supreme Court has allowed that post-conviction counsel's ineffectiveness can excuse a procedural default in certain narrow circumstances.  In *Martinez v. Ryan*, 566 U.S. 1, 12 (2012), the Court set forth four requirements a petitioner must meet for post-conviction counsel's performance to excuse a procedural default:

1. He has a "substantial" claim of ineffective assistance of trial counsel;

2. He had "no counsel or counsel . . . was ineffective" under *Strickland v. Washington*, 466 U.S. 668 (1984), in his collateral-review proceeding;

3. The collateral-review proceeding was the "initial" review of the claim; and

4. State law requires ineffective-assistance-of-trial-counsel claims to be raised in the first instance in a collateral-review proceeding.

. . .

The following year, . . . the Court extended the *Martinez* exception by modifying the fourth requirement. . . . *Trevino v. Thaler*[, 569 U.S 413 (2013)] applied the *Martinez* framework to any state where "by reason of its design and operation, [state procedure] makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.*

*White v. Warden*, 940 F.3d 270, 276 (6th Cir. 2019), quoting *Martinez*, 566 U.S at 9, 17; *Trevino*, 569 U.S. at 429. In *White*, the Sixth Circuit concluded that *Trevino* and its modification of *Martinez* applies in Ohio, reasoning that Ohio recognizes the necessity of expanding the record in state post-conviction where a petitioner's ineffective assistance of trial counsel claim relies on evidence outside the trial record. *White*, 940 F.3d at 277.

(ECF No. 44, PageID 14888–89 (footnote omitted).) Mundt can excuse the procedural default by showing cause through the ineffective assistance of post-conviction counsel and proving that he was actually prejudiced. *Berry*, 2023 WL 3818582, at *7 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989)).

Mundt asserts that post-conviction counsel was ineffective for failing to raise this claim in post-conviction, or at least for failing to identify Dr. Lehrer as a witness for the evidentiary hearing in a timely manner. (Traverse, ECF No. 27, PageID 14524.) Mundt also maintains that the trial court was unreasonable for prohibiting Dr. Lehrer from testifying and submitting his report into evidence. (*Id.*) As an initial matter, the state trial court was not unreasonable in

prohibiting Dr. Lehrer from testifying at the evidentiary hearing because post-conviction counsel did not share the report or identify Dr. Lehrer until a few days before the hearing.  (ECF No. 8-17, PageID 13424–25.)  Post-conviction counsel was required to identify expert witnesses 30 days before the hearing.  (*Id.* at PageID 13424.)  The trial judge determined that "[u]nder the circumstances -- this case has been meandering forever and to spring an expert report two days, three days before the hearing I think is unconscionable and we're not going to hear from Dr. Lehrer."  (*Id.* at PageID 13430.)  Given this reasoning, the state trial court was within its purview to prohibit Dr. Lehrer from testifying.

Turning to post-conviction counsel's performance as cause to excuse procedural default, Mundt has failed to prove ineffective assistance of post-conviction counsel.  It appears from the record that Mundt's post-conviction counsel had ample time to identify Dr. Lehrer as an expert witness for the hearing, regardless of any issues encountered in issuing a report.  (*Id.* at PageID 13425–26 ("[W]e didn't have Dr. Gur's final report until December and we were not able to get therefore Dr. Lehrer's report based on Dr. Gur's until then."); *see also* ECF No. 7-11, PageID 3584–86 (requesting a continuance of the post-conviction evidentiary hearing due to issues obtaining MRI analysis results from Dr. Christos Davatzikos).)  Though post-conviction counsel failed to disclose Dr. Lehrer in a timely manner, Mundt's post-conviction counsel *did* present a causal connection through Dr. Gur.

Dr. Gur's expert report revealed that Mundt's actions could be related to his organic brain damage.  Notably, Dr. Gur concluded:

> Results of neuropsychological testing, structural and functional imaging of Mr. Mundt's brain converge to show abnormalities indicating brain damage, especially frontal, parietal and subcortical regions.  These abnormalities are in regions that are **very important for regulating behavior and emotions**,

emotional conflict resolution, and the integration and relay of sensory information between subcortical and cortical regions. The combined abnormalities observed in the frontal regions of Mr. Mundt's brain would **suggest diminished executive functions such as abstraction and mental flexibility, planning, moral judgment, emotion regulation, moderation of limbic arousal and impulse control**. The abnormalities observed in parietal regions would portend deficits in integrating information across sensory modalities, as well as deficits in visuospatial reasoning and intuitive ability or holistic understanding. Finally, the abnormally low metabolic activity in the corpus callosum, combined with reduced white matter in frontal and parietal regions, would lead to deficits in integrating verbal reasoning and analytic processing modes of the left hemisphere with intuitive and affect-related processing modes of the right hemisphere.

A most relevant finding is the drastically reduced metabolism in the amygdala and hippocampus, combined with tissue loss and hyper-metabolism in cortical (particularly parietal) regions. Abnormally high metabolism in cortical regions most likely indicates compensatory hyper-vigilance of the "default brain" state. Hyper-activation in the precuneus region, as is the case with Mr. Mundt, would also be associated with inappropriate or excessive reference of external, unrelated events to the self, **leading to behavioral manifestations such as paranoia, delusions** (either persecutory or of grandeur), and may mimic narcissistic personality disorder. Reduced activity in limbic regions is often seen in seizure disorders, and could result in **"kindling" or sudden hyper-excitability**. Abnormally low metabolism in the temporo-limbic system, including the amygdala, could lead to **severe emotional dysregulation**. A damaged amygdala will **misinterpret danger signals and when excited it will issue false alarms** that require intact frontal components of the limbic system for modulation. Findings of tissue loss in the insula and cingulate regions also **supports the inference that Mr. Mundt's emotion processing and regulation system could be damaged**. Furthermore, in the context of significant tissue loss in the thalamus, which is responsible for integrating and relaying sensory information between subcortical and cortical regions, as well as in striatal regions, hyper-metabolism in Mr. Mundt's cortex likely **represents his strained effort to make sense of unreliable information deriving both from sensory input he receives and from the emotional centers in his subcortical regions**.

In Mr. Mundt's case, there is reduced volume in frontal, parietal and some subcortical regions, and some cortical regions are already at a highly hyper-activated state. Thus, when Mr. Mundt's amygdala becomes activated, his frontal lobe would be **unable to exercise control as a normal one would, because his "thinking brain" is not only damaged but is already operating at full capacity in its hyper-vigilant state**. This situation is further complicated by tissue loss in parietal and striatal regions, which contribute to the efficient relay and integration of information received from the senses with memory, emotion,

reward, and decisional processes. Taken together, this pattern of activity is analogous to a car with weak brakes that are already engaged when it begins to race. The impaired frontal lobe is unable to do its job and acts as the brakes on the primitive emotional impulses emanating from the amygdala when the limbic system reaches its activated stage (the Klüver-Bucy syndrome). Furthermore, with unreliable and inefficient integration and interpretation of sensory input, even relatively minor threats or aversive stimuli **might be misperceived as threatening, triggering Mr. Mundt's amygdala to activate in unpredictable ways**.

The etiology of these abnormalities is difficult to determine and requires clinical evaluation and integration with history. However, the abnormalities observed are consistent with several causes including traumatic brain injury. Reduced metabolism in corpus callosum and reductions in frontal and parietal white matter may relate to prenatal alcohol exposure. Given the pronounced abnormalities in amygdala and hippocampus, a seizure disorder should also be considered. Notably, patterns of tissue loss and abnormal metabolic physiology are stable over time following incidents of traumatic brain injury, insult, or from birth. Therefore, without any significant evidence of intervening traumatic injury or insult, the patten of brain abnormalities documented in this report was very likely present within Mr. Mundt at the time of the offense.

(ECF No. 18-2, PageID 14344–45.)

Reviewing Dr. Gur's report, post-conviction counsel *did* present evidence of a causal connection between Mundt's organic brain damage and his actions. Despite failing to disclose Dr. Lehrer as an expert for the evidentiary hearing, post-conviction counsel was still able to present a causal connection—rendering effective assistance of counsel, not deficient performance.

Even if post-conviction counsel performed deficiently, Mundt has not shown how he was actually prejudiced by this failure to disclose Dr. Lehrer. In Mundt's post-conviction proceedings, the state appellate court pointed out that "Dr. Gur offered no diagnosis and was unable to ascribe any connection between his findings and Mundt's criminal activity." (ECF No. 7-14, PageID 4372.) Mundt contends that Dr. Lehrer's testimony and report would have made

66

the "connection between the organic brain damage and the crimes." (Petition, ECF No. 63, PageID 15397, ¶ 61.) Dr. Lehrer's report directly connected information about Mundt's childhood to his brain damage and the crimes. (ECF No. 7-12, PageID 3860–65 ("Mr. Mundt's limited intelligence and impaired capacities for judgment, impulse suppression, complex problem solving, and emotional control all made contributions to the terrible events of that fateful day." *Id.* at PageID 3865).) A reasonable fact-finder could, however, infer causal connections between Mundt's organic brain damage and the convicted crimes through Dr. Gur's report. (*See, e.g.*, ECF No. 18-2, PageID 14345 ("Thus, when Mr. Mundt's amygdala becomes activated, his frontal lobe would be unable to exercise control as a normal one would, because his 'thinking brain' is not only damaged but is already operating at full capacity in its hyper-vigilant state.").)

Moreover, testimony about the connection between Mundt's mental health conditions and the convicted crimes was presented to the jury during the sentencing phase, albeit without the information about the brain damage. On direct appeal, the Ohio Supreme Court noted that trial counsel did present evidence connecting Mundt's psychological disorders to the convicted crimes. In analyzing a different ineffective assistance of trial counsel claim, discussed further in claim ten below, the Ohio Supreme Court detailed this causal connection as follows:

> {¶ 128} In reality however, McPherson and Heiden also gave testimony that was potentially valuable as mitigation. McPherson diagnosed Mundt as having several psychological disorders, including borderline personality disorder. See *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 120 (borderline personality disorder is a relevant mitigating factor). McPherson indicated that those disorders were caused by a factor (an unstable, abused childhood) beyond Mundt's control. Furthermore, she found a causal link between the disorders and the killing of Brittany.

> {¶ 129} Mundt's admission to murdering Brittany was part of the information that formed a basis for McPherson's diagnosis. McPherson testified: "I want to know

67

what people think and what they feel in the course of a crime of this type." Mundt's statements were "important" because they illustrated the "thinking process * * * characteristic of [Mundt] when he's under any kind of high arousal state." To McPherson, Mundt's thoughts during the crime exemplified "pure borderline thinking" and thus supported her diagnosis.

{¶ 130} Mundt's borderline thinking also supported McPherson's view that Mundt's disorder caused him to commit the murder. McPherson explained that Mundt engages in "narrow" thinking under stress, focusing only on getting out of the stress-inducing situation. Hence, he tends to act upon "whatever first [comes] to mind," even though his course of action might not make sense. According to McPherson, Mundt became stressed when he realized he was in trouble for raping Brittany. The solution that "first came to mind" was to put her in the well, and Mundt's disorder caused him to focus on that course of action, without considering consequences or alternatives.

(ECF No. 7-5, PageID 2398–99.) The Ohio Supreme Court's analysis further supports a conclusion that Mundt was not prejudiced by post-conviction counsel failing to timely produce Dr. Lehrer's letter. A causal connection was presented during the mitigation phase of trial, so it is too speculative to assume there is a reasonable probability the outcome would have changed. Mundt has failed to show ineffective assistance of post-conviction counsel. This claim is procedurally defaulted, and Mundt has failed to show cause to excuse the default.

Accordingly, this claim should be **DISMISSED**.

Because "jurists of reason" would not debate the correctness of this procedural ruling, the Undersigned **RECOMMENDS** that a COA should not be issued for this claim. *Malone v. Warden*, No. 1:16-cv-1160, 2018 WL 722863, at *5 (S.D. Ohio Feb. 6, 2018) (citing *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000)); *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582, at *12 (S.D. Ohio June 5, 2023).

**Third Ground for Relief**:  Due to Mr. Mundt's serious and severe mental illness, his death sentence violates the eighth and fourteenth amendments to the United States Constitution.  (Petition, ECF No. 63, PageID 15398–15403, ¶¶ 63–76.)

In his third ground for relief, Mundt contends that the Constitution prohibits his execution based on being severely mentally ill at the time of the offense, an illness "which continues to afflict him" today.[7]  (Petition, ECF No. 63, PageID 15398–99, ¶¶ 64–66.)  Mundt asserts that executing the severely mentally ill does not advance retribution or deterrence, the "only two justifications for the death penalty" recognized by the Supreme Court.  (*Id.* at PageID 15399, ¶ 67 (citing *Roper v. Simmons*, 543 U.S. 551, 571 (2005)).)  Further, Mundt posits that the rationale behind barring execution of the intellectually disabled "applies with full force" to those with severe mental illness.  (*Id.* at PageID 15398, ¶ 65 (citing *Atkins v. Virginia*, 536 U.S. 304, 318–21 (2002); *Hall v. Florida*, 572 U.S. 701, 708–10 (2014)).)  Mundt notes that he is seeking a substantive Eighth Amendment rule, "categorically prohibiting a punishment for an entire class of offenders," which, he contends, allows this Court to announce and apply it in the instant case. (*Id.* at PageID 15401, ¶ 73 (citing *Montgomery v. Louisiana*, 577 U.S. 190, 198 (2016)).)

The Warden points out that this claim was not raised in state court and is therefore barred due to lack of fair presentment.  (Return, ECF No. 21, PageID 14427–28.)  Additionally, the Warden notes that *Atkins* has not been extended to include individuals with severe mental illness, thus precluding relief.  (*Id.* at PageID 14428–29 (citing *Franklin v. Bradshaw*, No. 3:04-cv-187,

---

[7] To note, on June 29, 2022, the Undersigned denied Mundt's motion to stay this petition and hold the proceedings in abeyance while he sought state court relief for a new *state law* change related to severe mental illness.  (ECF No. 57.)  That claim is currently proceeding through state court; however, the "gravamen of [Mundt's] state court claim has no bearing on his federal constitutional rights, and thus any decision in the state court will not affect the disposition of his federal habeas petition."  (*Id.* at PageID 15366.)

2009 WL 649581, at *74 (S.D. Ohio Mar. 9, 2009) (Merz, J.) ("The very nature of the argument admits its inadequacy. The AEDPA provides that this Court may only grant habeas corpus relief if the Supreme Court has already interpreted the federal constitution in a way that favors the petitioner.").)

In reply, Mundt concedes that he did not raise this claim in state court, and he offers no cause-and-prejudice to excuse the default. (Traverse, ECF No. 27, PageID 14529.) Mundt also recognizes that the Supreme Court has not established a prohibition on executing the severely mentally ill. (*Id.*) Nonetheless, he argues without reasoning that "this Court can address the substantive issue raised in this claim on habeas review." (*Id.*) The Undersigned disagrees.

Apart from the lack of fair presentment, the Supreme Court has not ruled on the proposition that execution of the severely mentally ill violates the Eighth Amendment, as Mundt acknowledges. *See, e.g.*, *Franklin v. Bradshaw*, 695 F.3d 439, 454–55 (6th Cir. 2012) (noting *Atkins* and other categorical prohibitions have not extended to the mentally ill). Pointing to *Atkins*, Mundt asserts that the rationale behind the categorical ban of executing the intellectually disabled also applies to the severely mentally ill "because such punishment: (1) serves no penological interest; (2) creates an intolerably high risk of wrongful execution; and (3) flouts a growing consensus against such imposition of the death penalty." (Petition, ECF No. 63, PageID 15398, ¶ 65 (citing *Atkins*, 536 U.S. at 318–21; *Hall*, 572 U.S. at 708–10).)

Mundt cites to *Montgomery v. Louisiana* as support to create and apply this new ruling, but that case focused on the retroactive application of a new *Supreme Court* rule established in a previous case. 577 U.S. at 193–94, 197. In *Montgomery*, the Supreme Court held that *Miller v. Alabama*, 567 U.S. 460 (2012), established a substantive constitutional rule when the Court

70

concluded a "sentence of life without parole is disproportionate for the vast majority of juvenile offenders." *Montgomery*, 577 U.S. at 212. The Supreme Court held that the *Miller* rule required retroactive application as it "raises a grave risk that many [juveniles] are being held in violation of the Constitution." *Id.* Further, to grant federal habeas relief, the AEDPA requires deference to a state court adjudication on the merits unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, *clearly established* Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). Although Mundt's arguments may be persuasive as to why the severely mentally ill should not be executed, the Supreme Court has not adjudicated a new constitutional rule that extends *Atkins* to encompass this categorical ban. Mundt requests an expansion of a magnitude that the Undersigned is not inclined to create in the first instance.[8]

Accordingly, Mundt's Third Ground for Relief should be **DISMISSED**.

Because "jurists of reason" would not debate the correctness of this procedural ruling, nor would they debate that the issue could be resolved in a different manner, the Undersigned **RECOMMENDS** that a COA should not be issued for this claim. *Malone*, 2018 WL 722863, at *5 (citing *Slack*, 529 U.S. at 484–85); *Berry*, 2023 WL 3818582, at *12.

---

[8] To the extent that Mundt seeks relief from execution due to being incompetent, a ruling on that issue is not warranted at this time. Given the fact Mundt's execution date is not imminent, *see Ohio's Execution Schedule* at https://drc.ohio.gov/about/capital-punishment/execution-schedule, as noted in the Decision and Order denying Mundt's motion to expand the record, this claim is not yet ripe. (ECF No. 44, PageID 14898–99 (citing *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007); *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644–45 (1998)).)

**Fourth Ground for Relief**:  **Trial counsel were ineffective for failing to investigate and discover that Mr. Mundt was exposed to toxins that likely contributed to his organic brain damage.**  (Petition, ECF No. 63, PageID 15403–09, ¶¶ 77–93.)

In his next claim, Mundt asserts that his trial counsel failed to investigate toxin exposure that could have contributed to his organic brain damage.  (Petition, ECF No. 63, PageID 15403–04, ¶¶ 79–81.)  Mundt contends that growing up in northwest West Virginia and southeast Ohio exposed him to toxins, like lead and manganese, because of the coal deposits and mining in those areas.  (*Id.* at PageID 15404–08, ¶¶ 82–88.)  Given the alleged red flags in his history about potential brain damage and counsel knowing where he grew up, Mundt argues that his trial counsel were ineffective for not investigating the issue.  (*Id.* at PageID 15408, ¶ 88.)  Further, Mundt maintains that trial counsel were ineffective for failing to present the impact of toxin exposure to the jury during mitigation.  (*Id.* ¶ 89.)

The Warden contends that this claim is barred due to procedural default because it was not raised in the state court proceedings.  (Return, ECF No. 21, PageID 14429.)  The Warden also asserts that it is "bare effrontery" for Mundt to claim he suffers from manganese madness. (*Id.*)  Further, the Warden purports that the "absurdity of this claim should be seen as a concession by Mundt that none of his other claims have even plausible merit."  (*Id.* at PageID 14430.)

In reply, Mundt essentially concedes that he failed to present this claim to the state courts but asserts that ineffective assistance of post-conviction counsel constitutes cause to excuse the default.  (Traverse, ECF No. 27, PageID 14530.)  Mundt also maintains that he was actually prejudiced by post-conviction counsel's failure to thoroughly investigate and present these issues in his state post-conviction proceedings.  (*Id.*)  This failure, Mundt contends, serves as cause to

excuse any procedural default. (*Id.* at PageID 14530–31 (citing *Martinez v. Ryan*, 566 U.S. 1, 12 (2012); *Trevino v. Thaler*, 569 U.S. 413, 428–29 (2013)).) Mundt asserts that post-conviction was the first opportunity to raise this claim of ineffective assistance of trial counsel claim for failure to investigate alleged organic brain damage. (*Id.* at PageID 14531.) Additionally, Mundt maintains that if the claim is unexhausted, "the Court should grant the request to hold the habeas proceedings in abeyance to allow counsel to return to state court and exhaust the claim." (*Id.* at PageID 14534 (citing ECF No. 22).)

As an initial matter, on August 14, 2018, Mundt filed a Motion to Stay Habeas Case and Hold It In Abeyance For Exhaustion Of New Claims In State Court (ECF No. 22), which the Warden opposed (ECF No. 24), and Mundt replied (ECF No. 25). On December 21, 2018, the Undersigned denied Mundt's request. (ECF No. 28.) The decision pointed out that *Martinez* and *Trevino* carved out an exception for procedural default, not exhaustion. (*Id.* at PageID 14605–06, n.1.) That decision, however, reserved a ruling on whether *Martinez* and *Trevino* had potential applicability in the instant matter because "that contingency is premature at this time and will be considered if and when it materializes." (*Id.* at PageID 14605.) In denying Mundt's stay request, the Undersigned found that this claim, under the *Rhines v. Weber*, 544 U.S. 269 (2005) stay and abeyance standard, was "plainly meritless given the testimony presented by his own expert witness in his post-conviction proceedings." (*Id.* at PageID 14612.) Specifically, the decision also noted:

> Furthermore, Dr. Gur stated in his report that the abnormalities he observed are consistent with several causes including traumatic brain injury, fetal alcohol syndrome, or a seizure disorder. . . . Dr. Gur never attributed any part of the brain damage he detected in Mundt to an excessive exposure to manganese or any other mineral, for that matter.

(*Id.* (internal citation omitted).)

On February 13, 2019, Mundt filed objections to the denial of his motion for a stay and abeyance (ECF No. 30), to which the Warden opposed. (ECF No. 31.) In overruling Mundt's objections, Judge Barrett also addressed the issue of whether the claim was "plainly meritless." (ECF No. 32.) Notably, Judge Barrett recognized the following:

> As to the Fourth Ground for relief, Petitioner argues that the Magistrate Judge's conclusion that his Fourth Ground for relief is "plainly meritless" is contrary to law.
>
> Petitioner argues that post-conviction counsel could have raised this claim and presented evidence at the post-conviction evidentiary hearing of the prevalence of toxins in the Eastern Coal Province which likely contributed to his organic brain damage. As explained above, a showing of ineffective assistance of post-conviction counsel can be relied up[on] to satisfy the *Rhines* good cause standard. *Blake v. Baker*, 745 F.3d 977, 984 (9th Cir. 2014). However, as the Magistrate Judge explained, post-conviction counsel did present the report and testimony of an expert: Dr. Gur. The problem is that Dr. Gur stated the potential causes of Petitioner's brain damage were a tumor, stroke, traumatic brain injury, fetal alcohol syndrome, or a seizure disorder, ***but never attributed any part of the brain damage he detected to an excessive exposure to any toxins***.

(ECF No. 32, PageID 14636–37 (emphasis added).)

As Judge Barrett points out, the issue revolves around Dr. Gur failing to attribute Mundt's organic brain damage to toxin exposure. (*Id.*) Mundt maintains that his state post-conviction action was the first place this claim could be raised, and post-conviction counsel's failure to do so serves as cause to excuse procedural default. (Traverse, ECF No. 27, PageID 14530–31 (citing *Martinez*, 566 U.S. at 12; *Trevino*, 569 U.S. at 428–29).) Nothing in the record suggests, however, that Mundt was exposed to toxins or suffered manganese madness to put post-conviction counsel on notice, or even trial counsel for that matter, that further investigation was warranted. Not investigating toxin exposure was not an unreasonable decision because to an

74

objectively reasonable attorney, the record would not indicate that such a potential issue existed. Accordingly, Mundt's post-conviction counsel's performance cannot serve as cause to excuse the procedural default.

Moreover, Mundt was not actually prejudiced by post-conviction counsel's performance because he has failed to submit evidence that he suffers from ailments related to toxin exposure. Without evidence he suffers from toxin exposure, Mundt cannot show how failing to raise this claim was to his prejudice. Because post-conviction counsel did not perform deficiently and without sufficient evidence to prove prejudice, Mundt cannot excuse the procedural default of failing to raise this claim to the state courts. The Undersigned necessarily finds that this claim is procedurally defaulted, and Mundt has failed to show cause and prejudice to excuse the default. *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

This claim should be **DISMISSED**.

Because "jurists of reason" would not debate the correctness of this procedural ruling, the Undersigned **RECOMMENDS** that a COA should not be issued for this claim. *Malone*, 2018 WL 722863, at *5 (citing *Slack*, 529 U.S. at 484–85); *Berry*, 2023 WL 3818582, at *12.

**<u>Fifth Ground for Relief</u>:  Trial counsel were ineffective by not pursuing the change of venue motion during voir dire.**  (Petition, ECF No. 63, PageID 15410–19, ¶¶ 94–119.)

Mundt asserts here that trial counsel failed to "challenge effectively and thoroughly" their change of venue motion. (Petition, ECF No. 63, PageID 15410, ¶ 95.) According to Mundt, "[t]rial counsel moved for a change of venue before trial, but failed to continue to challenge venue during and after voir dire." (*Id.* ¶ 97.) Noting that this was the first capital murder trial in

75

over two decades in a sparsely populated, rural county in southeast Ohio, Mundt contends that

counsel's objectively unreasonable performance in connection with their change of venue motion

deprived him of his rights to a fair trial, impartial jury, and due process of law. (*Id.* ¶¶ 96–97.)

Mundt notes that on September 13, 2004, the trial court conducted a hearing on the

motion for a change of venue. (*Id.* at PageID 15411, ¶ 100.) Defense counsel presented five

media representatives, introduced numerous exhibits, and argued in closing that media attention

had so saturated the community that it would be impossible to find jurors who had not formed

strong opinions about the case. (*Id.* at PageID 15411–12, ¶ 100.) After the trial court held its

ruling in abeyance, according to Mundt, trial counsel failed to pursue a searching voir dire to

establish their position about the saturation of media coverage and resulting prejudice. (*Id.* at

PageID 15412, ¶ 101.) Mundt proceeds to highlight the flood of media coverage of (and

community discussion about) the case before and during the trial, as well as various responses

prospective jurors provided during individual voir dire. (*Id.* at PageID 15412–19, ¶¶ 102–16.)

Mundt suggests that the mere eleven hours the jury deliberated before finding him guilty, and the

eight hours the jury deliberated before recommending a death sentence, are evidence that

pressure from the community had a "negative effect on the verdicts." (*Id.* at PageID 15419,

¶ 117.)

The Warden asserts that Mundt's claim is barred by procedural default, due to Mundt

raising it in post-conviction instead of on direct appeal. (Return, ECF No. 21, PageID 14430–

32.) The Warden explains that because the trial record contained ample evidence about pretrial

publicity and, in connection with trial counsel's change of venue motion, various colloquies

during voir dire, Mundt was required by Ohio's doctrine of *res judicata* to raise the claim on

direct appeal.  (*Id.* at PageID 14431–32.)  The Warden maintains that Mundt offers no arguments to excuse this procedural default.  (*Id.* at PageID 14432.)  The Warden proceeds to argue in the alternative that Mundt's claim is also without merit.  (*Id.* at PageID 14432–33.)

Mundt replies by asserting that this claim was properly raised in his state post-conviction proceedings.  (Traverse, ECF No. 27, PageID 14535–37.)  Mundt notes that the claim was "supported by exhibits that were outside the record."  (*Id.* at PageID 14535 (citing ECF No. 7-7, PageID 2547–2681 (providing the ABA Guidelines for defense counsel in death penalty cases); ECF No. 7-8, PageID 2987–3003 (providing Juror Watson's questionnaire responses and defense counsel's rating system for jury selection)).)  Further, Mundt maintains that the state appellate court erred in applying *res judicata* because the "issue involved evidence outside of the record that could not have been presented on direct appeal, namely that trial counsel were aware the pre-trial publicity was a factor among the jurors who were finally picked."  (*Id.* at PageID 14536.)

In the alternative, Mundt argues that if this claim is procedurally defaulted, then his post-conviction counsel's unreasonable performance serves as cause to excuse the default.  (*Id.* (citing *Martinez*, 566 U.S. 1; *Trevino*, 569 U.S. 413).)  Mundt suggests that his post-conviction counsel did not "present sufficient evidence outside the record" to enable the post-conviction court to fully consider this claim.  (*Id.*)  As support, Mundt submits Exhibit C (ECF No. 18-3, PageID 14346–49), which includes "newspaper articles that detailed the misinformation and the extent of the community's preconceived prejudice against Mr. Mundt concerning his guilt and the punishment he should receive."  (Traverse, ECF No. 27, PageID 14536.)

Mundt raised this claim as the fifth ground for relief in his post-conviction proceedings. (ECF No. 7-6, PageID 2526–28.) Specifically, Mundt noted that the "convictions and sentence imposed against [him] are voidable because trial counsel rendered ineffective assistance of counsel at [his] trial. Counsel moved for a change of venue but failed to pursue an effective voir dire to cause the trial court to grant the venue change." (*Id.* at PageID 2526.) The state trial court denied Mundt's claim as follows:

> Claim for relief # 5, ineffective counsel for failing to pursue effective voir dire, was raised on direct appeal and was denied on the merits. Res judicata applies and that claim is denied.

(ECF No. 7-13, PageID 4178.)

In Mundt's post-conviction appeal, the state appellate court found that this claim could have been raised on direct appeal, noting the following:

> {¶ 19} Regarding claim five—counsel ineffectively conducted voir dire to the extent that a change of venue was not granted—Mundt attempts to provide a different reasoning to achieve his desired end. He raised ineffective assistance of counsel during voir dire on direct appeal focusing on Juror Watson being inclined to automatically vote for death. Mundt now attacks how trial counsel questioned Watson, contending he should have conducted a "searching voir dire on her views." Though this is a slightly different argument than was addressed on direct appeal in *Mundt I*, it was a legal argument that was capable of being raised on direct appeal and nothing attached to the petition, or testified to at the evidentiary hearing is competent, relative and material evidence outside the record to add to what was in the record and reviewable during a direct appeal.

(ECF No. 7-14, PageID 4370.)

In Mundt's post-conviction proceedings, the state trial court noted that this claim was raised on direct appeal and denied on the merits. (ECF No. 7-13, PageID 4178.) The voir dire claim raised on direct appeal, however, differs from the claim raised in the instant action. On direct appeal, the claim raised focused on trial counsel's alleged ineffective questioning of Juror

78

Watson during voir dire, which aligns with Claims 7 and 8 analyzed below. This specific change of venue claim was not raised on direct appeal, as recognized by the state appellate court in review of Mundt's post-conviction action. (ECF No. 7-14, PageID 4370.)

The Sixth Circuit addressed the issue of *res judicata* as it relates to pretrial publicity claims in *Hand v. Houk*, 871 F.3d 390 (6th Cir. 2017):

> Hand's first claim is that his trial counsel was constitutionally ineffective for failing to question two specific jurors regarding their exposure to pre-trial publicity. The district court held that this claim, like his second claim, was procedurally defaulted because the Ohio courts determined that it was barred by *res judicata*. Just as with this second claim, the district court was correct.

> It is undisputed that Hand failed to raise this ineffective-assistance-of-trial-counsel claim on direct appeal, first raising this claim in his petition for state post-conviction relief. Just as with his voir dire claim, *see supra* Part III.A, pp. 19-20, the post-conviction trial court held that this claim was barred by *res judicata*, and the Ohio Court of Appeals affirmed the trial court's judgment. *Hand*, 2006-Ohio-2028, 2006 WL 1063758, at *4-5. Ohio's rules regarding its bifurcated appellate system–requiring claims based upon evidence contained within the trial record to be brought on direct review–apply with equal force to ineffective-assistance-of-trial-counsel claims. Hand's claim, based on his trial counsel's performance during voir dire, could have been raised on direct appeal with the evidence contained within the trial record, just as he could have raised his analogous voir dire claim regarding the trial court. 2006-Ohio-2028, [WL] at *5 ("We find the [ineffective-assistance-of-trial-counsel] claims presented were cognizable and capable of review on direct appeal. . . . We note the record on direct appeal was supplemented with the jury questionnaires which appellant asserts merit review under post[-]conviction relief herein."). And as previously discussed, it is established law in this circuit that an Ohio court's application of the doctrine of *res judicata* is an independent and adequate state ground sufficient to bar habeas relief. *See Hanna*, 694 F.3d at 614.

> However, Hand argues that the procedural default of his ineffective-assistance-of-trial-counsel claim, unlike his voir dire claim concerning the trial court's conduct, may be excused because his appellate counsel was constitutionally ineffective for not raising it. *See* Appellant's Br. at 39-44. Although Hand is correct that ineffective appellate counsel can excuse a petitioner's procedural default, *see Murray*, 477 U.S. at 492, his appellate counsel was not constitutionally ineffective. The constitutional standard for counsel is governed by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which says

79

that in order to succeed in an ineffective-assistance-of-counsel claim, a claimant must show that counsel acted "outside the wide range of professionally competent assistance" such that the claimant was prejudiced. *Id.* at 690. This is an extremely deferential standard, as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Ibid.* Mere failure to raise a potentially viable claim is not enough, as "[a]ppellate counsel need not raise every non-frivolous claim on direct appeal." *Sanders v. Curtin*, 529 F. App'x 506, 521 (6th Cir. 2013). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Hand's counsel on direct appeal raised thirteen claims for relief, including an array of state and federal constitutional claims. *See supra* Part I.B, pp. 7-11. The thrust of Hand's claim is that his appellate counsel should have also argued that his trial counsel was ineffective for failing to question certain prospective jurors about pretrial publicity, which turns on the substance of his underlying juror-bias-pretrial-publicity claim. But, as Supreme Court precedent makes clear, succeeding on a juror-bias challenge is no easy task. To demonstrate actual prejudice, the publicity and the voir dire testimony must show that "a fair trial was impossible," *White v. Mitchell*, 431 F.3d 517, 532 (6th Cir. 2005) (citation omitted). A mere preconceived notion as to the guilt or innocence of the accused is not enough to rebut the presumption of a prospective juror's impartiality. *Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). Moreover, a reviewing court is instructed to give the trial court's assessment of a juror's impartiality deference because of the unique ability of the trial judge to assess "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling v. United States*, 561 U.S. 358, 386, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010). Although both of the jurors that Hand argues were influenced by pretrial publicity indicated that they held preconceived notions about his case, both also made clear during voir dire that they could set aside any opinions that they might have held and decide the case on the evidence presented in court. Given the number and strength of the other claims Hand raised on direct appeal, the voir dire claim that Hand now alleges his counsel improperly omitted was not so strong that his counsel acted "outside the wide range of professionally competent assistance" by failing to raise it.

Because Hand has not demonstrated that his appellate counsel was ineffective for failing to raise his first claim on direct appeal in state court, the claim is not only procedurally defaulted, but Hand has also not shown sufficient cause and prejudice to excuse the default.

*Hand*, 871 F.3d at 409–11.

As noted above, the Warden maintains that this claim could have and should have been raised on direct appeal. The Undersigned agrees. The state appellate court pointed out that the evidence submitted in Mundt's post-conviction proceedings added nothing from outside the record that was "competent, relative and material" that could not be reviewed on direct appeal. (ECF No. 7-14, PageID 4370.) Mundt contends that he needed evidence outside the record to support this claim, such as trial counsel's knowledge of the pretrial publicity. (Traverse, ECF No. 27, PageID 14536.) Nonetheless, at the evidentiary hearing for Mundt's post-conviction action, the only evidence presented about trial counsel's awareness of pretrial publicity was related to reviewing newspaper articles in preparation for filing the change of venue motion. (ECF No. 8-17, PageID 13273–74.)

In his post-conviction action, Mundt submitted evidence outside the trial record to support his claim through ABA guidelines, Juror Watson's jury questionnaire, and defense counsel's pre-voir dire rating system. (ECF No. 7-7, PageID 2547–2681; ECF No. 7-8, PageID 2987–3003.) This evidence, however, only highlights preconceived notions about the case, which is insufficient to warrant relief. *Hand*, 871 F.3d at 410 (citing *Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961)). Moreover, the voir dire transcript contained the relevant evidence needed to analyze any issues of pretrial publicity warranting a potential change of venue. The transcript would not only reveal any bias from jurors for assessing prejudice but would also reveal trial counsel's performance in questioning the potential jurors. Because the voir dire transcript was part of the trial record, this claim could have and should have been raised on direct appeal. *Id.* at 409–10. With respect to the *Maupin* test, the Undersigned notes that the state courts expressly enforced the procedural rule in Mundt's post-conviction action. Consistently, federal courts have

upheld Ohio's *res judicata* rule as an adequate and independent state ground for denying habeas relief. *Coleman v. Mitchell*, 268 F.3d 417, 432 (6th Cir. 2001); *Hanna v. Ishee*, 694 F.3d 596, 614 (6th Cir. 2012); *Hand*, 871 F.3d at 409; *Davis v. Shoop*, No. 2:16-cv-495, 2020 WL 3255145, at *28 (S.D. Ohio June 16, 2020) (Merz, J.). The state appellate court correctly applied *res judicata* in denying this claim in Mundt's post-conviction action. Accordingly, this claim appears to be procedurally defaulted.

Mundt argues that his post-conviction counsel's performance can serve as cause to excuse the procedural default. (Traverse, ECF No. 27, PageID 14536–37 (citing *Martinez*, 566 U.S. 1; *Trevino*, 569 U.S. 413).) As detailed above, ineffective assistance of post-conviction counsel can constitute cause to excuse a defaulted claim of ineffective assistance of trial counsel that could be raised only in a petitioner's post-conviction proceedings because it relies on evidence outside the trial record. *Martinez*, 566 U.S. 1; *Trevino*, 569 U.S. 413; *White v. Warden*, 940 F.3d 270, 276–77 (6th Cir. 2019).

Here, however, Mundt is not arguing that his post-conviction counsel was ineffective for *failing to raise* this claim in his post-conviction. Mundt instead contends that his post-conviction counsel did not provide "sufficient evidence outside the record" to support this claim. (Traverse, ECF No. 27, PageID 14536–37.) To bolster his assertions, Mundt notes that additional newspaper articles were "readily available" to his post-conviction counsel and that these articles were "found in the materials provided to habeas counsel by the Ohio Public Defender, the agency who represented Mundt on post conviction." (*Id.* at PageID 14536.) Mundt's contentions suffer from several problems.

82

Most notable, Mundt's assertions fail to address that this claim is procedurally defaulted for failing to raise the claim *on direct appeal*.  The procedural default of this claim does not stem from the failure to raise the claim in post-conviction, but rather from failing to raise the claim on direct appeal, discussed above.  Mundt's post-conviction counsel raised this same claim in his post-conviction action (ECF No. 7-6, PageID 2526–28), albeit without evidence outside the record that Mundt contends was necessary to support his claim.  (Traverse, ECF No. 27, PageID 14536.)  As Mundt points out, *Martinez* and *Trevino* allow the ineffective assistance of post-conviction counsel for failing to raise a claim to serve as cause to excuse an ineffective assistance of trial counsel claim.  *White*, 940 F.3d at 276–77.  Ineffective assistance of post-conviction counsel claims, however, cannot serve as cause to excuse default when post-conviction counsel *did* raise the claim at issue.  *Hugueley v. Mays*, 964 F.3d 489, 499 (6th Cir. 2020) ("[P]ost-conviction counsel's failure to take all possible steps to fully develop a claim cannot be the 'cause' of a default as long as counsel properly raised the claim and made a good-faith effort in presenting it."); *Jones v. Bradshaw*, 46 F.4th 459, 482 (6th Cir. 2022) ("Here, the claim *was* raised in postconviction proceedings—albeit not supported by the right evidence in petitioner's view—so there was no procedural default to excuse.  Because Jones's claim was not procedurally defaulted, that necessarily means that *Martinez* and *Trevino* do not apply . . . .").

Another problem with Mundt's assertions is that the newspaper articles submitted in the instant action do not support this ineffective assistance of post-conviction counsel claim.[9]  The

---

[9] To note, these additional newspaper articles were not part of the state court record, meaning consideration of this extra-record evidence is barred by *Cullen v. Pinholster*, 563 U.S. 170 (2011).  Further, in a June 18, 2020, Decision and Order, the Undersigned denied Mundt's motion to expand the record for this claim.  (ECF No. 44, PageID 14895–98.)

articles were published before or during the commencement of his trial and could have been made part of the trial record. (ECF No. 18-3, PageID 14346–49 (including articles from March 2004 to November 2004).) Additionally, two of the three articles were published in areas well removed from Noble County, Ohio, including one from Hamilton, Ohio (*id.* at PageID 14348), and another from Wapakoneta, Ohio. (*Id.* at PageID 14349.) Newspaper articles from other parts of Ohio do not support the claim that pretrial publicity was so pervasive *in the community* that an impartial jury could not be impaneled.

Mundt also notes that the trial record did not contain these "newspaper articles that detailed the misinformation and the extent of the community's preconceived prejudice against [him] concerning his guilt and the punishment he should receive." (Traverse, ECF No. 27, PageID 14536.) With only a general assertion that the news articles contained misinformation, the Undersigned declines to speculate on what, if any, misinformation was conveyed through pretrial publicity.[10] Further, the trial record is replete with newspaper articles, among other media stories and live testimony, about Mundt's case that were presented to the trial court for the change of venue motion and hearing—any contention otherwise is misplaced. (ECF No. 7-3, PageID 737–1019, 1058–1193; ECF No. 8-1, PageID 5966–6050.)

Yet another problem, Mundt does not assert that his state appellate counsel was ineffective for failing to raise this claim on direct appeal—he maintains that this claim had to be raised in post-conviction. (Traverse, ECF No. 27, PageID 14535–37.) Even if Mundt included

---

[10] The only specific "incorrect information" Mundt seemingly points to in support of this contention was a voir dire response from potential Juror No. 993, who noted that she heard "somebody had went by the area where [the victim] was found and when they went back through, Mr. Mundt had found where she was." (Petition, ECF No. 63, PageID 15414, ¶ 107 (citing ECF No. 8-7, PageID 8768).)

an alternative argument to excuse the default through appellate counsel's ineffectiveness on direct appeal, that claim is barred because it was never raised in state court, nor was it properly preserved.  *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (holding that an ineffective assistance of counsel claim cannot be offered as cause to excuse procedural default unless the claim was properly presented in the state courts).

This change of venue and pretrial publicity claim is procedurally defaulted because it should have been raised on direct appeal.  Moreover, Mundt has failed to show cause to excuse the default.

Accordingly, this claim should be **DISMISSED**.

Because "jurists of reason" would not debate the correctness of this procedural ruling, the Undersigned **RECOMMENDS** that a COA should not be issued for this claim.  *Malone v. Warden*, No. 1:16-cv-1160, 2018 WL 722863, at *5 (S.D. Ohio Feb. 6, 2018) (citing *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000)); *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582, at *12 (S.D. Ohio June 5, 2023).

> **Sixth Ground for Relief**:  **The death penalty on its face and as applied to Frederick Mundt is arbitrary, cruel and unusual, and it violates due process. U.S. Const. Amend. 5, 8, & 14.**  (Petition, ECF No. 63, PageID 15420–33, ¶¶ 120–56.)

Mundt contends in his sixth ground for relief that the death penalty and Ohio's death penalty statutes are unconstitutional because the Eighth Amendment "prohibits the infliction of cruel and unusual punishment."  (Petition, ECF No. 63, PageID 15420, ¶ 121.)  Ohio's death penalty scheme, Mundt asserts, "lacks reliability, is an arbitrary application of a serious and irreversible punishment, allows for individual suffering by long delays, and the penalty lacks any penological purpose."  (*Id.* ¶ 122.)  Mundt offers seven sub-claims, analyzed below.

In response, the Warden asserts that Mundt's claims that Ohio's death penalty statutes, and the death penalty *per se*, are unconstitutional is a "boilerplate recitation" and "bears little resemblance" to the same claim raised on direct appeal.  (Return, ECF No. 21, PageID 14433.)  The Warden argues that this claim is barred for lack of fair presentment because the "arguments and contentions" here are "fundamentally dissimilar" to those presented in Mundt's Proposition of Law XI on direct appeal to the Ohio Supreme Court.  (*Id.* (citing *Picard v. Connor*, 404 U.S. 270, 278 (1971)).)  Further, the Warden contends that an argument claiming Ohio's death penalty scheme is unconstitutional "for whatever reason is plainly wrong" because the Supreme Court has never announced such a clearly established Federal law.  (*Id.*)

In reply, Mundt notes that he raised this claim in state court, and the Ohio Supreme Court summarily denied the claim.  (Traverse, ECF No. 27, PageID 14544 (citing *State v. Mundt*, 873 N.E.2d 828, 854 (Ohio 2007)).)  Additionally, Mundt agrees that the United States Supreme Court has not recently found the death penalty unconstitutional, but "[u]nder the evolving standards of decency analysis," the Court has narrowed the death penalty's application.  (*Id.* at PageID 14542 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002); *Roper v. Simmons*, 543 U.S. 551 (2005)).)  As support, Mundt points to decisions from the highest courts in Connecticut and Washington. (*Id.* (citing *State v. Santiago*, 122 A.3d 1, 10 (Conn. 2015); *State v. Gregory*, 427 P.3d 621, 627 (Wash. 2018)).)  Mundt also notes that in dissent to *Glossip v. Gross*, 576 U.S. 863 (2015), four Supreme Court justices "expressed doubt and concern regarding the constitutionality of the death penalty" because of "1) serious unreliability, 2) arbitrariness in application, and 3) unconscionably long delays that undermine the death penalty's penological purpose."  (*Id.* at PageID 14542–43 (quoting *Glossip*, 576 U.S. at 909 (Breyer, J., dissenting)).)

86

On direct appeal, Mundt raised the following proposition of law, with multiple sub-claims:

> OHIO'S DEATH PENALTY LAW IS UNCONSTITUTIONAL. OHIO REV. CODE ANN. §§ 2903.01, O.R.C. § 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, AND 2929.05 DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO FREDERICK MUNDT. U.S. CONST. AMENDS. V, VI, VIII, AND XIV; OHIO CONST. ART. I, §§ 2, 9, 10, AND 16. FURTHER OHIO'S DEATH PENALTY STATUTE VIOLATES THE UNITED STATES' OBLIGATIONS UNDER INTERNATIONAL LAW.

(ECF No. 7-5, PageID 2127–48.) The Ohio Supreme Court summarily overruled Mundt's arguments that the Ohio death penalty statutes were unconstitutional, noting that his attacks "raise[d] long-settled issues." (ECF No. 7-5, PageID 2411 (citing *State v. Spisak*, 521 N.E.2d 800 (Ohio 1988); *State v. Poindexter*, 520 N.E.2d 568, syll. (Ohio 1988)).)

As noted above, under the fair presentment requirement, the petitioner must present "the same claim under the same theory" to the state courts. *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). "It is not sufficient that all the facts necessary to support the federal claim were before the court or that the petitioner made a 'somewhat similar' state-law claim." *Gross v. Warden, Lebanon Corr. Inst.*, 426 F. App'x 349, 355 (6th Cir. 2011) (citing *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). As an initial matter, the Undersigned finds that the arguments raised in Mundt's Proposition of Law XI on direct appeal are not so "fundamentally dissimilar" to bar the entire federal habeas corpus claim for lack of fair presentment. The issue of fair presentment for each sub-claim is addressed individually below.

**A.** **Arbitrary and unequal punishment** (Petition, ECF No. 63, PageID 15421–23, ¶¶ 124–28.)

In his first sub-claim, Mundt asserts that Ohio's death penalty statutory scheme violates the Fourteenth Amendment's Equal Protection Clause, stating that Ohio's scheme imposes the death penalty in an "arbitrary and discriminatory manner in violation of *Furman* and its progeny." (Petition, ECF No. 63, PageID 15421, ¶¶ 124–25.) Pointing out that prosecutors have "virtually uncontrolled indictment discretion," Mundt contends that the "Supreme Court has attempted to interpret the death penalty to make it applicable to only the 'worst of the worst,' . . . but clearly that is not what modern day cases reveal." (*Id.* (citing *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (Stevens, J., dissenting) (footnotes omitted).) Mundt relies on Justice Breyer's dissenting opinion in *Glossip* as support: "[S]tudies indicate that the factors that most clearly ought to affect application of the death penalty–namely, comparative egregiousness of the crime–often do not. Other studies show that circumstances that ought *not* to affect application of the death penalty, such as race, gender, or geography, often do." (*Id.* ¶ 124 (quoting *Glossip*, 576 U.S. at 918 (Breyer, J., dissenting) (emphasis in original)).) Further, Mundt contends that the death penalty does not serve as a "deterrent superior to lesser punishment," and is "neither the least restrictive nor an effective means of deterrence." (*Id.* at PageID 15422–23, ¶¶ 127–28.)

As noted above, the Warden purports that all of Mundt's contentions related to this claim are "fundamentally dissimilar" to those issues raised in state court, making the claim "barred for failure of fair presentment." (Return, ECF No. 21, PageID 14433 (citing *Picard*, 404 U.S. at 278).) For this sub-claim, the Undersigned disagrees. Mundt raised a similar "arbitrary and unequal punishment" claim under Proposition of Law XI on direct appeal as follows:

The Fourteenth Amendment's guarantee of equal protection requires similar treatment of similarly situated persons. This right extends to the protection against cruel and unusual punishment. Furman, 408 U.S. at 249 (Douglas, J., concurring). A death penalty imposed in violation of the Equal Protection guarantee is a cruel and unusual punishment. See id. Any arbitrary use of the death penalty also offends the Eighth Amendment. Id.

Ohio's capital punishment scheme allows the death penalty to be imposed in an arbitrary and discriminatory manner in violation of Furman and its progeny. Prosecutors' virtually uncontrolled indictment discretion allows arbitrary and discriminatory imposition of the death penalty. Mandatory death penalty statutes were deemed fatally flawed because they lacked standards for imposition of a death sentence and were therefore removed from judicial review. Woodson v. North Carolina, 428 U.S. 280 (1976). Prosecutors' uncontrolled discretion violates this requirement.

Ohio's system imposes death in a racially discriminatory manner. Blacks and those who kill white victims are much more likely to get the death penalty. While African-Americans are less than twenty percent of Ohio's population, forty-nine percent (49%) of Ohio's death row inmates are African-American. See Ohio Public Defender Commission Report, 1999; see also The Report of the Ohio Commission on Racial Fairness, 1999. While few Caucasians are sentenced to death for killing African-Americans, over forty African-Americans sit on Ohio's death row for killing a Caucasian. Id. Ohio's statistical disparity is tragically consistent with national findings. The General Accounting Office found victim's race influential at all stages, with stronger evidence involving prosecutorial discretion in charging and trying cases. "Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities," U.S. General Accounting Office, Report to Senate and House Committees on the Judiciary (February 1990).

Ohio courts have not evaluated the implications of these racial disparities. While the General Assembly established a disparity appeals practice in post-conviction that may encourage the Ohio Supreme Court to adopt a rule requiring tracking the offender's race, O.R.C. § 2953.21(A)(2), no rule has been adopted. Further, this practice does not track the victim's race and does not apply to crimes committed before July 1, 1996. In short, Ohio law fails to assure against race discrimination playing a role in capital sentencing.

Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest. Commonwealth v. O'Neal II, 339 N.E.2d 676, 678 (Mass. 1975) (Tauro, C.J. concurring); Utah v. Pierre, 572 P.2d 1338 (Utah 1977) (Maughan, J., concurring and dissenting). Moreover, where fundamental rights are involved personal liberties cannot be broadly stifled "when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479 (1960). To take a life

by mandate, the State must show that it is the "least restrictive means" to a "compelling governmental end." O'Neal, 339 N.E.2d at 678.

The death penalty is neither the least restrictive nor an effective means of deterrence. Both isolation of the offender and retribution can be effectively served by less restrictive means. Society's interests do not justify the death penalty.

(ECF No. 7-5, PageID 2127–29.)

On direct appeal, as with the claim raised in the instant action, Mundt focused on the unequal application of the death penalty and the prosecution's unfettered discretion on whom to indict on capital charges. These contentions are the same both on direct appeal and in Mundt's federal habeas petition. While Mundt honed in more on the racial disparities on direct appeal and just touched on that issue here, the claims are based on the same legal theories and are not "fundamentally dissimilar" as the Warden asserts. Hicks, 377 F.3d at 552–53 (quoting Pillette, 824 F.2d at 497). This claim is not barred by lack of fair presentment.

Mundt's claim, however, is without merit. Though the Ohio Supreme Court summarily denied this claim on direct appeal without providing substantive analysis (ECF No. 7-5, PageID 2411), it was not an unreasonable decision. England v. Hart, 970 F.3d 698, 710 (6th Cir. 2020) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)) (noting that to be deemed unreasonable, "the state court's ruling…[must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."). As the Warden correctly points out, the United States Supreme Court has never held that prosecutors' unfettered discretion, or any other such factor, renders Ohio's death penalty arbitrary. Mundt acknowledges this fact in his Reply, and then relies on state Supreme Court decisions to support his claim that the death penalty is applied in an arbitrary manner.

90

(Traverse, ECF No. 27, PageID 14542 (quoting *Santiago*, 122 A.3d at 9 ("[the death penalty] no longer comports with contemporary standards of decency and no longer serves any legitimate penological purpose"); *Gregory*, 427 P.3d at 627 ("The death penalty is invalid because it is imposed in an arbitrary and racially biased manner")).)  Despite a recent trend of states eliminating capital punishment, the United States Supreme Court has not done so.

Moreover, this same claim has been rejected by the Sixth Circuit and by other courts in this District.  As the Sixth Circuit noted in *Smith v. Mitchell*, 567 F.3d 246 (6th Cir. 2009): "Smith argues that '[p]rosecutors' virtually uncontrolled indictment discretion allows arbitrary and discriminatory imposition of the death penalty.' . . . We have previously rejected the same argument regarding the death-penalty system in Ohio."  *Smith*, 567 F.3d at 261 (citing *Williams v. Bagley*, 380 F.3d 932, 963 (6th Cir. 2004))  Judge Merz noted the same in *O'Neal v. Bagley*, 1:02-cv-357, 2010 WL 6423295 (S.D. Ohio Oct. 14, 2010):

> The Supreme Court held in *McClesky v. Kemp* that statistical studies suggesting racially-motivated disparities in the selection and prosecution of death penalty cases is insufficient to support a claim that such discriminatory practices occurred in the petitioner's case.  481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).  O'Neal has produced no evidence that the decision-makers in this particular case acted in a discriminatory manner.  The same claim has been rejected by this Court in *Zuern v. Tate*, 101 F. Supp. 2d 948, 1002 (S.D. Ohio 2000) *rev'd on other grounds*, 336 F.3d 478 (6th Cir. 2003), on the authority of *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

*O'Neal*, 2010 WL 6423295, at *61.  Accordingly, the Ohio Supreme Court was not unreasonable in denying this claim.

This sub-claim is without merit and should be **DISMISSED**.

**B.**     **Unreliable sentencing procedures** (Petition, ECF No. 63, PageID 15423–25, ¶¶ 129–34.)

Mundt next argues that Ohio's death penalty scheme results in unreliable sentencing procedures.  (Petition, ECF No. 63, PageID 15423, ¶ 130.)  Mundt asserts that the Ohio statutory scheme allows for unreliable sentencing because it is unconstitutionally vague.  (*Id.*)  Specifically, he contends that using "outweigh" to compare the aggravating and mitigating circumstances "preserves reliance on the lesser standard of proof by a preponderance of the evidence," creating an "unacceptable risk of arbitrary or capricious sentencing."  (*Id.*)  Further, Mundt maintains that Ohio's mitigating factors are vague, when the jury should be given clear guidance on sentencing.  (*Id.* at PageID 15424, ¶ 131 (citations omitted).)

The Warden, as noted, contends that the whole of Mundt's sixth ground for relief is barred by lack of fair presentment.  (Return, ECF No. 21, PageID 14433.)  In reply, Mundt notes that he raised this claim on direct appeal and reiterates that the "Ohio death penalty is [] unreliable in its sentencing procedures due to its vagueness."  (Traverse, ECF No. 27, PageID 14543.)

Mundt's "unreliable sentencing procedures" claim raised in the instant action is mostly a verbatim reiteration of the same claim raised on direct appeal.  (*Compare* Petition, ECF No. 63, PageID 15423–25, ¶¶ 129–34, *with* ECF No. 7-5, PageID 2129–30.)  Leaving out citations to Ohio state court decisions used as support on direct appeal (*see* ECF No. 7-5, PageID 2130), Mundt does add support to this federal habeas claim through *Hurst v. Florida*, 577 U.S. 92 (2016).  (Petition, ECF No. 63, PageID 15424–25, ¶¶ 133–34.)  Notably, Mundt asserts:

133). Most recently, on January 12, 2016, the United States Supreme Court decided *Hurst v. Florida*, 136 S. Ct. (2016), which clarifies that the Sixth Amendment requires a defendant's death sentence to be based on a jury verdict,

92

not a judge's fact finding. *Id.* at 624. The Supreme Court's *Hurst* decision directly implicates Ohio's death-penalty scheme. This makes the empirical evidence regarding juror confusion and misapplication of Ohio's death penalty all the more important since an unreliable jury verdict undermines the constitutional validity of a defendant's death sentence.

134). Under Ohio law as applied, the jury only provides an advisory recommendation of death to the trial court and then the judge ultimately identifies mitigating evidence, determines what weight the mitigation is to be afforded, and determines if the statutory aggravating circumstances outweigh these mitigating factors in order to sentence a defendant to death. *Hurst* clarifies that a death penalty scheme that removes the ultimate determination from the jury's hands is unconstitutional. And under *Hurst*, post hoc judicial fact-finding cannot cure defects in jury sentencing because the findings of an appellate court cannot replace the jury's verdict. *Id.*, at 624. Accordingly, *Hurst* is another example of why Mr. Mundt's death sentence is unconstitutional under the Sixth, Eighth, and Fourteenth Amendments.

(*Id.*)

Arguably, the claim is not so "fundamentally dissimilar" to the claim raised on direct appeal to bar it for lack of fair presentment. Mundt was not able to raise *Hurst* as support for his initial claims in the state courts because it was decided after both his direct appeal and state post-conviction actions were adjudicated. Here, Mundt notes that "*Hurst* is another example of why [his] death sentence is unconstitutional." (*Id.* at PageID 15425, ¶ 134.) Mundt does not necessarily assert a different theory, rather he is bolstering his argument with a more recent case. Mundt's claim in the instant action, like on direct appeal, focuses on the contention that Ohio's death penalty scheme does not meet the prohibition against "arbitrary and capricious procedures in the state's application of capital punishment" as set forth in *Gregg v. Georgia*, 428 U.S. 153, 188–89, 193–95 (1976), and *Furman v. Georgia*, 408 U.S. 238, 255, 274 (1972). (Petition, ECF No. 63, PageID 15423, ¶ 129.)

That being said, Mundt's theory on direct appeal does differ from the instant federal habeas claim because of his *Hurst* argument.[11]  Although Mundt could not use *Hurst* as support on direct appeal, the same argument could have been raised through *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).  *Hutton v. Mitchell*, 839 F.3d 486, 499 (6th Cir. 2016) (explaining that *Hurst* "reiterated" *Apprendi* and relied on *Ring*), *rev'd on other grounds*; *Gapen v. Robinson*, No. 3:08-cv-280, 2017 WL 3524688, at *5 (S.D. Ohio Aug. 14, 2017) (Rice, J.); *Sneed v. Jenkins*, No. 5:17-cv-83, 2017 WL 564821, at *4 (N.D. Ohio Feb. 13, 2017) (Gaughan, J.).  Both *Apprendi* and *Ring* were available as support for this claim prior to the *Hurst* decision, but Mundt failed to raise those cases as support for his arguments on direct appeal.  (ECF No. 7-5, PageID 2129–30.)  Accordingly, the Undersigned finds that this claim was not fairly presented to the state courts and is barred by procedural default.

Regardless of lacking fair presentment, this claim is meritless.  This same claim, pre-*Hurst*, was addressed and subsequently denied in *Moore v. Mitchell*, No. 1:00-cv-023, 2007 WL 4754340 (S.D. Ohio Feb. 15, 2007) (Merz, J.):

> Next Moore argues that Ohio's capital sentencing scheme results in unreliable sentencing procedures.  (Petition, Doc. No. 29 at 92.)  Specifically he argues that Ohio does not meet Due Process and Equal Protection Clauses in that it does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty.  Additionally, he argues that Ohio's death penalty statute fails to provide sufficient guidance on how to determine the existence of

---

[11] To note, Mundt did raise a *Hurst* argument to the state courts in his Motion for a New Mitigation Trial.  (ECF No. 7-16, PageID 4488–4508, 4567–88.)  The state appellate court denied this claim on appeal.  (*Id.* at PageID 4521–26.)  The Undersigned notes that whether raising this argument in such a motion constitutes fair presentment, subsequently affording deference to the state appellate court's denial, is not a necessary determination in this instance because the claim clearly fails on the merits.  *Overton v. Macauley*, 822 F. App'x 341, 346 (6th Cir. 2020) (citing *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)) ("Although procedural default often appears as a preliminary question, we may decide the merits first.").

94

mitigating factors and fails to establish a standard by which to balance the mitigating factors against the aggravating circumstances. *Id.* The United States Supreme Court has never held that "the state must affirmatively structure in a particular way the manner in which juries must consider mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998). The Court notes, too, that the Ohio statutes clearly place the burden of proving the existence of any mitigating factors on the defendant in a capital case, Ohio Rev. Code § 2929.03(D)(1), and a requirement that the defendant do so by a preponderance of the evidence does not offend the federal constitution. *See Walton v. Arizona*, 497 U.S. 639, 649-51, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) *overruled in part by Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

*Moore*, 2007 WL 4754340, at *90.

Even supporting his claim under *Hurst*, Mundt's contentions are unpersuasive because "the Supreme Court has not made *Hurst* retroactive to cases on collateral review as required by 28 U.S.C. § 2244(b)(2)." *In re Bonnell*, No. 17-3886, 2018 WL 11298156, at *1 (6th Cir. 2018) (citing *In re Coley*, 871 F.3d 455, 457 (6th Cir. 2017); *Tyler v. Cain*, 533 U.S. 656, 662–63 (2001)). Further, other courts in this District have denied habeas relief for the same assertions under *Hurst. See, e.g.*, *Johnson v. Bobby*, No. 2:08-cv-55, 2021 WL 6125049, at *154 (S.D. Ohio Dec. 28, 2021) (Morrison, J.). As noted in *Johnson*:

First, *Hurst* announced a new rule that does not apply retroactively to Petitioner's case. Generally, a new rule announced after a defendant's conviction and sentence become final may not be the basis for federal habeas relief unless it falls within one of two narrow exceptions. *Stringer*, 503 U.S. at 227; *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). *Hurst* was decided on January 12, 2016, while Petitioner's conviction and sentence became final upon direct appeal when the United States Supreme Court denied his petition for certiorari on October 1, 2007. (ECF No. 82-13, PageID 2877.) Thus, if *Hurst* indeed was a new rule, it cannot be the basis for habeas relief here. This Court has held on numerous occasions that *Hurst* did announce a new rule that may not be applied retroactively in habeas corpus, a position the Court again adopts here. *See, e.g.*, *Davis v. Shoop*, Case No. 2:16-cv-495, 2020 U.S. Dist. LEXIS 106444, 2020 WL 3255145, at *30 (S.D. Ohio June 16, 2020); *McKnight v. Bobby*, Case No. 2:09-cv-059, 2017 U.S. Dist. LEXIS 21946, 2017 WL 631411, at *4-5 (S.D. Ohio Feb. 15, 2017); *Fears v. Jenkins*, Case No.

95

2:17-cv-029, 2017 U.S. Dist. LEXIS 47901, 2017 WL 1177609, at *3 (S.D. Ohio Mar. 30, 2017).

Second, even if *Hurst* applied to Petitioner's case, his argument could not survive the Supreme Court's subsequent opinion in *McKinney v. Arizona*, 140 S.Ct. 702, 206 L. Ed. 2d 69 (2020). In *McKinney*, the Court held that a state supreme court could independently reweigh the aggravating and mitigating factors to reaffirm a death sentence even *after* habeas relief was granted, without the need for jury resentencing, in accordance with *Clemons*. *Id.* at 706-07.

*Johnson*, 2021 WL 6125049, at *154. Here, the record does not indicate whether Mundt sought

certiorari from the United States Supreme Court. Mundt's direct appeal, however, was decided

in October 2007. (ECF No. 7-5, PageID 2372.) Mundt's conviction and sentence therefore

became final well before *Hurst* was decided in 2016. *See Jones v. Rewerts*, No. 23-1390, 2023

U.S. App. LEXIS 23462, at *3 (6th Cir. 2023) (citing Sup. Ct. R. 13.1; *Jimenez v. Quarterman*,

555 U.S. 113, 119 (2009)) ("[Jones's] conviction became final . . . upon the expiration of the 90-

day period in which Jones could have filed a petition for a writ of certiorari in the United States

Supreme Court."). Accordingly, the Ohio Supreme Court's decision in rejecting Mundt's claim

was not contrary to, or an unreasonable application of, clearly established federal law.

This sub-claim is without merit and should be **DISMISSED**.

**C.  Ohio Rev. Code § 2929.04(A)(7) is constitutionally invalid when used to aggravate Ohio Rev. Code § 2903.01(B) aggravated murder.** (Petition, ECF No. 63, PageID 15425–27, ¶¶ 135–140.)

Mundt next claims that Ohio's statutory scheme, specifically O.R.C. § 2929.04(A)(7),

"fails to genuinely narrow the class of individuals eligible for the death penalty," as required

under the Eighth Amendment. (Petition, ECF No. 63, PageID 15425, ¶ 135 (citing *Zant v.

Stephens*, 462 U.S. 862, 877 (1983)).) Mundt also contends that merely repeating the definition

of felony-murder as an aggravating circumstance "automatically qualifies the defendant for the

96

death penalty." (*Id.* ¶ 137.)  This repetition, Mundt asserts, means that felony-murders are "treated more severely" than other aggravated murders.  (*Id.* at PageID 15426, ¶ 138.)

Again, the Warden claims this assertion is different than the claim raised on direct appeal. (Return, ECF No. 21, PageID 14433.)  Mundt, in reply, maintains that O.R.C. §§ 2929.03(D)(1) and 2929.04 are unconstitutionally vague, and that he properly raised the claim on direct appeal. (Traverse, ECF No. 27, PageID 14543–44.)

Only a few additional sentences are found in the claim raised on direct appeal compared to the claim raised in the instant action—and those additions do not change the theory of the claim to warrant a finding it is barred for lack of fair presentment.[12]  (*Compare* Petition, ECF No. 63, PageID 15425–27, ¶¶ 135–40, *with* ECF No. 7-5, PageID 2131–33.)  How the Warden finds this claim "fundamentally dissimilar" from the one raised on direct appeal is unclear, and the Undersigned is unpersuaded that this claim lacks fair presentment.

Reviewing this claim on the merits, however, the Undersigned finds that the Ohio Supreme Court was not unreasonable in denying the claim on direct appeal.  To be constitutional, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the

---

[12] The additional sentences included in the claim raised on direct appeal are as follows:

> The killer who kills with prior calculation and design is treated less severely, which is also nonsensical because his blameworthiness or moral guilt is higher, and the argued ability to deter him less. From a retributive stance, this is the most culpable of mental states. * * * The most brutal, cold-blooded and premeditated murderers do not fall within the types of murder that are automatically eligible for the death penalty.

(ECF No. 7-5, PageID 2132–33 (citation omitted).)

defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant*, 462 U.S. at 877). Under the Ohio capital sentencing scheme, the jury is required to find at least one aggravating circumstance before imposing a death sentence, creating a narrowing of the class of persons that may be eligible for the sentence. O.R.C. §§ 2903.01(B), 2929.04(A)(7). Furthermore, "an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself." *Williams v. Taylor*, 529 U.S. 362, 392 n.16 (2000) (citing *Lowenfield*, 484 U.S. 231).

Mundt's claim has been rejected by the Sixth Circuit and by other courts in this District because Ohio's death penalty scheme sufficiently narrows the class of eligible defendants:

> [I]t would be entirely within constitutional bounds for Ohio to provide similar definitions for both "aggravated murder" (in Ohio Rev. Code § 2903.01(B)) and "aggravating circumstances" (in Ohio Rev. Code § 2929.04(A)(7)). What matters is that Ohio has, *in the first instance*, narrowed the class of those eligible for the death penalty by requiring some aggravated form of murder.

*Cooey v. Coyle*, No. 98-3050, 2000 U.S. App. LEXIS 38700, at *94 (6th Cir. 2000) (emphasis in original) (citing *Lowenfield*, 484 U.S. at 243); *Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000) (finding that any overlap in the Ohio statutes was not problematic because O.R.C. § 2929.04(A)(7) also requires that the defendant was either "the principal offender in the commission of the Aggravated Murder or, if not the principal offender, committed the Aggravated Murder with prior calculation or design"); *Keene v. Mitchell*, No. 1:00-cv-421, 2004 WL 3325797, at *77 (S.D. Ohio Aug. 25, 2004) (Merz, J.) (citing *Lowenfield*, 484 U.S. at 231; *Buell v. Mitchell*, 274 F.3d 337, 369–70 (6th Cir. 2001)) ("Mr. Keene's next argument is that the Ohio death penalty statutes are unconstitutional because they fail to genuinely narrow the class

98

of individuals eligible for the death penalty. The United States Supreme Court rejected an argument similar to Mr. Keene's[.]"); *Moore*, 2007 WL 4754340, at *91; *Johnson*, 2021 WL 6125049, at *157–58. The Ohio Supreme Court was thus not unreasonable in denying Mundt's claim on direct appeal.

This sub-claim is without merit and should be **DISMISSED**.

**D.    Ohio Rev. Code §§ 2929.03(D)(1) and 2929.04 are unconstitutionally vague** (Petition, ECF No. 63, PageID 15427–28, ¶¶ 141–45.)

Mundt next alleges that Ohio's death penalty scheme is unconstitutionally vague because O.R.C. § 2929.03(D)(1) references "the nature and circumstances of the aggravating circumstance" as "factors to be weighed in favor of death," but then O.R.C. § 2929.04(B) lists the "nature and circumstances of the offense" as a mitigating factor. (Petition, ECF No. 63, PageID 15427, ¶ 141.) Because of this issue, Mundt contends, the jury is afforded "unfettered discretion to weigh a statutory mitigating factor as an aggravator." (*Id.*) As noted, the Warden purports that this claim is different from the claim raised on direct appeal. (Return, ECF No. 21, PageID 14433.) Mundt replies by reiterating that these statutory provisions are unconstitutionally vague because allowing the jury to have "discretion to consider *any* circumstance, the jury may impose the death penalty on any other fact in evidence arising from the nature and circumstances of the offense that the *jury* deems aggravating." (Traverse, ECF No. 27, PageID 14543 (emphasis in original).)

The sub-claim raised here is identical to the claim raised on direct appeal, apart from a few minor word changes. (*Compare* Petition, ECF No. 63, PageID 15427–28, ¶¶ 141–45, *with* ECF No. 7-5, PageID 2134–35.) The Warden's contention that this claim is barred for lack of fair presentment is unpersuasive.

Reviewing this claim on the merits, however, the Undersigned finds that the Ohio Supreme Court was not unreasonable in denying the claim on direct appeal.  As the Sixth Circuit concluded in *Cooey*:

> We find this argument meritless.  The only conceivable way for a court properly to weigh all the aggravating and mitigating circumstances is to take a hard look in both instances at the "nature and circumstances of the offense."  We cannot understand how the court's analysis could possibly become "unconstitutionally vague" by looking at the nature and circumstances of the offense in determining both aggravating and mitigating circumstances.  We cannot even imagine a constitutional violation here.

*Cooey*, 2000 U.S. App. LEXIS 38700, at *97.  This same claim has also been rejected by other Courts in this District.  *Stojetz v. Ishee*, No. 2:04-cv-263, 2014 WL 4775209, at *103–04 (S.D. Ohio Sept. 24, 2014) (Frost, J.); *Moore*, 2007 WL 4754340, at *74.  Finding that this same claim "does not present a Constitutional violation," the *Stojetz* court pointed out the following:

> This claim cannot prevail.  The United States Supreme Court has held that, "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'"  *Tuilaepa v. California*, 512 U.S. 967, 979-80, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994) (quoting *Zant v. Stephens*, 462 U.S. 862, 875, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) (further citations omitted).  Thus, because Ohio's death penalty scheme requires that the fact finder limit those eligible for the death penalty by requiring it to find the existence of at least one aggravating circumstance set forth in § 2929.04(A) during the culpability phase of trial, the Ohio scheme complies with the constitutional requirements as proscribed by the Supreme Court.

*Stojetz*, 2014 WL 4775209, at *104 (quoting *Smith v. Bradshaw*, No. 1:04-cv-694, 2007 WL 2840379, at *32 (N.D. Ohio Sept. 27, 2007) (O'Malley, J.)).  Accordingly, the Ohio Supreme Court's rejection of this claim was not an unreasonable application of clearly established federal law.

This sub-claim is without merit and should be **DISMISSED**.

100

**E.     Mandatory death penalty and failure to require appropriateness analysis**  (Petition, ECF No. 63, PageID 15428–31, ¶¶ 146–52.)

Mundt next contends that Ohio's "death penalty scheme precludes a mercy option," and is unconstitutional because it allows for a mandatory death penalty sentence without including an appropriateness analysis.  (Petition, ECF No. 63, PageID 15428–29, ¶ 146.)  Specifically, Mundt asserts that under Ohio's death penalty statutes a "death sentence is mandated after a mere weighing."  (*Id.* at PageID 15430, ¶ 151.)  Further, Mundt argues that despite the fact the Ohio Supreme Court claims a jury "'is not precluded from extending mercy to a defendant,' . . . Ohio juries are not informed of this capability," permitting "penalty phase jury instructions in direct contradiction to this extension of mercy capability."  (*Id.* at PageID 15430–31, ¶ 151 (quoting *State v. Zuern*, 512 N.E.2d 585, 593 (Ohio 1987)).)

Again, the Warden asserts that the entire claim Mundt raises here is dissimilar to the claim raised on direct appeal and is therefore barred for lack of fair presentment.  (Return, ECF No. 21, PageID 14433.)  Mundt replies by reiterating that he raised an "unconstitutionality of the death penalty" claim on direct appeal.  (Traverse, ECF No. 27, PageID 14544 (citing *State v. Mundt*, 873 N.E.2d 828, 854 (Ohio 2007)).)

The direct appeal claim that is most like the sub-claim Mundt raises here is as follows:

Ohio Revised Code §§ 2929.021 and 2929.03 require data be reported to the courts of appeals and to the Supreme Court of Ohio.  There are substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses or after charge reductions at trial.  O.R.C. § 2929.021 requires only minimal information on these cases.  Additional data is necessary to make an adequate comparison in these cases.  This prohibits adequate appellate review.

Adequate appellate review is a precondition to the constitutionality of a state death penalty system.  Zant, 462 U.S. at 879; Pulley v. Harris, 465 U.S. 37 (1984). The standard for review is one of careful scrutiny.  Zant, 462 U.S. at 884-85.

Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime.  Id.

Ohio's statutes' failure to require the jury or three-judge panel recommending life imprisonment to identify the mitigating factors undercuts adequate appellate review.  Without this information, no significant comparison of cases is possible.  Without a significant comparison of cases, there can be no meaningful appellate review.  See State v. Murphy, 91 Ohio St. 3d 516, 562, 747 N.E.2d 765, 813 (2001) (Pfeifer, J., dissenting) ("When we compare a case in which the death penalty was imposed only to other cases in which the death penalty was imposed, we continually lower the bar of proportionality.  The lowest common denominator becomes the standard.")

The comparison method is also constitutionally flawed.  Review of cases where the death penalty was imposed satisfies the proportionality review required by O.R.C. § 2929.05(A).  State v. Steffen, 31 Ohio St. 3d 111, 509 N.E.2d 383, syl. 1 (1987).  However, this prevents a fair proportionality review.  There is no meaningful manner to distinguish capital defendants who deserve the death penalty from those who do not.

This Court's appropriateness analysis is also constitutionally infirm.  O.R.C. § 2929.05(A) requires appellate courts to determine the appropriateness of the death penalty in each case.  The statute directs affirmance only where the court is persuaded that the aggravating circumstances outweigh the mitigating factors and that death is the appropriate sentence.  Id.  This Court has not followed these dictates.  The appropriateness review conducted is very cursory.  It does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."  Spaziano v. Florida, 468 U.S. 447, 460 (1984).

The cursory appropriateness review also violates the capital defendant's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.  The General Assembly provided capital appellants with the statutory right of proportionality review.  When a state acts with significant discretion, it must act in accordance with the Due Process Clause.  Evitts v. Lucey, 469 U.S. 387, 401 (1985).  The review currently used violates this constitutional mandate.  An insufficient proportionality review violates Mundt's due process, liberty interest in O.R.C. § 2929.05.

(ECF No. 7-5, PageID 2135–37.)

As the Warden contends, and the Undersigned agrees, the sub-claim raised on direct

appeal and the federal habeas sub-claim raised here are not the same.  (Compare Petition, ECF

No. 63, PageID 15428–31, ¶¶ 146–52, *with* ECF No. 7-5, PageID 2135–37.)  On direct appeal, Mundt raised a sub-claim related to the "proportionality and appropriateness review" of Ohio's death penalty scheme, asserting that this issue prevented "adequate appellate review."  (ECF No. 7-5, PageID 2135.)  In the instant action, Mundt does not focus on proportionality and adequate appellate review, rather his focus is on the Ohio death penalty statutory scheme mandating a death sentence after the mere weighing of aggravating and mitigating factors.  (Petition, ECF No. 63, PageID 15430–31, ¶¶ 148, 151 ("The Ohio statute permits no appropriateness determination; a death sentence is mandated after a mere weighing."  *Id.* at PageID 15430, ¶ 151).)  Mundt contends that this scheme "precludes a mercy option," and a "limit on the sentencing authority's ability to return a life verdict is impermissible."  (*Id.* at PageID 15428–29, ¶ 146.)

While Mundt asserts issues surrounding the appropriateness review in both sub-claims, the claims are not based on the "same theory."  *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  The instant federal habeas sub-claim does not mirror any other claims raised in the state court proceedings.  Because this sub-claim was not properly considered by the state court, the Undersigned necessarily finds that this claim is barred for lack of fair presentment.  *Picard v. Connor*, 404 U.S. 270, 275–76 (1971).

In any event, the claim is meritless.  To support this claim, Mundt relies on *California v. Brown*, 479 U.S. 538, 543 (1987), noting that the Supreme Court "agreed that jurors may be cautioned against reliance on 'extraneous emotional factors,' and that it was proper to instruct the jurors to disregard 'mere sympathy.'"  (Petition, ECF No. 63, PageID 15430, ¶ 150.)  Mundt asserts that this finding "approved and mandated that jurors be permitted to consider mercy, i.e., sympathy tethered or engendered by the penalty phase evidence."  (*Id.*)  The Supreme Court,

however, authorized that informing juries about a mercy option was constitutionally

*permissible*—not that such an instruction was constitutionally *required*.  *Brown*, 479 U.S. 538;

*see also Mapes v. Coyle*, 171 F.3d 408, 416 (6th Cir. 1999) ("Thus, there is no merit whatsoever

to Mapes's claimed entitlement to a 'merciful discretion' instruction, in light of the likely

tendency of such an instruction to lead to arbitrary differences in whom is selected to be

sentenced to death."); *Wogenstahl v. Mitchell*, No. 1:99-cv-843, 2007 U.S. Dist. LEXIS 102405,

at * 295 (S.D. Ohio Jan. 2, 2007) (Merz, J.) (citing *Blystone v. Pennsylvania*, 494 U.S. 299

(1990); *Boyde v. California*, 494 U.S. 370 (1990)) (rejecting the petitioner's claim "that the Ohio

death penalty scheme is unconstitutional because it does not give the sentencing authority the

option to impose a life sentence, or give mercy, when it finds that the aggravating circumstances

outweigh the mitigating factors").  Even if Mundt had fairly presented this claim to the state

courts, it would fail on the merits.

This sub-claim should be **DISMISSED** for lack of fair presentment, or in the alternative,

**DENIED** on the merits.

> **F.      Recommendations from the Joint Task Force to Review the Administration of Ohio's Death Penalty**  (Petition, ECF No. 63, PageID 15431–33, ¶¶ 153–56.)

Mundt's final sub-claim regarding the constitutionality of Ohio's death penalty scheme

relates to findings from a Joint Task Force[13] that reviewed the Ohio statutory provisions.

(Petition, ECF No. 63, PageID 15431–32, ¶¶ 153–54.)  Mundt points out five recommendations,

which "demonstrate that the Ohio capital punishment statute and scheme is flawed."  (*Id.*)  As

---

[13] Final report available at:
https://www.supremecourt.ohio.gov/Boards/deathPenalty/resources/finalReport.pdf.

with the other sub-claims raised here, the Warden asserts that the claim should be barred for lack of fair presentment.  (Return, ECF No. 21, PageID 14433.)  In this instance, the Undersigned agrees.

As Mundt points out, the Task Force was convened in 2011, and the "Task Force issued its final report with 56 recommendations that covered every aspect of a capital punishment in Ohio, from charging to clemency" in April 2014.  (Petition, ECF No. 63, PageID 15431, ¶ 153 (footnote omitted).)  Mundt's direct appeal was filed on January 28, 2005 (ECF No. 7-5, PageID 1826), and the Ohio Supreme Court delivered its opinion on October 3, 2007.  (*Id*. at PageID 2372.)  Mundt could not raise this claim on direct appeal because the Joint Task Force was created after his direct appeal was decided.  The state trial court denied post-conviction relief on August 23, 2013 (ECF No. 7-13, PageID 4176), and Mundt filed his appeal to the state appellate court on September 23, 2013 (ECF No. 7-14, PageID 4232), both before the Task Force recommendations came out in April 2014.  The state appellate court, however, did not render a decision until June 30, 2016 (*id.* at PageID 4231), allowing ample time for Mundt to add any claim about the Task Force recommendations to his state post-conviction proceedings.  Mundt subsequently appealed his post-conviction denial to the Ohio Supreme Court on August 15, 2016 (*id.*), affording him another opportunity to fairly raise this claim to the state courts.  Since he failed to fairly present this claim to the state court, Mundt cannot now seek federal habeas relief.[14]  *Picard v. Connor*, 404 U.S. 270, 275–76 (1971).

---

[14] Reviewing this claim on the merits would still not warrant relief.  As pointed out in *Leonard v. Warden, Ohio State Penitentiary*, No. 1:09-cv-056, 2015 WL 2341094, at *45 (S.D. Ohio May 14, 2015) (Dlott, J.), this reviewing court has "no basis to challenge the factual findings of the [Ohio Joint Task Force's] reviews.  Unfortunately for [petitioner], these findings are not sufficient to establish that the Ohio Supreme Court's determination that Ohio's

This sub-claim is barred for a lack of fair presentment and should be **DISMISSED**.

Accordingly, the entirety of this claim should be **DISMISSED** based on either procedural default or the merits.

As noted, a COA should not be issued unless a petitioner has shown that "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim or that the issue could be resolved in a different manner. *Malone v. Warden*, No. 1:16-cv-1160, 2018 WL 722863, at *5 (S.D. Ohio Feb. 6, 2018) (citing *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000)). Because "jurists of reason" would not debate the correctness of the above procedural or merits rulings for each sub-claim in Mundt's sixth ground for relief, the Undersigned **RECOMMENDS** that a COA should not be issued for this claim. *Malone*, 2018 WL 722863, at *5 (citing *Slack*, 529 U.S. at 484–85); *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582, at *12 (S.D. Ohio June 5, 2023).

> **Seventh Ground for Relief:** **The service of a juror in the penalty phase who could not fairly consider a sentence less than death violated Frederick Mundt's due process right to a fair and impartial jury trial on the matter of capital punishment. U.S. Const. Amend. XIV.** (Petition, ECF No. 63, PageID 15434–39, ¶¶ 157–80.)

> **Eighth Ground for Relief:** **Frederick Mundt was denied the effective assistance of counsel at *voir dire* as the result of trial counsel's failure to challenge for cause two jurors who were biased on the matter of whether to impose a death sentence. U.S. Const. Amend. VI, XIV.** (Petition, ECF No. 63, PageID 15440–48, ¶¶ 181–211.)

As to the seventh and eighth grounds for relief, the parties combined their responses to these claims: the Warden in the Return of Writ (ECF No. 21, PageID 14434–40), and Mundt in

---

prosecutorial system is constitutional is contrary to or an unreasonable application of clearly established federal law."

the Traverse (ECF No. 27, PageID 14544–49.)  The Undersigned addresses these claims together.

In his seventh ground for relief, Mundt asserts that juror Julie Watson was not able to "fairly consider a sentence of less than death."  (Petition, ECF No. 63, PageID 15434, ¶ 158.) According to Mundt, the record contains numerous indications that "Juror Watson was an [automatic death penalty] juror who could not fairly consider" any life sentence options, nor "give a fair assurance she could follow the law rather than her heart."  (*Id.* at PageID 15435, ¶ 162.)  He points to group voir dire when, in response to a question whether anyone had strong feelings about Mundt being charged with the rape, kidnapping, and aggravated murder of a seven-year-old girl, Juror Watson gave the following answer:  "My daughter's seven. …. My daughter's seven and it's kind of violent and it bothers me, but I think I'll be able to handle it." (*Id.* ¶ 163.)  Mundt also points to responses Juror Watson included in her jury questionnaire, further detailed below.  (*Id.* at PageID 15435–36, ¶¶ 164–68.)  Mundt cites to Juror Watson's varying responses during individual voir dire to show that on the one hand, she claimed no moral, religious, or other objections to capital punishment, and on the other hand she indicated her preference for the death penalty.  (*Id.* at PageID 15437, ¶¶ 169–70.)

Additionally, in his eighth ground for relief, Mundt contends that trial counsel were ineffective for failing to challenge for cause Juror Watson and Juror Gaydosik.  (*Id.* at PageID 15440, ¶ 182.)  Mundt asserts that both jurors "raised red flags on their unwillingness to fairly consider a life sentencing option on these facts."  (*Id.*)  Trial counsel were required to conduct a reasonably competent voir dire, which Mundt alleges his counsel failed to do.  (*Id.* at PageID 15441, ¶¶ 185–86.)  Mundt maintains that he was prejudiced by his trial counsel failing to

challenge these biased jurors, allowing them to be impaneled.  (*Id.* at PageID 15440, ¶ 182.)

Mundt points to *Morgan v. Illinois*, 504 U.S. 719 (1992), as support for both his seventh claim

(Petition, ECF No. 63, PageID 15434–35, ¶¶ 159–61), and eighth claim.  (*Id.* at PageID 15440–

41, ¶¶ 184–85.)  Mundt notes that his trial counsel failed to adequately question Jurors Watson

and Gaydosik to his prejudice because the "actual service of a single [automatic death penalty]

juror would violate the Constitution."  (*Id.* at PageID 15434–35, ¶ 161 (citations omitted);

PageID 15441, ¶ 186.)

 According to the Warden, denial of both grounds is warranted because Mundt "wholly

fails to address" whether the state courts were unreasonable in denying these claims.  (Return,

ECF No. 21, PageID 14434.)  The Warden contends that Mundt merely reiterates the same

claims he raised on direct appeal without "attacking the decision" by the Ohio Supreme Court to

deny this claim.  (*Id.* at PageID 14435.)  Pointing out that the Ohio Supreme Court "***wrote nearly***

***three thousand words***" to explain why the voir dire claims were meritless, the Warden maintains

that the state court adjudication was reasonable.  (*Id.* at PageID 14436–38 (emphasis in

original).)  Further, the Warden argues that Mundt seeks to expand the interpretation of *Morgan*,

to "preclude[] the seating on a capital jury of a juror who views the death penalty as an entirely

appropriate sentencing option."  (*Id.* at PageID 14438.)  Instead, the Warden asserts that the

"*Morgan* rule precludes the seating of a capital juror ***who will not follow the law***, as opposed to a

capital juror who expresses an amenability to impose the death penalty when that sentence is

warranted."  (*Id.* (emphasis in original).)  Jurors Watson and Gaydosik did not express an

unwillingness to follow the law, and were therefore not biased, the Warden maintains.  (*Id.* at

PageID 14440.)

In reply, Mundt contends that these claims are properly pled, despite the Warden's contentions to the contrary. (Traverse, ECF No. 27, PageID 14545.) Mundt asserts that allowing "two jurors to remain on the jury who stated clearly their views that this case called for an automatic death penalty" violated his right to a fair and impartial jury trial. (*Id.* at PageID 14544.) Mundt notes that he raised his seventh ground for relief on direct appeal. (*Id.* at PageID 14545 (citing ECF No. 7-5, PageID 2031).) Then Mundt points out that he raised his eighth ground for relief on direct appeal and in his state post-conviction proceedings. (*Id.* (citing ECF No. 7-5, PageID 1953; ECF No. 7-14, PageID 4369–70).) Mundt maintains that the state courts were unreasonable in denying these claims on the merits. (*Id.*)

Replying to the Warden's position on the *Morgan* holding, Mundt notes that *Morgan* does not require potential jurors to "state they could not follow the law," nor to "demonstrate the juror is biased" to prevail. (*Id.* at PageID 14546 (citing *Morgan*, 504 U.S. 719).) Instead, Mundt maintains that the impanelment of an automatic death penalty juror creates "sufficient prejudice to warrant a new trial." (*Id.* (citing *Morgan*, 504 U.S. at 729, 738).) Mundt then alleges that Jurors Watson and Gaydosik were both automatic death penalty jurors because they "stated on their juror questionnaires and during questioning they believed the death penalty was the only sentence for someone who murdered a child." (*Id.*)

The Ohio Supreme Court rejected the ineffective assistance of trial counsel claim related to both Juror Watson and Juror Gaydosik on direct appeal as follows:

{¶ 66} Upon review of the entire record, including Watson's voir dire as well as her responses to the questionnaire, defense counsel may have concluded that Watson "would be favorable for the defense." Watson's voir dire suggests that she was less than a strong supporter of capital punishment. She stated repeatedly that she had no opinion about the death penalty. Asked whether she could return a death sentence, Watson initially answered that she did not know, although she

109

ultimately decided that she could.  And she expressed an independent frame of mind: "If that's what I chose, yes, I could sign [a death-sentence verdict].  But if it's just everyone else, it's not what I chose, then I'm not going to sign my name to it."  Based on this record, Mundt has not established deficient performance on the part of defense counsel.

{¶ 67} Nor has he established prejudice.  When a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant "*must* show that the juror was *actually biased* against him."  (Emphasis added.)  *Miller v. Francis*, 269 F.3d at 616, citing *Hughes v. United States* (C.A.6, 2001), 258 F.3d 453, 458.  See also *Goeders v. Hundley* (C.A.8, 1995), 59 F.3d 73, 75, citing *Smith v. Phillips* (1982), 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.E.2d 78; *Carratelli v. State* (Fla.App.2005), 915 So.2d 1256, 1260-1261.

{¶ 68} Although Mundt argues that Watson was biased, the record does not support that claim.  Like the juror in *Miller v. Francis*, 269 F.3d at 617, Watson "never stated that she could not be fair."  Cf. *Miller v. Webb* (C.A.6, 2004), 385 F.3d 666, 679 (record supported actual-bias claim where juror expressly admitted bias).

{¶ 69} Nor does anything in the record suggest that Watson had a "close personal relationship," *Miller v. Francis*, 269 F.3d at 617, with the victim or the victim's family.  The record shows only that Watson's *nephew* attended school with Brittany.  It would be speculative to assume either that this was a close relationship or that it had any influence on Watson.  Cf. *Wolfe v. Brigano* (C.A.6, 2000), 232 F.3d 499, 502 (jurors who had close, ongoing relationships with victim's parents and had discussed case with them were biased) with *Miller v. Francis*, 269 F.3d at 617-619 (distinguishing *Wolfe*).

{¶ 70} Neither does Watson's discussion about the case with her sister establish bias.  That discussion occurred before Watson was called for jury duty.  Watson stated on voir dire that although she and her sister had discussed the case, she "d[id]n't know anything really about it."  Thus, the record does not establish that Watson had any extensive or detailed knowledge about the case as a result of the discussion.  *Miller v. Francis*, 269 F.3d at 616.  Moreover, "[j]urors need not be totally ignorant of the facts and issues involved in the case. * * * '[I]t is beyond question that mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint; such a standard would be certainly unsalutary, and likewise impossible to achieve.' "  *Miller v. Francis*, 269 F.3d at 616, quoting *DeLisle v. Rivers* (C.A.6, 1998), 161 F.3d 370, 382.

110

{¶ 71} Mundt argues that Watson was biased because she was an automatic-death-penalty juror. To the contrary, however, neither Watson's questionnaire nor her voir dire responses support the conclusion that she was an automatic-death-penalty juror. Question 65 of the questionnaire asked prospective jurors to give their opinion of the statement "Persons convicted of murder should be swiftly executed." Watson responded: "I would have to know the case before I could have an opinion."

{¶ 72} On voir dire, after explaining the weighing process and the three life-sentencing options, the prosecutor asked Watson:

{¶ 73} "If these [the aggravating circumstances and mitigating factors] are of equal weight or the mitigating factors are of more weight than the aggravating circumstances, then your verdict would be one of the three of these [life sentences].

{¶ 74} "Could you do that?"

{¶ 75} Watson replied: "I believe I could."

{¶ 76} This record does not establish that Watson harbored any bias. To the contrary, her responses indicated that she would be an open-minded juror. Accordingly, Mundt has not established actual bias or that he suffered prejudice because his attorneys allowed Watson to be seated as a juror. *Miller v. Francis*, 269 F.3d at 616; *Hughes*, 258 F.3d at 458. As Mundt has failed to demonstrate deficient performance of counsel, he has failed to meet the *Strickland* test, and we reject his claim that his counsel rendered ineffective assistance with regard to Watson.

\* \* \*

{¶ 77} Mundt contends that his counsel should have challenged Connie Gaydosik for cause on the grounds that she was biased in favor of the death penalty. Gaydosik had stated on her questionnaire that, "[i]n some cases," death "is the only just punishment." And on voir dire, defense counsel asked Gaydosik whether death "would be the only just punishment" where the jury found the defendant guilty of kidnapping and raping a seven-year-old, then killing her to escape detection. Gaydosik said, "As far as I'm concerned, yes."

{¶ 78} However, immediately after this exchange, defense counsel then asked Gaydosik whether she would still regard death as the only just punishment if the aggravating circumstances of rape, kidnapping, witness-murder, and murder to avoid detection *did not* outweigh the mitigating factors beyond a reasonable

111

doubt. Gaydosik replied: "Not if the mitigating factors outweighed – if I feel that they outweighed the aggravating circumstances."

{¶ 79} Gaydosik also said on her voir dire: "[I]f you're going to sentence somebody to death or not to death, I'd want to know everything I could about that person before I made a ruling on that." She said she could consider mitigating evidence offered by the defense, that hearing mitigating evidence would be important, and that whether a murderer should be executed "depends on the circumstances."

{¶ 80} Counsel asked what Gaydosik would do if the aggravating circumstances outweighed the mitigating circumstances "by a preponderance of the evidence." Gaydosik said: "It would depend on what mitigating factors had been presented to me that I had to consider before I could answer that honestly. * * * I mean, frame of mind, the circumstances of how it happened, what happened, all of that. * * * I would have to actually hear [the mitigating factors] to know how to be able to give you an answer on that."

{¶ 81} Finally, Gaydosik said that she would want to hear mitigating evidence before considering death, that she could return a life sentence if the state failed to prove that aggravating circumstances outweighed mitigating factors beyond a reasonable doubt, that she would not require the defense to prove that mitigation outweighed aggravation. Whether a life sentence was appropriate, Gaydosik said, "would depend * * *; I'd have to see everything proven to me."

{¶ 82} Taken as a whole, Gaydosik's voir dire responses made clear that she was not an automatic-death-penalty juror and would consider mitigating circumstances. These answers would not have supported a challenge for cause, and therefore defense counsel cannot be considered ineffective for failing to make such a challenge.

{¶ 83} Mundt further contends that defense counsel should have removed Gaydosik with a peremptory challenge. But "'[b]ecause the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.'" *Freeman*, 8 Cal.4th at 485, 34 Cal.Rptr.2d 558, 882 P.2d 249, quoting *People v. Montiel* (1993), 5 Cal.4th 877, 911, 21 Cal.Rptr.2d 705, 855 P.2d 1277. Upon review, this record does not demonstrate "reversible incompetence" in defense counsel's decision not to expend one of the six peremptory challenges on this juror.

{¶ 84} Mundt also contends that his counsel acted unreasonably by failing to question Gaydosik about specific mitigating factors. However, trial counsel is entitled to exercise broad discretion in formulating voir dire questions. See *Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139; *Murphy*, 91

112

Ohio St.3d at 539, 747 N.E.2d 765; *Bradley*, 42 Ohio St.3d at 143-144, 538 N.E.2d 373. We further note that the parties are not entitled to ask about specific mitigating factors during voir dire. See, e.g., *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292.

(ECF No. 7-5, PageID 2384–88.)

The Ohio Supreme Court also denied any error by the trial court related to juror bias as

follows:

> {¶ 164} In the second proposition of law, Mundt claims that the *trial court* failed to conduct a sufficient voir dire of prospective juror Watson. Mundt contends that the trial court had a duty to question Watson concerning whether she would automatically vote for a death sentence, even though Mundt's counsel chose not to ask such questions.

> {¶ 165} No such duty exists. "There is no requirement for a trial court to 'life qualify' any prospective juror, absent a request by defense counsel, in a capital murder case." *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329, syllabus. Rather, the trial court must inquire into the prospective juror's views, or else allow defense counsel to do so, *if the defendant so requests*. See *Morgan v. Illinois* (1992), 504 U.S. 719, 735-736, 112 S.Ct. 2222, 119 L.E.2d 492.

> {¶ 166} *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, is not to the contrary, and Mundt's citation to that case is inapposite. *Jackson* neither holds nor implies that a trial court must conduct a *Morgan* inquiry sua sponte. Rather, *Jackson* involved an improper restriction on the scope of defense voir dire: "The trial court erred when it held that appellant was not entitled to have prospective jurors informed that one of the murder victims was three years old." Id. at ¶ 49.

> {¶ 167} Here, the trial court imposed no restriction on defense questioning. The defense *chose* not to question Watson. Since the trial court had no duty to conduct a *Morgan* inquiry sua sponte, we reject Mundt's second proposition of law.

(ECF No. 7-5, PageID 2407.)

In Mundt's post-conviction action, the state trial court denied the ineffective counsel

claim as follows: "Claim for relief # 7, ineffective counsel for failing to effectively pursue voir

dire of juror 906, was raised on direct appeal and was denied on the merits. Res judicata applies and that claim is denied." (ECF No. 7-13, PageID 4178.)

The state appellate court in post-conviction affirmed the state trial court's denial as follows:

> {¶ 15} Lastly, regarding claim seven, ineffective assistance of counsel during voir dire specifically regarding juror Julie Watson and her inclination to "Automatically Vote for Death" Mundt asserted on direct appeal that Watson should have been excused given this articulated inclination. *Id.* at ¶49-61. The Court disagreed, finding no bias. "To the contrary, her responses indicated that she would be an open-minded juror." *Id.* at ¶76.

(ECF No. 7-14, PageID 4369.) The state appellate court noted that because the Ohio Supreme Court rejected this claim on direct appeal, that rejection was the "law of the case" and thus "res judicata barred Mundt from reasserting" the same claim in post-conviction. (*Id.* at PageID 4369–70.)

Mundt contends that the state court decisions denying these claims were unreasonable. The Undersigned disagrees. On direct appeal, the Ohio Supreme Court denied these claims by applying *Strickland* (ECF No. 7-5, PageID 2383), and *Morgan*. (*Id.* at PageID 2380, 2407.) In applying *Morgan*, the Ohio Supreme Court found that the trial court did not err during voir dire because the court did not restrict trial counsel from questioning the potential jurors. (*Id.* at PageID 2407.) The Ohio Supreme Court further noted that the trial court was not required to engage in its own questioning, unless requested by the defendant. (*Id.* (citing *Morgan*, 504 U.S. at 735–36.) The Ohio Supreme Court pointed out that trial counsel *chose* not to question Juror Watson during individual voir dire, without their questioning being limited by the trial court. (*Id.*) As Mundt explains in his Petition, the *Morgan* Court "vacated the death sentence because restrictions on *voir dire* made the sentencing process unreliable." (Petition, ECF No. 63, PageID

114

15434–35, ¶ 161 (citing *Morgan*, 504 U.S. at 728–29).)  Here, as the Ohio Supreme Court

determined, the trial court did not place a restriction on defense counsel's voir dire questioning

that would make the process unreliable.  The Ohio Supreme Court was therefore not

unreasonable in denying any trial court error.

 In applying *Strickland*, the Ohio Supreme Court was also not unreasonable in denying

Mundt's claim that trial counsel performed deficiently during voir dire.  The Sixth Circuit

recently addressed juror impartiality and ineffective assistance of counsel during voir dire in

*Hale v. Shoop*, No. 22-3265, 2023 U.S. App. LEXIS 13645 (6th Cir. 2023):

> As to the substantive aspect of the claim, Hale asserts that trial counsel was
> ineffective for failing to challenge or strike a juror for his troubling responses to
> questions about race.  "[T]he right to jury trial guarantees to the criminally
> accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Morgan v.
> Illinois*, 504 U.S. 719, 727, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).  This claim
> requires that Hale show that the juror was actually biased against him.  *See Miller
> v. Webb*, 385 F.3d 666, 674 (6th Cir. 2004).  "Bias in this context is 'actual bias,
> or bias in fact: the existence of a state of mind that leads to an inference that the
> person will not act with impartiality.'"  *Holder v. Palmer*, 588 F.3d 328, 339-40
> (6th Cir. 2009) (quoting *Hughes*, 258 F.3d at 463).  "When a biased juror is
> impaneled, however, 'prejudice under *Strickland* is presumed, and a new trial is
> required.'"  *Id.* at 338 (quoting *Hughes*, 258 F.3d at 457.)
>
> Contrary to Hale's assertions, the juror's responses did not reflect actual bias
> against Black people generally or against Hale specifically.  Therefore, Hale
> cannot show that trial counsel's failure to ask follow-up questions about race to
> this juror resulted in prejudice.  *See Stojetz v. Ishee*, 892 F.3d 175, 194 (6th Cir.
> 2018).

*Hale*, 2023 U.S. App. LEXIS 13645, at *10–11.  As noted in *Hale*, to prove the prejudice prong

of an ineffective assistance of counsel voir dire claim, the petitioner must prove the juror in

question was "actually biased."  *Miller v. Francis*, 269 F.3d 609, 616, 619 (6th Cir. 2001);

*Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001); *Johnson v. Bobby*, No. 2:08-cv-55,

2021 WL 6125049, at *110 (S.D. Ohio Dec. 28, 2021) (Morrison, J.).  Further, trial counsel is

afforded deference because an "attorney's actions during voir dire are considered to be matters of trial strategy." *Hughes*, 258 F.3d at 457.

As detailed above, the Ohio Supreme Court found that after reviewing the record as a whole, "including Watson's voir dire as well as her responses to the questionnaire, defense counsel may have concluded that Watson 'would be favorable for the defense.'" (ECF No. 7-5, PageID 2384.) Given Juror Watson's responses to the State's questioning, trial counsel could have reasonably determined that any further probing would not be helpful. Juror Watson demonstrated that she was not an automatic death penalty juror. In fact, she seemed amenable to handing down a life sentence if appropriate, while also having some hesitation about delivering a death sentence. Determining that defense counsel did not perform deficiently, the Ohio Supreme Court also pointed out that "Watson's voir dire suggests that she was less than a strong supporter of capital punishment" and that she "expressed an independent frame of mind." (*Id.*) Although Juror Watson mentioned she would "decide on the death penalty if that's what [she] felt in [her] heart that it should be," (ECF No. 8-3, PageID 7109), the culmination of her responses does not indicate she would be unwilling or unable to follow the law.

Defense counsel did not question Juror Watson during her individual voir dire, but that choice was a trial strategy afforded deference. *Hughes*, 258 F.3d at 457. Had defense counsel pushed the issue, it is possible that Juror Watson would appear more amenable to a life sentence, leading to the State challenging a favorable defense juror. Not questioning Juror Watson any further was a reasonable trial strategy because defense counsel is in the best position to assess voir dire answers, from counsel's in-court perspective. *See Miller*, 269 F.3d at 620 ("Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire,

116

where decisions are often made on the basis of intangible factors.").  Accordingly, the Ohio
Supreme Court was not unreasonable in finding that defense counsel did not perform deficiently
as it relates to Juror Watson.

Further, the Ohio Supreme Court was also not unreasonable in determining that defense
counsel did not perform deficiently in their voir dire of Juror Gaydosik.  Differing from Juror
Watson's voir dire, defense counsel engaged in a lengthy colloquy with Juror Gaydosik during
her individual voir dire.  (ECF No. 8-6, PageID 8326–38.)  Based on her responses, Mundt
contends, defense counsel should have challenged Juror Gaydosik for cause due to being an
automatic death penalty juror.  (Petition, ECF No. 63, PageID 15448, ¶ 209.)  Despite Mundt's
assertions, however, the record indicates that Juror Gaydosik gave acceptable responses to show
she was not an automatic death penalty juror.  As further detailed below in reviewing the
prejudice prong, the Ohio Supreme Court pointed out on direct appeal that Juror Gaydosik's voir
dire responses communicated she would be an open-minded juror and she wanted to hear
mitigating factors before voting for or against a death sentence.  (ECF No. 7-5, PageID 2387.)
As noted, defense counsel is afforded great deference during voir dire given the subjective nature
of the process.  *Miller*, 269 F.3d at 620; *Hughes*, 258 F.3d at 457.  The Ohio Supreme Court
recognized the same in denying this claim (ECF No. 7-5, PageID 2387–88), and was therefore
not unreasonable in concluding that defense counsel did not perform deficiently.

Even assuming trial counsel performed deficiently during voir dire as to either Juror
Watson[15] or Juror Gaydosik, the Ohio Supreme Court was not unreasonable in finding that

---

[15] In respect to Juror Watson's questionnaire responses, it is difficult to conceive why
trial counsel chose not to question her further during individual voir dire.  Apart from the
answers provided to the prosecution that indicated potential amenability to a life sentence, it is

Mundt was not prejudiced.  To prove prejudice, Mundt must demonstrate that either Juror Watson or Juror Gaydosik was *actually biased* against him.  *Miller*, 269 F.3d at 616; *Hughes*, 258 F.3d at 458.  Review of the record shows that both jurors provided sufficient answers to indicate they would follow the law by considering mitigating circumstances before voting for a death sentence.

The Ohio Supreme Court analyzed whether Juror Watson was actually biased against Mundt.  (ECF No. 7-5, PageID 2384–86.)  In finding that Juror Watson was not actually biased, and thus that Mundt was not prejudiced, the Ohio Supreme Court pointed out that Juror Watson "never stated that she could not be fair."  (*Id.* at PageID 2384 (citations omitted).)  The Ohio Supreme Court noted that while Juror Watson had a nephew who attended school with the victim, it would be "speculative to assume either that this was a close relationship or that it had any influence on Watson."  (*Id.* at PageID 2384–85 (citations omitted).)  The Ohio Supreme Court also analyzed whether Juror Watson was an automatic death penalty juror, as Mundt contends.  (*Id.* at PageID 2385–86.)

Mundt points to Juror Watson's jury questionnaire as support,[16] noting that her responses revealed some specific opinions about crimes against children.  (Petition, ECF No. 63, PageID 15435–36, ¶¶ 164–68 (citing ECF No. 7-8, PageID 2988–89).)  Mundt focused on the following questionnaire responses:

---

questionable why defense counsel did not ask Juror Watson *any* clarifying questions about her written responses.  That decision, however, was uniquely within the province of trial counsel and enjoys particular deference in view of their in-court perspective that this reviewing court does not have.

[16] Mundt submitted Juror Watson's questionnaire responses to the record in his state post-conviction proceedings.  (ECF No. 7-8, PageID 2987–94.)

166). In response to Question 63, "What factors do you think are relevant in deciding whether a person should be sentenced to the penalty of death or the penalty of life imprisonment without possibility of parole?" Juror Watson responded: "**Abuse or murder of child, rape.**" In response to Question 67, "In what types of cases/offenses do you feel the death penalty should be imposed?["] Ms. Watson wrote "**Child abuse/Murder [sic]/Rape.**" (*Id.* PAGEID 2988-89) (emphasis added).

167). In response to Question 69, "As a result of your having been asked to fill out this questionnaire, have you now formed an opinion about this case?", Juror Watson wrote: "After going through this paperwork I am assuming this is the Mundt's [sic] case. **My family talked about this case. My nephew went to school with Brittany. This was very upsetting. I have 2 little girls of my own and lots of nieces and nephews. I hate anything to happen to children (sic). Children are innocent. We as parents are put on this world to protect them.**" (*Id.* PAGEID 2989) (emphasis added).

168). In response to Question 70, "Do you know, or have you seen, heard or read anything about this case?" Juror Watson responded, "My sister told me about it. I don't know much about it, **to me it is horrible**." (emphasis added). In response to Question 71, which requested that additional comments be added, Ms. Watson wrote, "**I will try to be fair in my opinion but I feel very strongly against child abuse, child murder (sic) and sexual abuse/rape**". (*Id.*) (emphasis added).

(*Id.* at PageID 15436.) On direct appeal, the Ohio Supreme Court acknowledged Juror Watson's questionnaire responses, noting that "neither Watson's questionnaire nor her voir dire responses support the conclusion that she was an automatic-death-penalty juror." (ECF No. 7-5, PageID 2385.) Specifically, the Ohio Supreme Court pointed to Juror Watson's response to the statement "Persons convicted of murder should be swiftly executed," to which she responded: "I would have to know the case before I could have an opinion." (*Id.*) While some answers from Juror Watson's questionnaire revealed feelings about child murder, abuse, and rape, the Ohio Supreme Court was not unreasonable to determine she would be a fair-minded juror, particularly when reviewed in tandem with her voir dire responses made under oath.

119

Notably, Juror Watson's voir dire responses did not indicate she held actual bias toward

Mundt, regardless of any preconceived notions expressed on her questionnaire.  During Juror

Watson's group voir dire, defense counsel Blakeslee inquired the following of the potential

jurors:

> Fred is charged with rape, kidnapping and aggravated murder of a seven-year-old girl.
>
> Now, I want to know, is there anybody here -- and you can simply raise your hand and I'll zero in on you, is there anybody here that has such strong feelings regarding those crimes that it would be difficult to fairly and impartially weigh the facts at trial where those crimes have been alleged?  All you have to do is raise your hand.
>
> What about you, Ms. Watson, what do you think about that?

(ECF No. 8-3, PageID 7002–03.)  Juror Watson responded by noting, "My daughter's seven and

it's kind of violent and it bothers me, but I think I'll be able to handle it." (*Id.* at PageID 7003.)

Then during her individual voir dire, the trial judge asked Juror Watson whether she was

"religiously, morally or otherwise against the imposition of the death penalty," to which she

responded:

> No.  I don't -- I really don't have an opinion about -- I don't know how to explain it.  I never really considered it, like considered the death penalty.  If I would -- I wouldn't want to have to go through the death penalty, but I don't have a major opinion about it.

(*Id.* at PageID 7098.)  The State then queried Juror Watson about her questionnaire responses,

engaging in the following colloquy:

> [Prosecutor Prichard]: You'd be surprised how many people have not thought of these issues that we're talking about here today, the death penalty. * * * I believe you did indicate on your questionnaire that you do slightly favor or favor the death penalty, at least at the time you filled out the questionnaire?
>
> Juror [Watson]: I just don't remember.

Mr. Prichard: Okay. * * * That's what I want, is your honest opinion.

Juror [Watson]: I really don't have an opinion. I didn't know how to answer that question.

Mr. Prichard: Okay.

Juror [Watson]: Sometimes, yes, they probably do need the death penalty, yes. I'm not towards it or against the death penalty, either way.

Mr. Prichard: Okay. * * * It's not as though you're advocating either way for or against it?

Juror [Watson]: Yes.

Mr. Prichard: Okay. * * * If you were the queen of your own country, let's say, would you have a death penalty?

Juror [Watson]: I don't know.

(ECF No. 8-3, PageID 7098–7100.) The State went on to explain Ohio's death penalty scheme, and how to weigh mitigating and aggravating circumstances. (*Id.* at PageID 7100–09.) During this exchange, Juror Watson gave assurance that she was not a "If you take a life, then you should forfeit your life" type person. (*Id.* at PageID 7101.) Juror Watson also believed she could return one of the three life sentences if the mitigating factors were of equal weight or of greater weight than the aggravating circumstances. (*Id.* at PageID 7104.)

When the prosecutor asked Juror Watson whether she could return a death sentence if she determined the aggravating circumstances outweighed the mitigating factors by a reasonable doubt, Juror Watson responded as follows: "I don't know. I would have to go on what was happening and everything to know if that's what I would go on. After everything was done I would have to decide that. Right now I couldn't tell you." (*Id.* at PageID 7105.) The prosecutor acknowledged the difficulty of the hypothetical, asking Juror Watson to "possibly imagine that

121

what you found in the first phase is of greater importance or weight to you[] . . . [was] more weighty than what you did here in the second phase of the trial." (*Id.* at PageID 7105–06.) Juror Watson then answered, "So the evidence was greater, yes, then I would have to go with the death penalty." (*Id.* at PageID 7106.) Further, when asked if she could sign the verdict form for a death sentence if that is what she, herself, determined, Juror Watson noted, "If that's what I chose, yes, I could sign it. But if it's just everyone else, it's not what I chose, then I'm not going to sign my name to it." (*Id.* at PageID 7107.) The prosecutor even reiterated the question, pointing out, "[b]ut since you do seem to have some reservations and you're really thinking about it, do you think that you could sign that verdict form," to which Juror Watson answered in the affirmative. (*Id.* at PageID 7108.)

Juror Watson's responses during individual voir dire showed she could follow the weighing process and would not be swayed by others. Juror Watson iterated that she would be unwilling to sign a death sentence verdict just because the other eleven jurors voted in that direction, further showing she was not an automatic death penalty juror. The Ohio Supreme Court ultimately concluded that the "record does not establish that Watson harbored any bias" and that she "would be an open-minded juror." (ECF No. 7-5, PageID 2386.) Based on the record before it, the Ohio Supreme Court was not unreasonable in finding that Juror Watson was not actually biased or that Mundt failed to prove prejudice.

Turning to Juror Gaydosik's voir dire responses, the record does not show that she was actually biased toward Mundt.[17] The Ohio Supreme Court was not unreasonable in determining

---

[17] It is not clear if the Ohio Supreme Court decision included an analysis of whether Juror Gaydosik was actually biased against Mundt. (*See* ECF No. 7-5, PageID 2386–88.) The court pointed out the following: "Taken as a whole, Gaydosik's voir dire responses made clear that she

that Juror Gaydosik was not an automatic death penalty juror, nor was it unreasonable to find that she would consider mitigating factors before deciding a sentence.  (*Id.* at PageID 2387.)  In fact, Juror Gaydosik appeared to be an open-minded juror who wanted to hear everything about Mundt before handing down a death sentence.

Although Juror Gaydosik's questionnaire form does not appear to be a part of the record, the voir dire process revealed some of her questionnaire responses:

> [Prosecutor] Prichard: Okay. * * * Assuming that hypothetical -- let me get to your questionnaire now.  I have read your questionnaire and thank you for filling that out.  It does help us streamline our questions here. * * * You indicated on one of the questions, it's No. 60 on my form, next to the last page -- whether or not you -- what your opinion is concerning capital punishment.  And you checked the box for favor.

> Juror [Gaydosik]: Yes.

> Mr. Prichard: Is that your view?

> Juror [Gaydosik]: Yes.

> Mr. Prichard: Okay. * * * And you said: In some cases, it is the only just punishment?

> Juror [Gaydosik]: Yeah, I believe it is.

> Mr. Prichard: Let me stop there and then go back to our chart and see if your views can track with what Ohio law is.

---

was not an automatic-death-penalty juror and would consider mitigating circumstances." (*Id.* at PageID 2387.)  This conclusion seems to indicate that the Ohio Supreme Court did not find Juror Gaydosik was actually biased nor that Mundt was prejudiced by her service on the jury panel. The Undersigned will accordingly review Juror Gaydosik's responses for actual bias under AEDPA deference but notes that the outcome would be the same under *de novo* review.

(ECF No. 8-6, PageID 8319.)  Then Prosecutor Prichard went on to explain the Ohio death

penalty scheme and life sentence options.  (*Id.* at PageID 8320.)  Ensuring Juror Gaydosik

understood aggravated murder specifications, the State then queried:

> Mr. Prichard: Do you think, even if your verdict was guilty of aggravated murder with specifications, you would still want to hear or consider something about the person who committed the crime before you would decide on what the appropriate sentence was to be?
>
> Juror [Gaydosik]: Oh, yes, I think that makes a lot of -- to me, if you're going to sentence somebody to death or not to death, I'd want to know everything I could about that person before I made a ruling on that.

(*Id.* at PageID 8320–21.)

Defense counsel also questioned Juror Gaydosik during her individual voir dire.  (*Id.* at

PageID 8326–38.)  The question-and-answer revealed the following:

> Mr. Blakeslee: Okay. * * * Now, let's assume now that the aggravated -- the State proves beyond -- by a preponderance of the evidence that the aggravated circumstances outweigh the mitigating factors. * * * In that circumstance, what would be the appropriate sentence?
>
> Juror [Gaydosik]: If the aggravating circumstances outweigh the mitigating factors?
>
> Mr. Blakeslee: By just a preponderance of the evidence, more probably than not.
>
> Juror [Gaydosik]: It would depend on what mitigating factors had been presented to me that I had to consider before I can answer that honestly.
>
> Mr. Blakeslee: Well, that -- that -- okay.
>
> Juror [Gaydosik]: I mean, frame of mind, the circumstances of how it happened, what happened, all of that.  And when you bring in anybody for the mitigating factors, I would have to actually hear them to know to be able to give you an answer on that.
>
> Mr. Blakeslee: All right. * * * But let's assume that the aggravating circumstances outweigh the mitigating factors by 51 percent to 49 percent.  What would be your sentence here?

124

Juror [Gaydosik]: Probably death.

Mr. Blakeslee: And why is that?

Juror [Gaydosik]: Because -- okay, we're dealing with this case?

Mr. Blakeslee: Yes.

Juror [Gaydosik]: He killed a child, he killed a young child. If what you have said before, he did it, tried to hide it, all of that and you don't show me that there is rea -- I mean, that there is something wrong with him, that he didn't understand right from wrong, whatever, in the mitigating factors to put against that, I would have to say death. Because, to me, killing a child is the most heinous crime you can do.

Mr. Blakeslee: I appreciate that. * * * Now, under these circumstances here there's going to be three -- under the circumstances here, there could be some feelings like this, "I just can't -- I just can't vote for the death penalty under any circumstances." * * * Then there could be some people that say, "Hey under that scenario, Blakeslee, that you outlined to me, I don't care what the mitigating factors are, I'm going to vote for death. Just don't waste your time." * * * Then there are those people that say, "Well, before I would consider the penalty of death, I want to hear mitigating evidence."

Juror [Gaydosik]: Well, I would want to hear it.

Mr. Blakeslee: And I'm sure you would, too. * * * Okay, so you're that type of person. * * * But what I'm trying to see here before I sit down and shut my mouth, the State -- the Defense has to just present evidence of mitigating factors.

Juror [Gaydosik]: Yes. I understand that.

Mr. Blakeslee: We don't have any burden of proof at all. We don't have to prove that the mitigating factors outweigh the aggravating circumstances or anything like that. * * * Now, on the other hand, the State has to prove that the aggravating circumstances exceed the mitigating factors by proof beyond a reasonable doubt.

Juror [Gaydosik]: I understand that.

Mr. Blakeslee: All right. * * * If they don't do that, can you return a life imprisonment or any of the other two options?

125

Juror [Gaydosik]: Yes, if they don't prove what they say they're going to prove in their case.

(*Id.* at PageID 8332–36.)

Juror Gaydosik's responses indicate that she would be willing and able to follow the law in determining whether one of the life sentences or a death sentence was appropriate. While Juror Gaydosik noted that murdering a child is the "most heinous crime you can do" (*id.* at PageID 8334), she was not indicating that she would *never* consider a life sentence. Rather, Juror Gaydosik was noting that a death sentence would be her stance in the hypothetical set forth by defense counsel—but would still "want to hear" the mitigating factors before coming to that conclusion. (*Id.* at PageID 8335.) Moreover, Juror Gaydosik stated multiple times that she would want to hear mitigating factors, and to learn about the defendant, before deciding a death sentence was appropriate.

The alleged troubling responses from Juror Gaydosik that Mundt points to as support go more to the weight she would give to different aggravating or mitigating circumstances, and not an indication she would automatically vote for the death penalty. There was some back and forth about the appropriate burden of proof during sentencing (i.e. if the defense had to prove that the mitigating factors outweighed the aggravating circumstances). Juror Gaydosik's answers, however, indicate that she understood the law. (*Id.* at PageID 8335–37.) Juror Gaydosik also reiterated that she would weigh the mitigating factors, and wanted to hear those factors, before signing a death sentence verdict. Based on the record, Juror Gaydosik was an impartial juror who could follow Ohio law, and she was not actually biased toward Mundt. The Ohio Supreme Court pointed out the same, noting Juror Gaydosik was not an automatic death penalty juror and

would appropriately consider mitigating factors.  (ECF No. 7-5, PageID 2387.)  The record

necessarily leads to the conclusion that denying this claim on direct appeal was not unreasonable.

Whether focusing on trial court error or ineffective assistance of trial counsel during voir

dire, Mundt has failed to meet the *Strickland* and *Morgan* standards.  Accordingly, the Ohio

Supreme Court was not unreasonable in denying these claims on direct appeal.

The seventh and eighth grounds for relief should both be **DISMISSED**.

As noted, a COA should not be issued unless a petitioner has shown that "jurists of

reason" would find it debatable whether petitioner has stated a viable constitutional claim or that

the issue could be resolved in a different manner.  *Malone v. Warden*, No. 1:16-cv-1160, 2018

WL 722863, at *5 (S.D. Ohio Feb. 6, 2018) (Bowman, J.) (citing *Slack*, 529 U.S. at 484–85);

*Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582, at *12 (S.D. Ohio June 5, 2023)

(Bowman, J.).  The Undersigned finds that reasonable jurists could resolve this claim in a

different manner.  *Moody*, 958 F.3d at 488.  Accordingly, the Undersigned **RECOMMENDS**

issuing a COA for this claim.

> **Ninth Ground for Relief**:  **Frederick Mundt's trial counsel failed to present relevant mitigation evidence in the penalty phase of the trial in violation of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments.  U.S. Const. Amends. VI and XIV.**  (Petition, ECF No. 63, PageID 15449–63, ¶¶ 212–73.)

In his next ground for relief, Mundt contends that his defense counsel were ineffective for

failing to present relevant evidence during the mitigation stage of trial through available witness

testimony.  (Petition, ECF No. 63, PageID 15449, ¶ 213.)  Mundt asserts he was prejudiced by

trial counsel's failure because at least one juror "would have changed the weighing calculus" had

counsel presented this available mitigation evidence.  (*Id.* ¶ 214.)  Additionally, Mundt posits

that this claim should be reviewed *de novo* because, although he raised some ineffective assistance of counsel claims on direct appeal, "his claims could not be litigated within the confines of the appellate record because evidence *de hors* the record was needed to establish his counsel's ineffectiveness." (*Id.* at PageID 15452, ¶ 225 (citations omitted).)

The Warden asserts that the state court decisions rejecting this claim on the merits on direct appeal and rejecting this claim on the basis of *res judicata* in post-conviction, were reasonable and correct. (Return, ECF No. 21, PageID 14441.) The Warden also contends that Mundt merely repeats the same claims that were rejected by the state courts, which are insufficient to warrant habeas relief. (*Id.*) Additionally, the Warden maintains that this claim is meritless, regardless of the state court findings. (*Id.* at PageID 14443.) Specifically, the Warden points out trial counsel's attempts to keep the "mitigation jury from learning that Mundt was 'faking dumb,'" noting that "unassailable evidence in the record shows that trial counsel had good reason to temper the 'limited intellect' evidence in the mitigation case; that being the avoidance of evidence that Mundt was falsely portraying himself as mentally deficient." (*Id.* at PageID 14443–45.) Further, the Warden asserts that Mundt failed to garner testimony during the post-conviction evidentiary hearing from defense counsel Warhola "about strategic decision-making regarding limited intellect evidence for the mitigation phase." (*Id.* at PageID 14446.)

Replying to the Warden's assertions, Mundt argues that this claim should be reviewed *de novo* because it relies on evidence that was outside the state court record considered by the Ohio Supreme Court on direct appeal. (Traverse, ECF No. 27, PageID 14550–51.) Mundt notes that it was necessary to develop evidence during post-conviction review to support his ineffective assistance of counsel claim, meaning the claim could not adequately be reviewed on direct

128

appeal.  (*Id.* at PageID 14552.)  Mundt then provides examples from the record to support a

conclusion that defense counsel performed deficiently (*id.* at PageID 14552–57), and how that

unreasonable performance was to his prejudice.  (*Id.* at PageID 14557–65.)  While Mundt

maintains that this claim is entitled to *de novo* review, he suggests in the alternative that the state

court adjudication on this claim was unreasonable.  (*Id.* at PageID 14565–66.)  As noted in claim

1 above, in response to the Undersigned's October 20, 2022, Show Cause Order on whether this

case was decisional (ECF No. 59), Mundt submitted additional authority through *Odraye Jones,*

*n/k/a Malik Allah-U-Akbar v. Bradshaw*, 46 F.4th 459, 485 (6th Cir. 2022), as support for his

argument that *de novo* review is warranted.  (ECF No. 61.)  Mundt maintains that this claim

necessarily relies on evidence outside the record.  (*Id.*)

      On direct appeal, the Ohio Supreme Court rejected this claim as follows:

{¶ 149} Before trial, defense counsel filed a motion to declare Mundt mentally retarded and therefore ineligible for the death penalty pursuant to *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.E.2d 335, and *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011.  Witnesses at the *Atkins* hearing included Robert Willis and Constance Kline Brady, Ph.D., testifying for the defense, and Jeffrey Stevens, testifying for the state.

{¶ 150} Willis was the special-education supervisor for the Switzerland of Ohio School District.  Dr. Brady was a school psychologist who examined students to determine whether they have learning disabilities.  Willis and Brady based their testimony on Mundt's school records.  Stevens was the vocational special-educational coordinator at Mundt's high school.  It was his job to assist learning-disabled ("LD") and developmentally handicapped ("DH") students with their studies.  His testimony was based on personal knowledge of Mundt, as well as Mundt's records.

{¶ 151} Brady testified that, at age 12, when Mundt attended school in the Marietta school district, his IQ scores were 82 and 85, consistent with a learning disability.  The Marietta schools had classified Mundt as LD.  However, when he later attended high school in the Switzerland of Ohio school district, he was classified as DH.  Brady and Willis testified that at the time Mundt was classified as a DH student, an IQ measurement of 80 or less was one of the prerequisites for that designation.

{¶ 152} Stevens testified that Mundt had studied cosmetology in a vocational program. Although Mundt had struggled academically as a DH student, he had performed tasks to the best of his ability. In a 1995 evaluation, Stevens had rated Mundt's daily attendance as good.

{¶ 153} Brady testified that when Mundt was 15, he could read at only a second-grade level. Stevens testified that, as a junior and senior, Mundt read at only a second-grade level and had difficulty with written instructions. It was necessary to speak slowly and clearly to Mundt and to repeat until he understood. Mundt did not retain information well and had a short attention span. Despite receiving special help, he was barely able to keep up with his cosmetology class. He needed extra time to complete most tasks and worked slowly, but persistently.

{¶ 154} Stevens and Willis testified that Mundt had received several "E" grades in high school. Stevens, Willis, and Brady explained that an "E" was a grade given in place of an "F" to a special-education student who had failed to earn a passing grade but had put forth reasonably good effort and done his best.

{¶ 155} Mundt contends that in the mitigation hearing, defense counsel should have called Willis, Brady, and Stevens ("the *Atkins* witnesses") to testify about his academic history and low intelligence. Mundt contends that his low intelligence would have had significant mitigating value. Moreover, he argues, such testimony would have humanized him by showing him as a struggling special education student who worked hard and tried to achieve despite limited intellectual capability.

{¶ 156} In general, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 739 N.E.2d 749. See also *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 118; *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 125. "It may be that often the best strategy in a capital case is to attempt to humanize the defendant by presenting evidence of his personal qualities. We are unable to hold, however, that any other strategy would be so unreasonable as to constitute ineffective assistance of counsel." *Stanley v. Zant* (C.A.11, 1983), 697 F.2d 955.

{¶ 157} Moreover, in evaluating the performance of counsel, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691, 104 S.Ct. 2052, 80 L.E.2d 674.

{¶ 158} Here, the record shows that counsel's decision not to call the *Atkins* witnesses in the penalty phase did not result from any lack of investigation. Cf.

130

*State v. Tyler* (1990), 50 Ohio St.3d 24, 40, 553 N.E.2d 576. Mundt's lawyers knew the *Atkins* witnesses existed and what their testimony would be. They had already presented *that very testimony* at the *Atkins* hearing. Because Mundt's counsel were fully aware of what these witnesses had to say, counsel's decision not to present them in the penalty phase is "virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.E.2d 674.

{¶ 159} Moreover, Mundt fails to demonstrate prejudice, i.e., a reasonable likelihood that the outcome of the case would have been otherwise but for the allegedly ineffective assistance. Mundt's contention that being depicted as a struggling special-education student would have humanized him is rank speculation. Mundt's claim that the jury would have found this evidence compelling is equally speculative.

{¶ 160} Finally, even without the *Atkins* witnesses, evidence of Mundt's low intelligence was placed before the jury in the penalty phase. Mundt's school records showed that his IQ ranged between 78 and 85, as measured by Stanford-Binet and Weschler Intelligence Scale for Children tests administered during childhood. Dr. McPherson testified that Mundt's intelligence, as reflected by intelligence test scores, was below average; that he had difficulty in school, especially with reading, memory, and attention; that he had been placed in a "developmentally handicapped section" and had been diagnosed with attention-deficit disorder; and that his "limited" intellectual resources contributed to his tendency to avoid problems instead of trying to solve them.

{¶ 161} At most, the *Atkins* witnesses would have corroborated the other evidence of Mundt's low intelligence and emphasized its mitigating value. However, there is no reason to assume that the jury would have given Mundt's low intelligence decisive weight if the *Atkins* witnesses had testified. Indeed, juries often recommend death sentences despite a defendant's low intelligence. See, e.g., *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 264; *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 139; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 109; *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376. Thus, no evidence exists that the testimony of the *Atkins* witnesses would have changed the outcome of the penalty phase.

{¶ 162} Mundt also contends that defense counsel's argument failed to lay sufficient emphasis on Mundt's lack of a significant criminal record. However, defense counsel did discuss this mitigating factor in the defense opening statement, and in closing argument as well. The degree of emphasis to be given any individual mitigating factor in argument is a matter of trial strategy, and Mundt fails to demonstrate deficient performance.

{¶ 163} After thorough review, we conclude that Mundt failed to demonstrate that his counsel rendered ineffective assistance . . . during the penalty phase of the trial. Accordingly, we overrule the first proposition of law.

(ECF No. 7-5, PageID 2403–06.)

In Mundt's state post-conviction proceedings, the state trial court rejected this

claim as follows:

Claim for relief # 6, ineffective counsel for failing to call Jeffrey Stevens as a witness at the penalty phase, was raised on direct appeal and was denied on the merits. Res judicata applies and that claim is denied.

* * *

Claim for relief # 8, ineffective counsel for failing to call Robert Willis as a witness at the penalty phase was raised on direct appeal and was denied on the merits. Res judicata applies and that claim is denied.

(ECF No. 7-13, PageID 4178.)

In Mundt's appeal of his state post-conviction proceedings, the state appellate court

rejected this claim as follows:

{¶ 14} Regarding claim six, ineffective assistance of counsel during the penalty phase in the testimony of Jeffrey Stevens, Mundt's argument on direct appeal that this proposed witness should have been called to testify was rejected by the Court as a strategic choice by counsel. *Id.* at ¶155-156. "Mundt's contention that being depicted as a struggling special-education student would have humanized him is rank speculation. Mundt's claim that the jury would have found this evidence compelling is equally speculative." *Id.* at ¶ 159. In a similar fashion, claim eight, ineffective assistance of counsel during the penalty phase regarding the testimony of proposed witness, Robert Willis, was rejected. *Id.* at ¶155-163.

(ECF No. 7-14, PageID 4369.)

Differing from the first ground for relief, however, this claim was properly raised on

direct appeal because it does not rely on extra-record evidence that could only be raised in post-

conviction. Although Mundt contends *Jones* supports his assertions that this claim is entitled to

132

*de novo* review (ECF No. 61), the Undersigned disagrees. The *Jones* case focused on the incorrect application of a state procedural rule. *Jones*, 46 F.4th at 485. Unlike in claim one above, which necessarily relied on evidence outside the record to prove the prejudice prong, the state courts correctly applied *res judicata* to this claim in Mundt's post-conviction proceedings. (ECF No. 7-13, PageID 4178; ECF No. 7-14, PageID 4369.) Further, as with claim five above, the additional evidence provided in post-conviction did not meaningfully advance this claim such that it was necessary to establish the prejudice prong. Accordingly, the Ohio Supreme Court provided the last reasoned decision when it analyzed this claim under the *Strickland* standard on Mundt's direct appeal. That state court decision is afforded deference under the AEDPA. 28 U.S.C. § 2254(d)(1); *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001).

As detailed above, proving ineffective assistance of counsel requires both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668 (1984); *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). Deficient performance is established when counsel's performance fell below objectively reasonable professional standards. *Strickland*, 466 U.S. at 687; *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011). Prejudice is found when a reasonable likelihood exists that but for counsel's deficient performance, the outcome of a petitioner's case would be different. *Strickland*, 466 U.S. at 694; *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). Defense counsel is afforded deference in sound trial strategy, and review under the AEDPA creates a "highly deferential" double layer of deference. *Harrington*, 562 U.S. 86, 105 (2011) (citations omitted). Further, defense counsel has "discretion over deciding which witnesses to call and how to examine them," even if jurors would be more sympathetic toward

different witnesses providing the same testimony. *Frazier v. Jenkins*, 770 F.3d 485, 504 (6th Cir. 2014) (citing *Gonzalez v. United States*, 553 U.S. 242, 249 (2008)).

The Ohio Supreme Court was not unreasonable in denying this claim on direct appeal as it correctly applied the *Strickland* standard to review Mundt's ineffective assistance of trial counsel claim. (ECF No. 7-5, PageID 2405–06.) In analyzing whether trial counsel performed deficiently, the Ohio Supreme Court noted that failing to call these available witnesses did not result from "any lack of investigation." (*Id.* at PageID 2405.) These witnesses, the Ohio Supreme Court pointed out, were known to trial counsel at the time of mitigation, given that they testified at Mundt's competency hearing. (*Id.*) Moreover, trial counsel knew what information the testimony would include. (*Id.*) The Ohio Supreme Court concluded that Mundt's trial counsel were not deficient because any decision to not call these witnesses is "virtually unchallengeable" under *Strickland*. (*Id.* (quoting *Strickland*, 466 U.S. at 690).) It was not unreasonable for the Ohio Supreme Court to determine that trial counsel performed effectively given the fact that trial counsel is given latitude in calling available witnesses. *Gonzalez*, 553 U.S. at 249; *Frazier*, 770 F.3d at 504. Provided the double layer of deference afforded to the Ohio Supreme Court's reasoning and defense counsel's trial strategy, the Undersigned necessarily concludes that neither layer was unreasonable. *Harrington*, 562 U.S. at 105.

Further, the Ohio Supreme Court was not unreasonable in finding that Mundt was not prejudiced by trial counsel's failure to call these witnesses. Mundt claims the jury was not informed of his educational struggles in school, which would have humanized him. The Ohio Supreme Court reasoned, however, that such a contention was "rank speculation" and that it was "equally speculative" that the jury would find the additional evidence "compelling." (ECF No.

134

7-5, PageID 2405.)  The Ohio Supreme Court also noted that "even without the *Atkins* witnesses, evidence of Mundt's low intelligence was placed before the jury in the penalty phase."  (*Id.*)  The Ohio Supreme Court then discussed the relevant testimony that defense counsel *did* present during mitigation.  (*Id.* at PageID 2405–06.)  Because the *Atkins* witnesses would testify to the same information elicited through other mitigation witnesses—namely Marsha Heiden and Dr. McPherson—the evidence would be merely cumulative.  Mundt was therefore not prejudiced by trial counsel's failure to call these available witnesses.  *Frazier*, 770 F.3d at 504 ("We agree with the Ohio Court of Appeals that the information to which Frazier's siblings allude to in the affidavits is cumulative, and therefore, Frazier was not prejudiced by counsel's decisions.").  Accordingly, the Ohio Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law.  *Id.* (citing *Gonzalez*, 553 U.S. at 249); *England v. Hart*, 970 F.3d 698, 710 (6th Cir. 2020).

This claim should be **DISMISSED**.

Because "jurists of reason" would not resolve this claim in a different manner, the Undersigned **RECOMMENDS** that a COA should not be issued for this claim.  *Malone v. Warden*, No. 1:16-cv-1160, 2018 WL 722863, at *5 (S.D. Ohio Feb. 6, 2018) (citing *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000)); *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582, at *12 (S.D. Ohio June 5, 2023).

**Tenth Ground for Relief**: **Frederick Mundt's trial counsel provided ineffective assistance in the penalty phase by presenting materially inconsistent evidence and evidence that was harmful to counsel's attempts to mitigate the sentence for the aggravated murder conviction.** (Petition, ECF No. 63, PageID 15464–87, ¶¶ 274–377.)

In his final claim, Mundt asserts that he was denied constitutionally effective counsel by defense counsel presenting "materially inconsistent themes between the culpability and penalty phases of trial." (Petition, ECF No. 63, PageID 15464, ¶ 275.) Mundt claims that defense counsel were ineffective after theorizing about another's involvement during the culpability phase, but then presenting "new and graphic confessions" during mitigation. (*Id.*) Further, Mundt contends that his "[c]ounsel's credibility with the jury was eviscerated by introducing" the confessions, and that Dr. McPherson's "testimony was more harmful than mitigating." (*Id.*) Mundt also maintains that the claim should be reviewed *de novo* because the *Strickland* claim could not be reviewed adequately on direct appeal since it necessarily depends on evidence outside the trial record. (*Id.* at PageID 15466, ¶¶ 283–84.)

The Warden asserts that deference is owed to the Ohio Supreme Court when it denied Mundt's claim on direct appeal, concluding that "trial counsel were in a position to 'take the good with the bad' in presenting the defense psychological evidence from Dr. McPherson and Marsha Heiden." (Return, ECF No. 21, PageID 14448 (citation omitted).) The Warden also argues that Mundt is *not* claiming his defense counsel were ineffective for failing to investigate mitigating evidence, but instead is claiming that defense counsel were ineffective because they "*did put the psychological status evidence on during the mitigation phase*." (*Id.* at PageID 14451–52 (emphasis in original).) Further, the Warden maintains that Mundt "overstates the jury's hypothetical reaction" to the revelation of Mundt admitting he committed the convicted

136

crimes. (*Id.* at PageID 14453.) Noting that the jury had already found Mundt guilty when the admissions were revealed, the Warden suggests this new information would not be so "shocking and unanticipated" as asserted by Mundt. (*Id.*)

Additionally, the Warden posits that defense counsel offered a "plausible theory" for mitigating the convicted crimes because the psychological evidence linked Mundt's "supposed unthinking and spontaneous knee-jerk reactions to crises." (*Id.*) Given this strategic choice, the Warden maintains that defense counsel is afforded high deference under federal habeas review. (*Id.* at PageID 14455–56 (citations omitted).)

In reply, Mundt contends that presenting inconsistent theories between the penalty and mitigation phases "violated the prevailing professional norms for capital trial counsel in Ohio in 2004." (Traverse, ECF No. 27, PageID 14569.) Mundt also suggests that he was prejudiced by counsel's "shotgun approach" because defense counsel "eviscerated their credibility" with errors that "opened the door to a devastating rebuttal from the State." (*Id.* at PageID 14569–70.) Moreover, Mundt asserts that this claim should be reviewed *de novo* because it relies on "off-the-record evidence." (*Id.* at PageID 14570.) As with grounds one and nine above, Mundt supports this position by submitting *Odraye Jones, n/k/a Malik Allah-U-Akbar v. Bradshaw*, 46 F.4th 459, 485 (6th Cir. 2022), as additional authority for *de novo* review. (ECF No. 61.) In the alternative, Mundt maintains that he is entitled to relief under a merits review, even with the AEDPA deference afforded to the state courts, because defense counsel presented "materially inconsistent" theories. (Traverse, ECF No. 27, PageID 14598–99.)

The Ohio Supreme Court rejected this claim on direct appeal as follows:

{¶ 120} Mundt contends that he received ineffective assistance of counsel during the penalty phase of the trial when his counsel presented evidence and argument

137

that damaged his mitigation case and when counsel failed to present available evidence that would have made a "compelling" case for a life sentence.

1. Penalty-Phase Evidence Contradicting Defense Guilt-Phase Theory

{¶ 121} During the guilt phase of the trial, defense counsel argued that Mundt, while guilty of rape, had not been proven guilty of kidnapping or murdering Brittany. The jury, however, rejected that argument and convicted Mundt of aggravated murder.

{¶ 122} Mundt's chief claim of ineffectiveness during the penalty phase is that his counsel presented testimony that contradicted their theory of the case during the guilt phase. Further, he claims counsel later compounded this error in closing argument by returning to their guilt-phase theory, which was inconsistent with the testimony of the penalty-phase witnesses.

{¶ 123} During the penalty phase, Mundt presented the testimony of Marsha Heiden, a psychologist and mitigation specialist, and Dr. Sandra McPherson, a psychologist. Heiden interviewed Mundt on several occasions, investigated his background, administered a psychological test, and wrote a report. McPherson also interviewed Mundt; administered, scored, and interpreted psychological tests; reviewed background material gathered by the defense; and arrived at a diagnosis of Mundt's mental condition.

{¶ 124} Heiden noted in her report, and admitted on cross-examination, that Mundt had changed his story. Initially, Mundt told Heiden a story consistent with his guilt-phase position that although he had raped Brittany, he had not taken her to the well or killed her. Mundt later changed his story, admitting to Heiden that he had put Brittany in the well after raping her, first claiming that he had thrown rocks at her, but later stating that he had placed rocks over the well opening and a rock fell on her, and that he acted alone.

{¶ 125} Mundt also gave differing accounts of the crime to Dr. McPherson. McPherson testified that at first Mundt "admitted to having violated [Brittany] sexually." Mundt told McPherson that he became "extremely frightened" when she began bleeding, and that he was going to take her to the hospital, but abandoned that plan because he was afraid of what would happen. Instead, he took her to the well, thinking "that he would leave her there until he figured out what to do." Later, however, Mundt told McPherson that Hendrickson was "the primary aggressor," that she had used a dildo on Brittany, and that Johnny had helped Mundt take the body to the well. McPherson testified: "Fred is not a good historian and tends to respond out of whatever is effective at the moment."

{¶ 126} Mundt argues that defense counsel rendered ineffective assistance by presenting the testimony of McPherson and Heiden because their testimony

138

revealed that, contrary to the guilt-phase defense theory, Mundt had indeed murdered Brittany.

{¶ 127} Mundt argues that McPherson and Heiden hurt his case in three ways: first, their testimony eliminated any doubt the jury may have retained as to the degree of Mundt's involvement in Brittany's murder, such as whether Mundt was the principal offender; second, it sacrificed defense counsel's credibility, since counsel had argued Mundt's innocence in the guilt phase; third, it "demonized" Mundt.

{¶ 128} In reality however, McPherson and Heiden also gave testimony that was potentially valuable as mitigation. McPherson diagnosed Mundt as having several psychological disorders, including borderline personality disorder. See *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 120 (borderline personality disorder is a relevant mitigating factor). McPherson indicated that those disorders were caused by a factor (an unstable, abused childhood) beyond Mundt's control. Furthermore, she found a causal link between the disorders and the killing of Brittany.

{¶ 129} Mundt's admission to murdering Brittany was part of the information that formed a basis for McPherson's diagnosis. McPherson testified: "I want to know what people think and what they feel in the course of a crime of this type." Mundt's statements were "important" because they illustrated the "thinking process * * * characteristic of [Mundt] when he's under any kind of high arousal state." To McPherson, Mundt's thoughts during the crime exemplified "pure borderline thinking" and thus supported her diagnosis.

{¶ 130} Mundt's borderline thinking also supported McPherson's view that Mundt's disorder caused him to commit the murder. McPherson explained that Mundt engages in "narrow" thinking under stress, focusing only on getting out of the stress-inducing situation. Hence, he tends to act upon "whatever first [comes] to mind," even though his course of action might not make sense. According to McPherson, Mundt became stressed when he realized he was in trouble for raping Brittany. The solution that "first came to mind" was to put her in the well, and Mundt's disorder caused him to focus on that course of action, without considering consequences of alternatives.

{¶ 131} Heiden presented Mundt's life history, which was potentially mitigating in itself, and which McPherson had used in diagnosing Mundt.

{¶ 132} Mundt's contention that the jury may have "harbored * * * doubt as to the level of Mundt's involvement" amounts to speculation and is insufficient to show prejudice. Mundt's guilt-phase theory – that Mundt had raped Brittany, but that Hendrickson, Johnny Mundt, or someone else had kidnapped and murdered her – is implausible and unsupported by credible evidence. Thus, the testimony

139

of McPherson and Heiden was not prejudicial according to the *Strickland* test, because it is not reasonably probable that the penalty-phase outcome would have been different if counsel had forgone their testimony.

{¶ 133} In a capital case, conceding guilt in the penalty phase can be a valid strategy, even when such a concession is inconsistent with the defense guilt-phase position. During the penalty phase, "the jury is not, as at the beginning of the guilt phase, disposed in [the defendant's] favor. Each juror believes beyond a reasonable doubt that [the defendant committed the murder]. * * * [D]espite what [the defendant] may wish it to believe, the jury, and therefore the law, thinks him guilty. * * * Recognizing a verdict of guilty at the penalty phase * * * was simply a sensible concession to the realities of the penalty proceeding in a capital case." *Brown v. Dixon* (C.A.4, 1989), 891 F.2d 490, 499.

{¶ 134} Moreover, it is not necessarily deficient performance for defense counsel to present inconsistent alternative theories to the jury. See generally *Brown v. Rice* (W.D.N.C.1988), 693 F.Supp. 381, 398, reversed in part on other grounds; *Brown v. Dixon*, (C.A.4, 1989), 891 F.2d 490, 498-500; *State v. Losee* (Iowa 1984), 354 N.W.2d 239, 244; *Commonwealth v. Iglesias* (1998), 426 Mass. 574, 580, 689 N.E.2d 1315. Nor does a midtrial change in strategy necessarily constitute deficient performance. *Gabourie v. State* (App.1994), 125 Idaho 254, 260, 869 P.2d 571; *State v. Swavola* (App.1992), 114 N.M. 472, 476, 840 P.2d 1238.

{¶ 135} There were advantages, as well as disadvantages, to having Heiden and McPherson testify. Certainly, it would have been desirable for the defense to avoid contradicting its own guilt-phase theory if possible. But here, the defense could avoid such contradiction only by abandoning the significant favorable testimony that Heiden and McPherson had to offer. Defense counsel cannot be criticized for their presentation of testimony from Heiden and McPherson during the penalty phase of the trial and their conduct in doing so does not violate *Strickland*.

{¶ 136} Mundt also contends that his counsel were ineffective because, in their penalty-phase argument, they returned to their earlier theory that Mundt may not have been the principal offender.

{¶ 137} In closing argument, they minimized the reliability and importance of Mundt's "different stories about what happened." Counsel argued that Mundt had grown up "in a home where people lied," and hence should not be expected "to tell the truth either to my experts or the State."

{¶ 138} Counsel then argued that in the guilt phase, the jury "had a reasonable doubt * * * as to whether Fred Mundt was the principal offender in this case * * * based on the evidence you heard at that time. And you can still have a

reasonable doubt as to whether he was the principal offender, even after everything you've heard here. * * * And you can consider that, that reasonable doubt that you had.  So that's another mitigating factor."

{¶ 139} Even if counsel's tactical choice did constitute deficient performance, Mundt has not demonstrated that the outcome would have been different but for this argument.  In view of the totality of the evidence, it seems improbable that this part of the defense argument changed any juror's opinion as to Mundt's guilt or McPherson's credibility.  Hence, it is not likely that the outcome would have been otherwise but for counsel's inconsistent argument.

{¶ 140} Further, as we have already noted, presenting inconsistent alternative theories is not per se deficient performance.  "Even assuming the defenses were inconsistent, the decision to advance two different theories of non-culpability is a trial tactic or strategy.  It is obvious that defendant's lawyers * * * were presenting any and all possible defenses.  Whether the strategy was good or bad, it is a tactic that is not so unreasonable that it shows ineffectiveness."  *Losee*, 354 N.W.2d at 244.

{¶ 141} These observations have special relevance to the penalty phase of a capital murder case.  In a capital case, the defense can win a life sentence by creating a reasonable doubt in the mind of only one juror, because the jury may recommend a death sentence only by a unanimous vote.  See *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96.  And each juror is entitled to consider any mitigating factors that he or she *individually* finds to have been established.  See *McKoy v. North Carolina* (1990), 494 U.S. 433, 442-443, 110 S.Ct. 1227, 108 L.E.2d 369.  Thus, it may well be a valid defense strategy to present any and all possible evidence and arguments in mitigation, even if they conflict, for evidence and arguments that 11 jurors reject may yet persuade the 12th.

{¶ 142} To be sure, such a strategy is not risk-free.  It may not be the best strategy in every case.  But every case is different, "and an act or omission that is unprofessional in one case may be sound or even brilliant in another."  *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 143} Due to the nature of Mundt's crime, counsel could have rationally decided to offer the jury a variety of reasons to vote for life, hoping that at least one juror would accept at least one of those reasons.  We cannot conclude, therefore that this constituted ineffective assistance of counsel.

2. Presenting Harmful Testimony

{¶ 144} Mundt finds fault with Dr. McPherson's testimony in various ways.  First, he argues that she prejudiced him by diagnosing him with pedophilia, based on the fact that he had been found guilty of having raped Brittany.  However,

inasmuch as Mundt never contested that he raped Brittany, it is not apparent how this diagnosis prejudiced him.

{¶ 145} Mundt contends that McPherson failed to explain what borderline personality disorder meant. This claim is untrue. McPherson explained borderline personality disorder at length, and she discussed its causes and symptoms with specific reference to Mundt. Mundt also contends that McPherson's testimony regarding Mundt's "borderline thinking" was "nonsensical, inflammatory, unintelligible and clearly not mitigating." However, Mundt fails to explain these assertions and points to nothing in the record that supports them.

{¶ 146} Moreover, his citation of *Skaggs v. Parker* (C.A.6, 2000), 235 F.3d 261, in support of his argument is inapposite. In *Skaggs*, defense counsel were found to be ineffective for using a so-called psychologist in the penalty phase who had no license, degree, or training, but "had completely falsified his credentials," 235 F.3d at 265, and who had previously given "bizarre and eccentric" guilt-phase testimony, id. at 269. In contrast, McPherson's qualifications are undisputed, and her testimony was material and relevant, not bizarre or eccentric.

{¶ 147} Mundt contends that McPherson "destroyed" her own credibility by discussing the Minnesota Multiphasic Personality Inventory ("MMPI-2"), which Mundt had taken as part of the defense psychological evaluation. McPherson found that Mundt overstated responses on the MMPI-2. McPherson did not think the results were "useless," but thought that their value was "limited." Certain "aspects of [Mundt's MMPI-2 profile] could be interpreted, but only as hypotheses to be confirmed in other ways."

{¶ 148} McPherson did not rely heavily on the MMPI-2 in reaching her conclusions, and she forthrightly acknowledged its limited value. Thus, it is unclear how testifying about it undermined her credibility.

(ECF No. 7-5, PageID 2396–2403.)

In Mundt's post-conviction action, the state trial court rejected this claim as follows:

Claim for relief # 4, ineffective counsel at the Penalty Phase was raised on direct appeal and was denied on the merits. Res judicata applies and that claim is denied.

(ECF No. 7-13, PageID 4178.)

Further, in his post-conviction action, the state appellate court applied *res judicata* and

rejected Mundt's claim as follows:

{¶ 13} Regarding claim four, ineffective assistance of counsel during the penalty phase involving the testimony of Dr. Sandra McPherson, although Mundt specifically argued on direct appeal that this testimony damaged his case, *Mundt* I at ¶120-123, the Court was unpersuaded. "Defense counsel cannot be criticized for their presentation of testimony from Heiden and McPherson during the penalty phase of the trial and their conduct in doing so does not violate *Strickland*." *Id.* at ¶135.

\* \* \*

{¶ 17} Further, Mundt has failed to present competent, relevant and material evidence outside the record that was not in existence and available to him at the time of that direct appeal. None of the attached affidavits and documentation for any of the raised claims are competent evidence dehors the record. A petition for post-conviction relief does not provide a petitioner with a second opportunity to litigate his conviction. *State v. Rose*, 12th Dist. No. CA2012-03-050, 2012-Ohio-5957, ¶ 15-16.

(ECF No. 7-14, PageID 4369–70.)

Mundt leans on *Jones* to support his contention that this claim should be reviewed *de novo*. (ECF No. 61 (citing *Jones*, 46 F.4th at 485).) As discussed in claims one and nine above, *Jones* applies in cases where state courts incorrectly applied a procedural rule in denying a petitioner's post-conviction claim that necessarily relied on evidence outside the trial court record. *Jones*, 46 F.4th at 485. If a state court incorrectly applied a procedural rule, without providing a merits ruling, then a petitioner is entitled to *de novo* review of the claim in his federal habeas proceedings. *Id.* This claim, however, was properly raised on direct appeal.

Mundt asserts that his post-conviction action was the proper place to raise this claim because it "could not be litigated within the confines of the appellate record because evidence *de hors* the record was needed to establish his counsel's ineffectiveness." (Petition, ECF No. 63, PageID 15466, ¶ 283.) Trial counsel Warhola's post-conviction testimony did not reveal evidence to meaningfully advance this claim in a way that no record evidence could have done.

143

(ECF No. 8-17, PageID 13245–63.)  Notably, Warhola's testimony revealed the following

exchange with Mundt's post-conviction counsel:

> Q    When  Dr.  McPherson  testified  did  the  information  from  her  interview "Retrospectives  Client"  section  of  her  report  get  disclosed  during  cross examination?
>
> A  I'm not sure what that part of the report even says.
>
> Q That was in her report that I let you read about Fred's involvement in the case.
>
> A  She did testify I believe about Fred's involvement in the case.
>
> Q  Did that include Fred's description of Brittany's rape?
>
> A  Yes, I believe it did.
>
> Q  And how she was placed in the well?
>
> A  Yes.
>
> Q  How she was bleeding at the time.
>
> A  I believe so.
>
> Q  And that Fred had thrown rocks on top of her.
>
> A  I believe so.
>
> Q And [Brittany] was hanging onto a pipe in the well when he left?
>
> A  I don't know if she testified to that or not.
>
> Q    Do  you  believe  that  the  information  that  we  talked  about  from  Dr. McPherson's report and Dr. Heiden's report coincided with what you did during the first phase of the trial?
>
> A  Well, I'm not sure how to answer that question.
>
> Q  Do you want me to rephrase it?
>
> A  Okay.

144

Q  What was your strategy in the first phase of the trial?

A  Concerned involvement of other people.

Q  Do you believe that sections of these reports supported that or contradicted that?

A  Well, they don't mention other people but that doesn't determine the issue at least in my mind.  There were other factors you have to look at.  But in these statements that Fred was making to these people and to law enforcement he did not indicate that other people were involved except for the statement that he made that the mother had told him that she took care of the issue.

Q  Did his later statements though contradict that statement, the other two statements that he made?

A  I believe they did.

(*Id.* at PageID 13256–58.)

Mundt contends that this claim could only be raised in post-conviction through support of evidence outside the trial record, even though Warhola's post-conviction testimony focused mainly on mitigation phase reports and testimony that were part of the record available on direct appeal.  During the post-conviction action, the only additional evidence revealed outside the trial record showed that defense counsel *had developed* trial and penalty phase strategies—even if not ultimately successful in returning a not guilty verdict or one of the life sentences.  The post-conviction record does not indicate that evidence outside the record was necessary to prove this claim, as pointed out by the state appellate court in denying the claim based on *res judicata*. (ECF No. 7-14, PageID 4369–70 ("Mundt has failed to present competent, relevant and material evidence outside the record that was not in existence and available to him at the time of that direct appeal.").)  Accordingly, the state trial court appropriately applied *res judicata* in denying this claim in Mundt's post-conviction proceedings.  The Undersigned therefore reviews this

claim with deference to the last reasoned state court decision—the Ohio Supreme Court's adjudication of this claim on direct appeal.  28 U.S.C. § 2254(d)(1); *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001).

The Ohio Supreme Court decision denying this claim on Mundt's direct appeal was not unreasonable.  In analyzing this claim, the Ohio Supreme Court applied the *Strickland* standard to find that trial counsel did not perform deficiently.  Mundt contends that the jury held some doubt whether he was the principal offender for the murder charge and maintains that McPherson and Heiden testifying to his confessions enabled the State to "demonize[]" him.  (Petition, ECF No. 63, PageID 15481, ¶ 352.)  Defense counsel, however, had a strategy going into trial.  With uncontroverted DNA evidence, trial counsel knew that the rape could not be contested.  (*See* ECF No. 7-10, PageID 3519–20 (explaining the approach that Mundt was "guilty of rape but not murder," defense counsel Warhola noted that "the scientific evidence must have in our mind been pretty clear on that to the point where we weren't really going to dispute that issue").)  Trial counsel focused heavily on the possibility someone else was involved in the murder during the trial phase.  Although it is arguable that abandoning this theory and presenting the confessions was surprising to the jury, it was not necessarily unreasonable.  As the Ohio Supreme Court analyzed, the jury rejected the idea that Mundt was not guilty of kidnapping or murder.  (ECF No. 7-5, PageID 2396.)  The Warden discusses this fact in detail, noting the following:

> In other words, the defense strategy to paint Mundt's brother Johnny as the murderer would not exonerate Mundt from hypothetically seeing to it that the victim would never be able, by herself, to reveal the violent rape by Mundt.
>
> What this means is that Mundt overstates the jury's hypothetical reaction when the psychological evidence that revealed Mundt's admission of kidnapping and murder of the child victim.  At the very first moment the jury heard these[] admissions, they had already deliberated and concluded that Mundt was guilty of

146

> kidnapping and murder. In other words, the jury had appropriately determined that Mundt was criminally responsible for the kidnapping and murder of the victim, even in the absence of step-by-step details about how the victim was transported from the rape scene to end up drowned in the well, covered over with sheet metal.
>
> In this context, learning about the particulars of Mundt's actions in the kidnapping and murder from the defense psychologists during the mitigation case would not have been a shocking and unanticipated revelation to the jury.

(Return, ECF No. 21, PageID 14453.) As the Warden points out, the jury had already found Mundt guilty—regardless if anyone else was involved.

Moreover, the Ohio Supreme Court addressed the fact that "McPherson and Heiden also gave testimony that was potentially valuable as mitigation." (ECF No. 7-5, PageID 2398.) The Ohio Supreme Court acknowledged that while there were disadvantages (along with advantages) to having McPherson and Heiden testify, presenting inconsistent or alternative theories that contradicted the trial phase theory was not deficient performance. (*Id.* at PageID 2399–2400 (citations omitted).) Notably, the Ohio Supreme Court focused on Dr. McPherson's diagnosis that Mundt suffered from "several psychological disorders, including borderline personality disorder." (*Id.*) The Ohio Supreme Court pointed out that McPherson found that the disorders were a result of an "unstable, abused childhood," which was "beyond Mundt's control." (*Id.*) Had defense counsel tried to avoid contradicting the trial phase theory by choosing not to present Dr. McPherson's testimony, the jury would not have heard this mitigating evidence. As the Warden highlights, "[w]here the jury was already convinced beyond a reasonable doubt that Mundt was responsible for the kidnapping and the murder of the victim, the defense psychological evidence linking Mundt's supposed unthinking and spontaneous knee-jerk

reactions to crises would have at least provided a plausible theory to mitigate Mundt's crimes." (Return, ECF No. 21, PageID 14453.)

Contradictory trial and penalty phase theories do not necessarily render trial counsel ineffective, where here, they had a reasonable strategy. Trial counsel presented valuable mitigating evidence, even if in contrast to the trial phase theory. Through Dr. McPherson's testimony, trial counsel presented to the jury a causal connection between Mundt's psychological disorders and the crimes, providing an explanation as to why he committed such acts—a sound trial strategy that is afforded deference. *Strickland*, 466 U.S. at 690–91 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); *Yarborough v. Gentry*, 540 U.S. 1 (2003) (citation omitted) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); *Hand v. Houk*, No. 2:07-cv-846, 2013 WL 2372180, at *50 (S.D. Ohio May 29, 2013) (Beckwith, J.) ("The defense theory, . . . although unsuccessful, was coherent and fit into the testimony of the witnesses. Thus, counsel made a 'strategic trial decision' in presenting the defense theory of mitigation, and such decision 'cannot be the basis for an ineffectiveness claim.'" (citation and internal quotation marks omitted)). Further, as noted above, trial counsel has wide latitude in deciding what mitigation witnesses to call to testify. *Gonzalez v. United States*, 553 U.S. 242, 249 (2008); *Frazier v. Jenkins*, 770 F.3d 485, 504 (6th Cir. 2014). The Ohio Supreme Court was not unreasonable in rejecting Mundt's assertions because its analysis comports with *Strickland* in finding that defense counsel did not perform deficiently.

The Ohio Supreme Court noted that "[e]ven if counsel's tactical choice did constitute deficient performance," Mundt failed to prove the prejudice prong. (ECF No. 7-5, PageID 2400.) The Ohio Supreme Court was not unreasonable in its application of *Strickland* in finding that Mundt was not prejudiced. Mundt maintains that offering the confessions during mitigation ruined his and his trial counsel's credibility. (Petition, ECF No. 63, PageID 15479–80, ¶¶ 343–49.) Noting that the change in strategy "must have created a bad impression in the jurors' minds," Mundt asserts that it is likely the jury was left feeling "angered or insulted by the incongruous case." (*Id.* at PageID 15479, ¶ 345.) It would be purely speculative to assume the outcome would have been different had trial counsel avoided presenting the confessions. The Ohio Supreme Court determined the same, noting that "[i]n view of the totality of the evidence, it seems improbable that this part of the defense argument changed any juror's opinion as to Mundt's guilt or McPherson's credibility." (ECF No. 7-5, PageID 2400–01.)

As detailed above, the jury had already convicted Mundt. Hearing about Mundt's confessions would not be such a drastic surprise to a jury panel who deliberated and found Mundt guilty beyond a reasonable doubt sufficient to support a finding that, but for counsel's deficient performance, any juror poised to recommend a sentence less than death had their mind changed in favor of death. Further, despite presenting inconsistent theories, trial counsel presented mitigating evidence through Dr. McPherson, who created a causal connection between Mundt's psychological disorders and crimes. For these reasons, the Ohio Supreme Court was not unreasonable when it concluded that "it is not likely that the outcome would have been otherwise but for counsel's inconsistent argument." (*Id.* at PageID 2401.)

Even if reasonable jurists could disagree and come to a different conclusion, the state court decision is afforded deference.  Because the Ohio Supreme Court decision denying this claim was not an unreasonable application of *Strickland*, the Undersigned necessarily concludes that relief is not warranted.

Accordingly, this claim should be **DISMISSED**.

As noted, a COA should not be issued unless a petitioner has shown that "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim or that the issue could be resolved in a different manner.  *Malone v. Warden*, No. 1:16-cv-1160, 2018 WL 722863, at *5 (S.D. Ohio Feb. 6, 2018) (Bowman, J.) (citing *Slack*, 529 U.S. at 484–85); *Berry v. Meintel/Warden*, No. 2:22-cv-2465, 2023 WL 3818582, at *12 (S.D. Ohio June 5, 2023) (Bowman, J.).  The Undersigned finds that reasonable jurists could resolve this claim in a different manner.  *Moody*, 958 F.3d at 488.  Accordingly, the Undersigned **RECOMMENDS** issuing a COA for this claim.

## IT IS THEREFORE RECOMMENDED THAT:

1.      Petitioner Mundt's claims be **DENIED** and his Petition be **DISMISSED with prejudice**.

2.      A certificate of appealability should issue on the following grounds for relief: **ONE**, **SEVEN**, **EIGHT**, and **TEN**.

## PROCEDURE ON OBJECTIONS:

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within **FOURTEEN** (14) days, file and serve on all parties' objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to the objections must be filed within **FOURTEEN** (14) days after being served with a

copy.  Fed. R. Civ. P. 72(b).

      The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

the magistrate judge's report and recommendation).  Even when timely objections are filed,

appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d

981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal. . . .") (citation

omitted).

      **IT IS SO RECOMMENDED.**

**DATED:**  April 29, 2024

                *s/Stephanie K. Bowman*
                **STEPHANIE K. BOWMAN**
                **United States Magistrate Judge**